UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHENMING HOLDINGS (HONG KONG) LIMITED, *a Hong Kong limited company,*<br><br>                  Plaintiff,<br><br>        -against-<br><br>JOHN DOES 1-10, individuals and/or entities whose names are currently unknown to Plaintiff,<br><br>           Defendants. | Civil Case No. 24-cv-935<br><br>**VERIFIED COMPLAINT AND JURY TRIAL DEMANDED** |

Plaintiff Chenming Holdings (Hong Kong) Limited ("Chenming" or "Plaintiff"), by and through its attorneys, King & Wood Mallesons LLP, as and for its Verified Complaint against Defendants John Does 1-10 (collectively "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    This is a civil action for conversion, unjust enrichment, fraudulent inducement, and conspiracy to defraud, arising under the laws of the State of New York.

2.    Plaintiff seeks relief under the laws of the State of New York, including equitable and monetary relief, punitive damages, costs, legal expenses and reasonable attorneys' fees, and all other appropriate relief to which it is entitled under law.

## PARTIES

3.    Chenming is a company organized under the laws of the Hong Kong Special Administrative Region ("Hong Kong") with its registered address at No. C, 16/F., Chinaweal Centre, 414-424 Jaffe Road, Wanchai, Hong Kong.

4.    The true name and capacity of Defendants are unknown to Plaintiff at this time. Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of

1

Union Pacific Capital 1 Ltd. ("UPC1"), Astor Asset Management 2 Limited ("Astor2"), Cornelius Vanderbilt Capital Management LTD ("Vanderbilt," together with UPC1 and Astor2, "Lenders").  Acting under the direction and on behalf of the Defendants, the Lenders entered into three separate loan transactions underlining the fraudulent scheme with Plaintiff.

5.      Upon information and belief, Defendants reside in or have their principal places of business in the following States: New York, California, North Carolina, and/or Georgia.

6.      Plaintiff reasonably believes that information obtained through discovery will lead to the identification of Defendants' true names, identities, and locations.  Plaintiff reserves its right to amend the Complaint upon ascertaining the identities of Defendants and the nature and extent of their involvement in the fraudulent scheme.

<u>**JURISDICTION AND VENUE**</u>

7.      Jurisdiction is proper in this Judicial District pursuant to 28 U.S.C. § 1332. Complete diversity exists in this action as Plaintiff is a Hong Kong company and Defendants are citizens and/or subjects of the States of New York, California, North Carolina, and/or Georgia. In addition, the amount in controversy exceeds $75,000.

8.      Venue in this Judicial District is proper under 28 U.S.C. § 1391(b).  Although the true identity of Defendants is unknown to Plaintiff at this time, Defendants, upon information and belief, may be found in this District, and/or a substantial part of the acts complained on herein occurred in this District.  Upon information and belief, personal jurisdiction in this District is also proper, because Defendants are the ultimate beneficiary owners of multiple bank accounts including, but not limited to, JPMorgan Chase Bank NA; Citibank, NA, New York; and Community Federal Savings Bank accounts, which are established within this District and Defendants, through the Lenders, directed Plaintiff to send deposits, interest, maintenance fees,

and/or custody fees in connection with the loan transactions to these bank accounts located in this District.

## **FACTUAL BACKGROUND**

9.      Between January 2020 and April 2021, Defendants, under the cover of separate shell companies, entered into three separate securities loan transactions with Plaintiff and loaned a sum of approximately $67.5 million ("Loans") to Plaintiff.

10.      Plaintiff is the shareholder of a public company Shandong Chenming Paper Holdings Limited ("ListCo"), whose shares are listed on the Shenzhen Stock Exchange and Hong Kong Stock Exchange.  To secure the Loans, Plaintiff provided 210,717,563 Class B shares and 153,414,000 Class H shares of the ListCo (200488:SZ; 01812:HK) as collateral ("Collateral") to the Loans.

11.      Upon information and belief, the Lenders executed the loan agreements under different fictitious names: Michael Romanoff (Astor2), Christopher Warner (Vanderbilt), Winstone Carrington (UPC1).  Plaintiff has never communicated with or met any individual with these names.  These fictitious names had never appeared in any communication between Plaintiff and the Lenders *prior to* the execution of the loan agreements, and have never appeared in any subsequent communications.

12.      Plaintiff diligently performed its obligations under the loan agreements, including by making payments of principal and interest as required, and "topping up" a substantial amount of additional shares of the ListCo as well as cash, following repeated threats by Lenders that the Collateral was subject to immediate forfeiture due to its alleged drop in market price and Lenders would declare Events of Default unless Plaintiff deposited additional shares or cash.

13.     On or about February 10, 2023, upon full repayment of the loan principal under the Astor2 Agreements (defined below), Plaintiff demanded that Astor2 return the shares provided to secure the Astor2 Loan pursuant to the parties' agreement.  Astor2, however, ignored Plaintiff's multiple requests in February and March 2023, and refused to return the shares or refund additional cash deposited by Plaintiff following Margin Calls[1].

14.     This was the first time Plaintiff realized that Lenders, acting under the direction of Defendants, never intended to return the Collateral to Plaintiff.

15.     By that time, however, Plaintiff had already substantially paid off the principal amount of the Vanderbilt Loan (defined below) and had been making regularly scheduled payments relating to the UPC1 Loan (defined below).

16.     Concerned about the security of the Collateral, Plaintiff withheld further repayments on the UPC1 and Vanderbilt Loans and demanded that UPC1 and Vanderbilt provide proof that the shares it deposited under the respective loan agreements remained safe in custody with the custodian broker appointed by the parties and reassurances that UPC1 and Vanderbilt intend to return the shares upon the full repayment of the UPC1 Loan and Vanderbilt Loan.

17.     UPC1 refused to disclose the whereabouts of the Collateral and refused to provide any reassurance.  Instead, UPC1 accused Plaintiff of breaching the UPC1 Agreement (defined below) by failing to make further repayments and used that as an excuse to issue notices of default against Plaintiff.  Vanderbilt, on the other hand, never responded to Plaintiff's requests.

---

[1] "Margin Calls" is defined in the Astor2 Agreements and requires Chenming to top up shares or cash equal to 20% more than the fair market price of the Collateral in the event the Collateral falls to less than 60% of its fair market price.

18.     Left with no choice, Plaintiff had to resort to other means to locate the Collateral, including by making an application to the High Court of Hong Kong, only to find out, to its complete surprise, that almost all of the shares had been fraudulently transferred or sold by Lenders shortly after they were deposited with the custodian broker.

19.     What is even more concerning is the fact that Lenders procured significant revenues—in amounts substantially higher than the face value of the Loans—from the fraudulent sale of the Collateral.  Nonetheless, Lenders and Defendants intentionally withheld these facts and relentlessly demanded repayments and additional deposits from Plaintiff.

20.     This action therefore involves a carefully designed scheme by Defendants to enter into sham loan transactions with Plaintiff under the cover of separate shell companies, and fabricate defaults by Plaintiff under the loan agreements, in order to ultimately take possession and control of the Collateral and deprive Plaintiff of its rights to and interest in the same.

### The Astor2 Agreements

21.     On January 17 and September 17, 2020, Plaintiff entered into two Stock Loan Agreements ("Astor2 Agreements") with Astor2, pursuant to which Astor2 agreed to loan Plaintiff up to $35,000,000 ("Astor2 Loan").  The agreements are governed by Hong Kong law.

22.     To secure the Astor2 Loan, Plaintiff provided 110,000,000 Class B shares of the ListCo under the first agreement ("Astor2 B Shares Agreement"), and 95,000,000 Class H shares of the ListCo under the second agreement ("Astor2 H Shares Agreement").  The value of the Class B and H shares provided to Astor2, based on their trading prices at the time the shares were deposited with the custodian broker, was approximately $88,662,546.86.

23.     Plaintiff also entered into two Custodian Management Agreements and deposited those shares with a custodian broker designated by Astor2, i.e., Weiser Global Capital Markets,

an entity registered in Bahamas ("Weiser"). Because Weiser was not a qualified holder of B or H shares, it in turn appointed China Merchants Securities (HK) Co., Ltd ("CMS") and ICBC International Securities Limited ("ICBCI"), who are qualified holders, as custodians. Weiser subsequently opened accounts with CMS and ICBCI and instructed Chenming to deposit shares into these accounts.

24.    A person with the name "Michael Romanoff" whose title appears to be "Managing Member" signed the agreements on behalf of Astor2. Plaintiff had never heard of or met this person prior to the signing of the Astor2 Agreements and has never received any communication from this person.

25.    Plaintiff drew a total of $40,292,899.39 in loan principal under the Astor2 Agreements, consisting of $15,593,873.64 under the Astor2 B Shares Agreement and $24,699,025.75 under the Astor2 H Shares Agreement.

26.    On or about May 9, 2022, Astor2 issued a Margin Call Notice, demanding Chenming to deposit additional shares and cash. On or about May 15, 2022, Chenming proposed full repayment of the Astor2 Loan in exchange for the return of the Collateral. Astor2 declined Chenming's proposal.

27.    On or about May 19, 2022, pressed by Astor2's threats to forfeit the Collateral, Plaintiff deposited additional cash in the amount of $8,105,800 and $7,866,000 as further security under the Astor2 B Shares Agreement and Astor2 H Shares Agreement, respectively, into the bank account designated by Astor2.

28.    Between January and April 2023, Astor2 intentionally and fraudulently induced Plaintiff to make full repayment on the Astor2 Loan by repeatedly reassuring Plaintiff that it would ask its "loan committee" to approve and "swift[ly]" process the return of the Collateral

upon the full satisfaction of all loan amounts.  Relying on these promises, Plaintiff fully repaid the Astor2 Loan funds on February 10, 2023.  However, Astor2 repeatedly invented new excuses to delay the return of the Collateral, such as that the weekly loan committee meeting did not take place.  On April 17, 2023, Astor2 issued a letter notifying Plaintiff that its "loan committee" decided to reject Plaintiff's request for the return of the shares and declare the immediate acceleration of the loan, and considered the "filed closed."

29.     Plaintiff was outraged and devastated.  As explained *supra*, Plaintiff had fully repaid the Astor2 Loan by February 2023.  Specifically, in addition to paying off the loan principal, Plaintiff made interest and fee payments on the Astor2 Loan in the following amounts: (a) $2,178,386.31 in interest, $116,992.56 as maintenance fees, $243,174.00 as custody fees, $864,465.90 as origination fees, and $1,000 in legal expenses under the Astor2 B Shares Agreement; and (b) $1,312,023.79 in interest, $136,329.52 as maintenance fees, $281,867.59 as custody fees, $486,348.00 as origination fees, and $1,000 in legal expenses under the Astor2 H Shares Agreement.

30.     Astor2 directed Plaintiff to send payments to the following bank accounts in this District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Bank: Citibank, NA, New York
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> Sierra Universal Corp
> 5830 E. 2nd Street, Ste. 7000 #2419 Casper, WY 82609
> Bank: JPM Chase
> Beneficiary Account Number: 675179672
> Beneficiary Bank: JPM Chase
> Beneficiary Bank Address: 270 Park Ave 31st Floor, New York, NY 10017, United States

Beneficiary Bank ABA: 021000021
Beneficiary Bank SWIFT: CHASUS33XXX

31.    To date, Astor2 has refused to return the shares and the additional deposits.

**The UPC1 Agreement**

32.    On October 19, 2020, Plaintiff and UPC1 entered into a Securities Loan Agreement ("UPC1 Agreement")[2]. Pursuant to the UPC1 Agreement, UPC1 agreed to loan Plaintiff up to $17,000,000.00 ("UPC1 Loan"). The UPC1 Agreement is governed by the laws of England & Wales.

33.    A person with the name "Winstone Carrington" whose title appears to be "Senior Vice President" signed the UPC1 Agreement on behalf of UPC1. Plaintiff had never heard of or met this person prior to the signing of the UPC1 Agreement and has never received any communication from this person.

34.    UPC1 loaned Plaintiff $14,674,492.77 under the UPC1 Agreement. To secure the loan, Plaintiff provided a total of 80,000,000 Class B shares of the ListCo and deposited the same with the same custodian broker Weiser pursuant to a similar Custodian Management Agreement. The value of the Class B shares, based on their trading prices at the time the shares were deposited with the custodian broker, was approximately $31,729,653.04.

35.    Plaintiff had been making regular and timely payments on the UPC1 Loan until around April 2023, when it discovered the fraudulent scheme by Defendants. As of the end of 2023, Plaintiff had paid off $2,037,307.53 in loan principal, plus $992,651.36 in interest,

―――――――――――――――――――

[2] The UPC1 Agreement was dated September 18, 2020, but it was executed by Chenming on October 19, 2020.

8

$122,760.00 as maintenance fees, $371,372.64 as custody fees, $440,234.79 in loan generation

fees, and $5,000 in closing costs.

36.    UPC1 directed Plaintiff to send payments to the following bank accounts in this

District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> UPC Holdings Ltd.
> 155 E. 44th Street
> New York, NY 10017, USA
> Bank: Community Federal Savings Bank
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: 822000317861
> Beneficiary bank SWIFT: CMFGUS33
>
> Lviv Estate Holdings Ltd
> 142 Gold Springs Ct
> Canton, GA 30114, USA
> Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: 727275510
> Beneficiary bank SWIFT: CHASUS33

37.    In or around early May 2023, Plaintiff began to investigate into the whereabouts

of the B Shares provided as collateral under UPC1 Agreement.  Plaintiff requested the complete

transaction records held by the shareholders of those shares from China Securities Depository

and Clearing Co. Ltd., a central securities depository.  Based on the records disclosed by the

central depository, Plaintiff was unable to identify accounts that could possibly hold the 80

million shares.

38.    Concerned about the security of the shares, Plaintiff wrote to UPC1 on May 5, 2023, seeking disclosure of the whereabouts of the shares and proposing a conference call with UPC1.  Several hours later, UPC1 sent Plaintiff a Margin Call Notice purportedly pursuant to the drop of the share price, demanding additional shares or cash as further security, but otherwise refused to disclose the whereabouts of the shares or hold a conference call with Plaintiff.

**The Vanderbilt Agreement**

39.    On April 17, 2021, Plaintiff entered into a Collateralized Securities Loan Agreement ("Vanderbilt Agreement")[3] with Vanderbilt, pursuant to which Vanderbilt agreed to loan Plaintiff up to $45,000,000 ("Vanderbilt Loan").  The Vanderbilt Agreement is governed by Singapore law.

40.    A person with the name "Christopher Warner" whose title appears to be "Executive Vice President" signed the agreement on behalf of Vanderbilt.  Plaintiff had never heard of or met this person prior to the signing of the Vanderbilt Agreement and has never received any communication from this person.

41.    Vanderbilt issued $12,572,187.35 in loan funds to Plaintiff.  To secure the Vanderbilt Loan, Plaintiff pledged 58,414,000 Class H shares of the ListCo and deposited the same with Weiser as the custodian broker, pursuant to a similar Custodian Management Agreement.

42.    In response to Margin Call Notices issued by Vanderbilt on August 2, 2021 and June 16, 2022, Plaintiff deposited additional cash in the amount of $5,640,000 and $5,851,421.50, respectively, as further security to the Vanderbilt Loan.  In or around February

_____

[3] The Vanderbilt Agreement was dated April 12, 2021.

2023, Plaintiff further deposited an additional 20,717,563 shares of Class B stock of the ListCo

with another broker appointed by Vanderbilt, Armira Capital Limited, pursuant to a separate

Custodian Management Agreement.  The value of the Class B and H shares provided to

Vanderbilt, based on their trading prices at the time the shares were deposited with the custodian

broker, was approximately $48,594,383.04.

43.    As of April 2023, Plaintiff has paid off $6,150,327.92 in loan principal and the

following amounts in interest and fees: $439,614.77 in interest, $62,860.94 as maintenance fees,

$182,602.45 as custody fees, $408,596.09 in loan generation fees, and $5,000 in closing costs.

44.    Vanderbilt directed Plaintiff to send payments to the following bank accounts in

this District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: 856519621
> Beneficiary Bank SWIFT: CHASEUS33
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: Community Federal Savings
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: 822000321912
> Beneficiary Bank SWIFT: CMFGUS33

45.    Moreover, the value of the additional cash and shares deposited by Plaintiff in

June 2022 far exceeds the outstanding amount of the Vanderbilt Loan. Vanderbilt continues to

withhold these substantial assets, including $5,851,421.50 in cash, and refuses to return the same to Plaintiff in accordance with the Vanderbilt Agreement.

**<u>UPC1 Further Impedes Plaintiff's Efforts to Recover the Collateral by Filing Arbitration</u>**

46.     On or about June 14, 2023, UPC1 commenced arbitration proceedings in the London Court of International Arbitration ("LCIA") against Plaintiff, seeking declaratory judgment and damages for alleged disparaging statements made by Plaintiff, among other things ("LCIA Arbitration"), even though UPC1's remedy under the agreement is strictly limited. Section 4.2 of the UPC1 Agreement provides:

> Limited Recourse. Lender's sole recourse for nonpayment of the Loan is the Collateral and *Lender shall make no claim against Borrower* or any affiliate, successor, or assign of Borrower ("Borrower's Affiliates") or institute any litigation or claim (however described) against Borrower or any of Borrower's Affiliates in the event the value of the Collateral is insufficient to cover amounts due Lender hereunder.

*See* UPC1 Agreement § 4.2.

47.     The LCIA Arbitration is but another concerted attempt by the Lenders and Defendants to further their fraudulent scheme and delay Plaintiff's efforts in recovering the Collateral.  The alleged "disparaging statements" UPC1 complained of are those statements in Plaintiff's demand letters that UPC1 has unreasonably refused to disclose the whereabouts of the shares and fraudulently disposed of the same in violation of the UPC1 Agreement.  Those statements are accurate and true.

48.     Plaintiff asserted counterclaims, seeking redemption of the UPC1 Collateral, or, in the alternative, monetary damages equal to the difference between the value of the shares provided to UPC1 and the face value of the UPC1 Loan, as at the date of the appropriation of the Collateral or the Award, and the return of paid interests and fees.

49.    On August 17, 2023, UPC1 suddenly changed its position and revised the estimated value of its claims in the arbitration from $264,423,911.01 to $1.00. The explanation offered by UPC1 was that it decided to lower the amount of its claimed damages "based solely upon the par value of the shares pledge by the [Plaintiff] as collateral for the loan" and "given the shares have no par value, this claim should now be valued as a nominal amount of $1.00 USD."

50.    On October 31, 2023, UPC1 changed course again by further adjusting the amount of its claims. Among other things, UPC1 claimed for forfeiture of the Collateral and monetary damages in the amount of $1,000,000.

51.    Remarkably, UPC1 has resisted discovery in the LCIA Arbitration, including by refusing to produce any fact witness. Although the tribunal has ordered the parties to complete document production by June 2024, it is doubtful whether and to what extent UPC1 would obey in view of how it conducted itself throughout and the tactics it has employed in the arbitration.

52.    This action is therefore imperative and, the only viable alternative, for Plaintiff to discover the true identity of the fraudulent actors behind the so-called Lenders.

### Further Evidence of Defendants' Fraudulent Scheme

53.    In July 2023, Plaintiff made an application before the High Court of Hong Kong, seeking a Norwich Pharmacal Order requiring non-party disclosures from the two custodian banks CMS and ICBCI regarding the transaction documents of the accounts that received the Collateral under the Loan Agreements.

54.    On October 4, 2023, CMS and ICBCI disclosed certain transaction documents to Plaintiff upon the orders by the High Court of Hong Kong. Plaintiff's suspicion and concern regarding the fraudulent scheme was further corroborated by the disclosures it received, which

conspicuously show that Defendants began transferring or trading the pledged shares shortly after the shares were deposited and *before* the occurrence of any Event of Default.

55.    The disclosures indicate that the first share transfer by Astor2 occurred on May 15, 2020, merely 38 days after the shares were deposited, when it transferred 5,000,000 Class B shares to DBS Vickers Securities.  By no later than December 8, 2020, Astor2 had fraudulently sold or transferred the entirety of 110,000,000 Class B shares that were deposited as Collateral. By no later than January 27, 2021, Astor2 had fraudulently sold or transferred the entirety of the 95,000,000 Class H shares that were deposited as Collateral.

56.    In the case of UPC1, by January 21, 2021, it had transferred or sold the entirety of the 80,000,000 Class B shares that were deposited as Collateral on November 27, 2020 and January 7, 2021.

57.    As to Vanderbilt, by August 4, 2021, it had transferred or sold 58,414,000 Class H shares that were deposited as Collateral.  Upon information and belief, 414,000 Class H shares were and may remain in the custody of Weiser, and 20,717,563 Class B shares, valued at approximately $6,561,884.58, were and may remain in the custody of Amira Capital Limited.

58.    Upon information and belief, all of these transfers and sales were carried out unilaterally and fraudulently by the Lenders, pursuant to instructions by Defendants, without Plaintiff's knowledge or consent and without or prior to any purported breach by Plaintiff under the Loan Agreements.

59.    Significantly, Lenders and Defendants procured a tremendous amount of proceeds from the unauthorized fraudulent sale of the shares, totaling HK$540,983,978.63, approximately $69,280,000, by trading a total of 185,000,000 Class B shares.  The remaining 5,000,000 Class B

shares, valued at approximately $1,812,903.23, have been transferred to a third-party custodian (DBS Vickers Securities).

60.      Moreover, Lenders and Defendants received HK$321,027,564.16, approximately over $41,110,000 in proceeds, by trading a total of 77,462,000 Class H shares.  They have further transferred 75,538,000 Class H shares, valued at approximately $47,204,452.82,[4] to third-party custodians Citibank, Zundiao Securities Limited, and Fidelity Clearing Canada.

## **Plaintiff Discovers the Relationship among the Lenders**

61.      Upon information and belief, all three Lenders are closely affiliated, owned, and controlled by the same Defendants and used as instruments of Defendants' fraudulent scheme.

### *Astor2 and UPC1 Are Represented by the Same U.S. Law Firm*

62.      In relation to the Astor2 Loan, in or around January 2023, Astor2 directed Plaintiff to send loan payments to its law firm's "client escrow account," the name of that law firm is Jurist IQ Corp ("Jurist IQ").  Jurist IQ has a New York-based business address at 530 Fifth Ave, 9th Floor, New York, NY 10036.

63.      On August 17, 2023, the same law firm Jurist IQ served a demand letter on Plaintiff on behalf of UPC1 demanding the return of loan funds under the UPC1 Agreement.

64.      More recently, in the LCIA Arbitration commenced by UPC1 against Plaintiff, UPC1's counsel, Fred W. Freitag IV, Esq., submitted a letter from Jurist IQ confirming Jurist IQ's payment of the deposit of arbitration fees on behalf of UPC1.  In that letter, Jurist IQ explicitly stated that it "regularly acts as general counsel for UPC."  Based on information

---

[4] The average share price was calculated by dividing total value of the Class H shares deposited by the total number of Class H shares deposited under each agreement.

published by the Disciplinary Board of the Supreme Court of Pennsylvania,[5] Mr. Freitag is an active member of the State Bar of Pennsylvania with a business address at 1041 Applejack Drive, Gibsonia, PA 15044.

65.    Moreover, on October 19, 2023, in his communication with the LCIA, Mr. Freitag inadvertently attached documents from what appears to be another arbitration concerning a similar loan dispute, where Astor Asset Management 1 Limited ("Astor1") was the claimant. Upon information and belief, Astor1and Astor2 are affiliated entities.  Mr. Freitag represents both Astor entities.

66.    Astor2 is established under the laws of St Kitts & Nevis whereas UPC1 is established under the laws of Belize.  Neither Lender has any apparent connection with the United States.  The fact that they are represented by the same U.S.-based law firms in separate transactions and/or arbitration proceedings governed by different foreign laws indicates that the individuals or entities behind the Lenders reside or are located in the United States.

*UPC1 and Vanderbilt*

67.    On or about May 5, 2023, Plaintiff received an email from UPC1 with an attachment titled "Vanderbilt Chenming MOU Addendum – May 3, 2023 – 6-42 PM.pdf."  The document, however, is an addendum to the UPC1 Agreement and does not concern Vanderbilt.

_____

[5] On June 28, 2019, Mr. Freitag received a Public Reprimand from the Disciplinary Board of the Supreme Court of Pennsylvania, for engaging in professional misconduct by failing to segregate client-entrusted funds and personal funds and misappropriating client funds.  The Disciplinary Board also found that Mr. Freitag "has a substantial history of professional discipline," which constitutes "an aggregating factor" warranting a Public Reprimand.  *See* DB Order No. 188 DB 2017, available at https://www.pacourts.us/assets/opinions/DisciplinaryBoard/out/188DB2017-Freitag.pdf (last visited November 29, 2023).

This further confirms Plaintiff's belief that all three Lenders are affiliated and controlled by the same Defendants.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Fraud in the Inducement**
(Against All Defendants)

68.    Plaintiff repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.    Plaintiff executed the Loan Agreements and delivered the Collateral in reliance on material misrepresentations by Defendants, including material misrepresentations made through Lenders, that they would return the Collateral to Plaintiff upon full repayment of the Loan funds.

70.    Those material misrepresentations and false promises are distinct and separate from UPC1's, Astor2's, and Vanderbilt's representations or obligations under the separate Loan Agreements.

71.    Defendants intentionally made those misrepresentations and false promises designed to induce Plaintiff to enter into the Loan Agreements and to deliver the Collateral to and for the benefit of Defendants.

72.    Defendants acted with scienter by making knowingly false representations and promises that they would return the Collateral upon Plaintiff's performance of its obligations under the Loan Agreements, when in fact they had no intention, from day one, of honoring these false representations and promises.  Defendants made the material misrepresentations and false promises as part of a fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral.

73.     Plaintiff had no reason to doubt the truthfulness of Defendants' false representations and promises about their intention to return the Collateral upon Plaintiff's performance of its contractual obligations.

74.     Plaintiff relied to its detriment on those material misrepresentations and false promises by entering into the Loan Agreements and delivering the Collateral to Defendants.

75.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

76.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fraud
(Against All Defendants)

77.     Plaintiff repeats and realleges paragraphs 1 through 76 as if fully set forth herein.

78.     Defendants imposed upon Plaintiff a fraudulent scheme, with concerted efforts from Lenders, by intentionally and falsely representing to Plaintiff that they were willing to provide financing to Plaintiff in exchange for Plaintiff's execution of Loan Agreements and delivery of the Collateral as security under the Loans.

79.     Upon information and belief, Defendants never intended to provide financing to Plaintiff. Their plan all along was to keep the Collateral for themselves and make profits by trading the Collateral, while requiring Plaintiff to repay the Loan principal and interest in full.

80.     Following the execution of the Loan Agreements, Defendants repeatedly threatened to forfeit the Collateral by manufacturing Events of Default and pressured Plaintiff into depositing additional shares and cash as security under the agreements. While Plaintiff

reluctantly obliged, due to fear of forfeiture of the Collateral, Defendants secretly and fraudulently transferred and sold a majority of the Collateral, in some cases immediately after they were deposited and in most cases before the occurrence of any alleged default had occurred.

81.    Defendants exerted enormous economic gain in trading the Collateral. Nonetheless, it continued to require Plaintiff to pay off the Loan principal and interest by knowingly and deliberately misrepresenting to Plaintiff that they were prepared to return the Collateral upon full payment of the Loans.  They never intended to return the Collateral.  In fact, they *cannot* return the Collateral, because a significant majority of the shares have already been disposed of by the Defendants.

82.    Defendants' scheme was successful.  Relying on their material misstatements, Plaintiff entered into the Loan Agreements, delivered the Collateral, deposited additional shares and cash, and paid off the entirety of the principal of the Astor2 Loan and a significant portion of the principal of the UPC1 and Vanderbilt Loans.

83.    To this date, Defendants continue to refuse to return the Collateral to Plaintiff.

84.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

85.    Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Conspiracy to Defraud
(Against All Defendants)

86.    Plaintiff repeats and realleges paragraphs 1 through 85 as if fully set forth herein.

87.     Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of Lenders UPC1, Astor2, and Vanderbilt.

88.     Further, upon information and belief, Defendants are the beneficiary owners of various bank accounts (described *supra* in paragraphs 30, 36 and 44), which received deposits and payments from Plaintiff.

89.     Defendants made an agreement and conspired with Lenders to fraudulently induce Plaintiff to enter into sham loan transactions with Lenders, by wrongfully exercising dominion over and taking possession of the Collateral, among other things, Defendants acted in furtherance of the fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral.

90.     Defendants knowingly and voluntarily participated in the fraudulent scheme, by fraudulently, including through Lenders, inducing Plaintiff into signing the Loan Agreements and Custodian Management Agreements.

91.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

92.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Conversion
(Against All Defendants)

93.     Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

94.     Plaintiff is the legal owner of the Collateral, which is a specific identifiable property.  Plaintiff had ownership, possession and control over the Collateral before its conversion by Defendants.

95.     Defendants exercised an unauthorized dominion over the Collateral to the exclusion of Plaintiff's rights and deprived Plaintiff of its interest in the same, by, among other things, refusing to return the Collateral and coercing Plaintiff into forfeiting the same through wrongfully manufacturing an Event of Default under the Loan Agreements.

96.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment
(Against Defendants)

97.     Plaintiff repeats and realleges paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants have wrongfully and unjustly been enriched through its exercise of unauthorized dominion over the Collateral, by, among other things, refusing to return the Collateral to Plaintiff and fraudulently transferring and selling the Collateral for their own financial gain.

99.     As alleged herein, Plaintiff has conferred a benefit upon Defendants and Defendants have obtained and retained such benefit without adequately compensating Plaintiff. It is against equity and good conscience to permit Defendants to retain the benefit.

100.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chenming demands judgment in its favor against Defendants as follows:

A. As to the First, Second and Third Causes of Action, awarding Plaintiff compensatory and punitive damages against Defendants, including interest thereon, in an amount to be determined at trial, but in any event not less than $121,697,216.41;

B. As to the Fourth Cause of Action, permanently enjoining and restraining all Defendants, their agents, servants, employees, representatives, and all persons acting in concert or participating with Defendants or any one of them, from further trading, transferring, or otherwise disposing of the Collateral;

C. As to the Fourth and Fifth Causes of Action, ordering all Defendants to immediately return the Collateral to Plaintiff or, to the extent the Collateral is no longer retrievable, awarding Plaintiff compensatory and punitive damages against all Defendants, including interest thereon, in an amount to be determined at trial, but in any event, not less than $121,697,216.41;

D. As to the First, Second, and Fifth Causes of Action, ordering Defendants to disgorge any proceeds and profits procured from wrongfully transferring, selling, and trading the Collateral, in an amount to be determined at trial, but in any event, not less than $121,697,216.41;

E. As to all Causes of Action, awarding Plaintiff its costs, legal expenses, and reasonable attorneys' fees incurred in connection with this action; and

F. As to all Causes of Action, awarding Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.


Dated:  New York, New York
        February 8, 2024

                              Respectfully submitted,
                              KING & WOOD MALLESONS LLP

                              By:    /s/ Vincent Filardo, Jr.
                                    Vincent Filardo, Jr.
                                    Aaron T. Wolfson
                                    500 Fifth Avenue, 50th Floor
                                    New York, NY 10110
                                    (212) 319-4755
                                    vincent.filardo@us.kwm.com
                                    aaron.wolfson@us.kwm.com

## VERIFICATION

| | | |
|---|---|---|
| SHANDONG PROVINCE | ) | |
| | | ) ss.: |
| PEOPLE'S REPUBLIC OF CHINA | ) | |

Zheng Chunxing, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I am an employee of Chenming Holdings Co., Ltd., Plaintiff Chenming Holdings (Hong Kong) Limited's sole shareholder, in the above captioned case and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information and documents kept by Plaintiff in the ordinary course of business, and I believe them to be true.

_____

Zheng Chunxing

Chenming Holdings (Hong Kong) Limited

24