UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHENMING HOLDINGS (HONG KONG)
LIMITED, *a Hong Kong limited company*,

                          Plaintiff,

               -against-

Val Sklarov, Tetyana Sklarov, Jaitegh "JT" Singh,
Jurist IQ Corp, Sierra Universal Corp, UPC
Holdings Ltd, Lviv Estate Holdings Ltd, C
Vanderbilt Management Ltd.,

                       Defendants.

Civil Case No. 24-cv-935

**VERIFIED AMENDED
COMPLAINT AND JURY TRIAL
DEMANDED**

 

Plaintiff Chenming Holdings (Hong Kong) Limited ("Chenming" or "Plaintiff"), by and through its attorneys, King & Wood Mallesons LLP, as and for its Verified Amended Complaint against Defendants Val Sklarov, Tetyana Sklarov, Jaitegh "JT" Singh (together with Val Sklarov and Tetyana Sklarov, the "Individual Defendants"), Jurist IQ Corp, Sierra Universal Corp, UPC Holdings Ltd, Lviv Estate Holdings Ltd, and C Vanderbilt Management Ltd. (collectively, "Corporate Defendants") (together with Individual Defendants, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     This is a civil action asserting claims for fraud, fraud in the inducement, conspiracy to defraud, aiding and abetting fraud, conversion, conspiracy to commit fraud, and unjust enrichment arising under the laws of the State of New York.

2.     Plaintiff seeks relief under the laws of the State of New York, including equitable and monetary relief, punitive damages, costs, legal expenses and reasonable attorneys' fees, and all other appropriate relief to which it is entitled under law.

1

## PARTIES

3.       Chenming is a company organized under the laws of the Hong Kong Special

Administrative Region ("Hong Kong") with its registered address at No. C, 16/F., Chinaweal

Centre, 414-424 Jaffe Road, Wanchai, Hong Kong.

4.       Upon information and belief, Defendant Val Sklarov is a natural person and

United States citizen, residing at 142 Gold Springs Court, Canton, Georgia 30114 and/or in

Chicago, Illinois.  He is the sole shareholder and ultimate beneficiary owner of both Defendants

UPC Holdings Ltd and C Vanderbilt Management Ltd.

5.       Upon information and belief, Defendant Tetyana Sklarov is the wife of Defendant

Val Sklarov and resides with him.

6.       Upon information and belief, Defendant Jaitegh "JT" Singh is a registered New

York attorney, the proprietor of Singh Law Firm, P.A. with offices in New York and Miami, and

the Chief Executive Officer ("CEO") of Defendant Juris IQ Corp.

7.       Upon information and belief, Defendant Jurist IQ Corp ("Jurist IQ") is a domestic

business corporation organized under the laws of the State of New York, with its principal

address located at 530 Fifth Ave, 9th Floor, New York, NY 10036.

8.       Upon information and belief, Defendant Sierra Universal Corp ("SUC") is a

corporation organized under the laws of the State of Wyoming, with its principal address located

at 5830 E 2nd St, STE 7000 #2419, Casper, WY 82609.

9.       Upon information and belief, Defendant UPC Holdings Ltd ("UPCH") is a

corporation organized under the laws of the State of New York.  Its principal place of business is

located at 155 E 44th Street, New York, New York 10017.

10.       Upon information and belief, Defendant Lviv Estate Holdings Ltd ("Lviv") is a

2

domestic business corporation organized under the laws of the State of New York, with its

principal place of business located at 142 Gold Springs Ct, Canton, GA30114-6333, which is

also Defendant Val Sklarov's home address.

11.    Upon information and belief, Defendant C Vanderbilt Management Ltd. ("CVM")

is a corporation organized under the laws of the State of New York with its principal place of

business located at 600 Broadway, Albany, New York 12207.

## JURISDICTION AND VENUE

12.    Jurisdiction is proper in this Judicial District pursuant to 28 U.S.C. § 1332.

Complete diversity exists in this action because Plaintiff is a Hong Kong company and

Defendants are citizens and/or subjects of the States of New York, Georgia, Illinois, or

Wyoming.  The amount in controversy exceeds $75,000.

13.    Personal jurisdiction exists over Defendants because, among other things, Jaitegh

Singh, Jurist IQ, UPCH, Lviv, and CVM either reside in, were incorporated in, and/or have their

principal places of business in this district.

14.    Personal jurisdiction exists over Defendants Val Sklarov and Tetyana Sklarov

pursuant to New York's long-arm statute CPLR 302(a)(2) based upon, among other things, (i)

their conspiracy to commit and commission of tortious acts within the State of New York, (ii)

they established Defendants UPCH, Lviv, and CVM, all of which are domestic New York

corporations, and (iii) they opened several bank accounts in this district which were used to

advance the conspiracy to defraud Plaintiff.

15.    Personal jurisdiction exists over Defendant SUC pursuant to CPLR 302(a)(2)

because, among other things, it participated, along with the other Defendants, in a conspiracy to

defraud Plaintiff, and committed overt acts in furtherance of the conspiracy within the State of

3

New York as alleged herein.

16.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts complained of herein occurred in this district, including but not limited to: (i) the Individual Defendants established Defendants UPCH and Lviv in or about March 2021 in this district shortly after they induced Plaintiff to enter into the UPC1 Agreement (defined hereinafter); (ii) the Individual Defendants established Defendant CVM in or about November 2021 in this district shortly after they induced Plaintiff to enter into the Vanderbilt Agreement (defined hereinafter); and (iii) Defendants are the ultimate beneficiaries of multiple bank accounts located at Chase, Citi, and CFSB, which were established in this district and Defendants, through the Lenders (defined hereinafter), directed Plaintiff to send deposits, interest, so-called maintenance fees and/or custody fees, purportedly in connection with the loan transactions to the bank accounts located in this district.

## FACTUAL BACKGROUND

### A. Interrelationships Between the Defendants

17.     Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of the three lenders Union Pacific Capital 1 Ltd. ("UPC1"), Astor Asset Management 2 Limited ("Astor2"), Cornelius Vanderbilt Capital Management LTD ("Vanderbilt," together with UPC1 and Astor2, the "Lenders").  Acting under the direction and on behalf of Defendants, the Lenders entered into three separate loan transactions intended to facilitate the fraudulent scheme directed at Plaintiff.

18.     Upon information and belief, Individual Defendants Val Sklarov, Tetyana Sklarov, and Jaitegh Singh, exercise dominion and control over the Corporate Defendants as well as the Lenders, disregard the corporate form of those entities to such an extent that the

independent existence of those entities should be disregarded, and the corporate veil pierced rendering the Individual Defendants personally liable for any acts purportedly undertaken through those corporate entities.

19.     Upon information and belief, Defendant Val Sklarov is the sole shareholder and ultimate beneficial owner of Defendants UPCH and CVM.  UPCH and CVM in turn are the beneficiaries of record for two New York based Community Federal Savings Bank ("CFSB") accounts ███████7861 and ████████1912, respectively, which were used by the Lenders to receive payments from Plaintiff.  Defendant Val Sklarov is the individual authorized to manage both CFSB accounts.

20.     Upon information and belief, Defendant Tetyana Sklarov is the President of Defendants SUC and Lviv.  She applied to open bank accounts on behalf of these two Defendants, namely, (i) the JPMorgan Chase Bank N.A. ("Chase") account ████9672 for SUC, which was used by Lender Astor2 to receive payments from Plaintiff; and (ii) Chase account ████5510 for Lviv, which was used by Lender UPC1 to receive payments from Plaintiff.

21.     Upon information and belief, Defendant Jaitegh Singh's law firm Singh Law Firm, P.A. engaged in financial transactions through the Chase account ████9621 and CFSB account ███████1912, both of which were used by Lender Vanderbilt to receive payments from Plaintiff.

22.     Upon information and belief, Defendant Jurist IQ was incorporated on January 7, 2021, shortly after Plaintiff entered into the Astor2 and UPC1 loan transactions.  Lender Astor2 maintains a "client escrow account" or Interest on Lawyers' Trust Account ("IOLTA") with Jurist IQ.  Jurist IQ represented Lender UPC1 in the transaction with Plaintiff and serves as "general counsel" for UPC1.  Defendant Jaitegh Singh is the CEO of Defendant Jurist IQ.  Jurist

IQ engaged in financial transactions through the Citibank, N.A. ("Citi") account █████0089 that was used by all three Lenders to receive payments from Plaintiff.

23.    Upon information and belief, Defendant Tetyana Sklarov is the President, Director, Treasurer, and Secretary of the SUC.  She, along with the two other Individual Defendants, organized and established Defendant SUC on October 13, 2020—only one month after Lender Astor2 induced Plaintiff to enter the second fraudulent stock loan transaction—and was administratively dissolved on December 9, 2023.  Defendant SUC is the beneficiary of record for the Chase account █████9672, which was opened by Defendants Jaitegh Singh and Tetyana Sklarov, and was used by Lender Astor2 to receive payments from Plaintiff.  The same Chase account was used for financial transactions in connection with another Chase account █████9621 that was used by Lender Vanderbilt to receive payments from Plaintiff.

24.    Upon information and belief, Defendant UPCH was incorporated on March 1, 2021, only five months after Lender UPC1 induced Plaintiff to enter the UPC1 Agreement and provide the collateral stock.  UPCH is the beneficiary of record for the CFSB account █████7861 that was used by Lender UPC1 to receive payments from Plaintiff.

25.    Upon information and belief, Defendant Lviv was incorporated on March 29, 2021, in the same month Defendant UPCH was incorporated.  It is the beneficiary of record for the Chase account █████5510 that was opened by Defendants Jaitegh Singh and Tetyana Sklarov, and was used by Lender UPC1 to receive payments from Plaintiff.

26.    Upon information and belief, Defendant CVM was incorporated on November 11, 2021.  It is the beneficiary of record for Chase account █████9621 and CFSB account █████1912.  Both bank accounts were opened by Defendant Jaitegh Singh and were used by Lender Vanderbilt to receive payments from Plaintiff.  The CFSB account was used for financial

transactions with Defendant Jaitegh Singh's law firm Singh Law Firm P.A.

**B. Defendants' Fraudulent Scheme**

27.     Between January 2020 and April 2021, Defendants, under the cover of separate

shell companies, entered into three separate securities loan transactions with Plaintiff ("Loans").

28.     Plaintiff is the shareholder of the public company Shandong Chenming Paper

Holdings Limited ("ListCo"), whose shares are listed on the Shenzhen Stock Exchange and

Hong Kong Stock Exchange.  To secure the Loans, Plaintiff provided 210,717,563 Class B

shares and 153,414,000 Class H shares of the ListCo (200488:SZ; 01812:HK) as collateral

("Collateral Shares") to the Loans.

29.     Upon information and belief, the Lenders executed the loan agreements under

different fictitious names: Michael Romanoff (for Astor2), Christopher Warner (for Vanderbilt),

Winstone Carrington (for UPC1).  Plaintiff has never communicated with nor met any individual

with these names.  These fictitious names had never appeared in any communication between

Plaintiff and the Lenders *prior to* the execution of the loan agreements and have never appeared

in any subsequent communications.  These fictitious names do not appear in any account

opening documents or transaction records associated with the various bank accounts produced by

the non-party banks or corporate filings made by any of the Corporate Defendants.

30.     Plaintiff diligently performed its obligations under the loan agreements, including

by making payments of principal and interest as required, and upon Defendants' demand

"topping up" a substantial amount of additional shares of the ListCo as well as cash, following

repeated threats made through the Lenders that the Collateral Shares would be subject to

immediate forfeiture due to its alleged drop in market price and, unless Plaintiff deposited

additional shares or cash, a declaration of Events of Default would be made.

31.     On or about February 10, 2023, upon full repayment of the loan principal under the Astor2 Agreements (defined hereinafter), Plaintiff demanded the return of shares provided as collateral to secure the Astor2 Loan.  Defendants through Astor2, however, ignored Plaintiff's multiple requests made in February and March 2023, and then refused to return the shares and refund the additional cash deposited by Plaintiff following fraudulent Margin Calls[1].

32.     This was the first time Plaintiff realized that the Lenders, acting under the direction of Defendants, never intended to return the Collateral Shares to Plaintiff.

33.     By that time, however, Plaintiff had already substantially paid off the principal amount of the Vanderbilt Loan (defined below) and had been making regularly scheduled payments on the UPC1 Loan (defined below).

34.     Concerned about the security of the Collateral Shares, Plaintiff withheld further repayments on the UPC1 and Vanderbilt Loans and demanded that UPC1 and Vanderbilt provide proof that the shares it deposited under the respective loan agreements remained in safe custody and reassurances that UPC1 and Vanderbilt intend to return the shares upon the full repayment of the UPC1 Loan and Vanderbilt Loan.

35.     UPC1 refused to disclose the whereabouts of the Collateral Shares and refused to provide any reassurance.  Instead, UPC1 accused Plaintiff of breaching the UPC1 Agreement (defined below) by failing to make further repayments and used that claim as an excuse to issue notices of default against Plaintiff.  Vanderbilt, on the other hand, never responded to Plaintiff's requests.

---

[1] "Margin Calls" is defined in the Astor2 Agreements and requires Chenming to top up shares or cash equal to 20% more than the fair market price of the Collateral in the event the Collateral falls to less than 60% of its fair market price.

8

36.     With no other recourse, Plaintiff made an application to the High Court of Hong Kong to locate the Collateral Shares, only to find out, to its complete surprise, that almost all of the shares had been fraudulently transferred or sold by Defendants through the Lenders shortly after Plaintiff deposited those shares with the custodian broker.

37.     Upon the fraudulent and unlawful sale of Collateral Shares, Defendants realized significant revenues in amounts substantially higher than the face value of the Loans. Defendants and Lenders intentionally withheld these facts and relentlessly continued the fraudulent scheme by, among other things, demanding repayments and additional deposits of shares and cash collateral from Plaintiff.

**C.  The Astor2 Stock Loan Fraud**

38.     On January 17 and September 17, 2020, Plaintiff entered into two Stock Loan Agreements ("Astor2 Agreements") with Astor2, pursuant to which Astor2 agreed to loan Plaintiff up to $35,000,000 ("Astor2 Loan").

39.     Purportedly to secure the loan, Defendants through Astor 2 demanded that Plaintiff provide 110,000,000 Class B shares of the ListCo under the first agreement ("Astor2 B Shares Agreement"), and 95,000,000 Class H shares of the ListCo under the second agreement ("Astor2 H Shares Agreement").  The value of the Class B and H shares was, based on their trading prices at the time the shares were deposited with the custodian broker, approximately $88,662,546.86.

40.     Pursuant to two Custodian Management Agreements, Plaintiff deposited those shares with a custodian broker controlled and designated by Defendants through Astor2, Weiser Global Capital Markets, an entity registered in Bahamas ("Weiser").  Weiser, however, is not a qualified holder of B or H shares, it in turn appointed China Merchants Securities (HK) Co., Ltd

("CMS") and ICBC International Securities Limited ("ICBCI"), who are qualified holders, as custodians. Weiser subsequently opened accounts with CMS and ICBCI and instructed Plaintiff to deposit the Collateral Shares into these accounts.

41.   A person using the name "Michael Romanoff" and title of "Managing Member" signed the agreements on behalf of Astor2. Plaintiff had never heard of this person prior to seeing the name signed on the Astor2 Agreements and has never received any communication from this person.

42.   Upon information and belief, Michael Romanoff is a fictitious name fabricated by Defendants. Defendants carefully concealed their identities including by using generic email addresses such as operations@astorassetgroup.com, operations@astorcapitalfund.com and compliance@astorcapitalfund.com to communicate with Plaintiff throughout the negotiation and performance of the Astor2 Agreements.

43.   On or about May 9, 2022, Defendants through Astor2 issued a fraudulent Margin Call Notice, demanding that Plaintiff deposit additional stock shares and cash as collateral. On or about May 15, 2022, Plaintiff proposed full repayment of the Astor2 Loan in exchange for the return of the Collateral Shares. Astor2 declined Plaintiff's proposal.

44.   On or about May 19, 2022, pressed by Defendants' threats to forfeit the Collateral Shares, Plaintiff deposited additional cash in the amounts of $8,105,800 and $7,866,000 as further security under the Astor2 B Shares Agreement and Astor2 H Shares Agreement, respectively, into the bank account designated by Defendants through Astor2.

45.   Between January and April 2023, Defendants through Astor2 intentionally and fraudulently induced Plaintiff to make full repayment on the Astor2 Loan by repeatedly reassuring Plaintiff that it would ask its "loan committee" to approve and "swift[ly]" process the

return of the Collateral Shares upon the full satisfaction of all loan amounts.  Relying on these promises, on February 10, 2023, Plaintiff fully repaid the Astor2 Loan to Astor2's IOLTA account held by Jurist IQ.

46.     Defendants, through Astor2, and with the assistance of Jurist IQ as Astor2's "Escrow Agent," repeatedly invented new excuses to delay the return of the Collateral Shares. For example, on February 17, 2023, Jurist IQ issued a letter on Astor2's behalf, stating that it was necessary to conduct due diligence to ensure compliance with anti-money laundering laws upon receipt of funds from Plaintiff.  Through this clever maneuver, Jurist IQ and Astor2 successfully stalled the process for months.

47.     During the same period, Defendants through Astor2 further delayed the return of the Collateral Shares by misrepresenting to Plaintiff the necessity for a loan committee meeting and that it had been delayed.  Finally, on April 17, 2023, Astor2 issued a letter notifying Plaintiff that its fabricated "loan committee" rejected Plaintiff's request for the return of the shares, declared the immediate acceleration of the loan, and considered the "filed closed."

48.     Plaintiff had fully repaid the Astor2 Loan as of February 2023.  In addition to paying off the loan principal, Plaintiff made interest and fee payments on the Astor2 Loan in the amounts of: (i) $2,178,386.31 in interest, $116,992.56 as maintenance fees, $243,174.00 as custody fees, $864,465.90 as origination fees, and $1,000 in legal expenses under the Astor2 B Shares Agreement; and (ii) $1,312,023.79 in interest, $136,329.52 as maintenance fees, $281,867.59 as custody fees, $486,348.00 as origination fees, and $1,000 in legal expenses under the Astor2 H Shares Agreement.

49.     Defendants through Astor2 directed Plaintiff to send payments to the following bank accounts in this district:

Deltec Bank and Trust Limited
Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
Bank: Citibank, NA, New York
Beneficiary Account Number: ███2100
Beneficiary Bank ABA: 021000089
Beneficiary Bank SWIFT: CITIUS33XXX

Sierra Universal Corp
5830 E. 2nd Street, Ste. 7000 #2419 Casper, WY 82609
Bank: JPM Chase
Beneficiary Account Number: ███9672
Beneficiary Bank: JPM Chase
Beneficiary Bank Address: 270 Park Ave 31st Floor, New York, NY 10017,
United States
Beneficiary Bank ABA: 021000021
Beneficiary Bank SWIFT: CHASUS33XXX

50.     Upon information and belief, Defendant Jaitegh Singh is identified as the

"President" of SUC on its account opening forms associated with Chase account ███9672

opened on December 24, 2020.  At the time of opening, the account type was "Chase

Performance Business Checking."  On June 3, 2021, the same account was upgraded to "Chase

Platinum Business Checking" and on the relevant forms, Tetyana Sklarov is also identified as the

"President" and Jaitegh Singh the "Signer."

51.     Upon information and belief, Defendant Tetyana Sklarov is identified as the

President, Director, Treasurer, and Secretary of SUC in its filings with the Wyoming Secretary

of State.

52.     To date, Defendants through Astor2 have refused to return to Plaintiff the shares

of stock and cash it deposited as collateral in the approximate total value of $104 million.

**D.   The UPC1 Stock Loan Fraud**

53.      On October 19, 2020, Plaintiff and UPC1 entered into a Securities Loan

Agreement ("UPC1 Agreement")[2]. Pursuant to the UPC1 Agreement, UPC1 agreed to loan

Plaintiff up to $17,000,000.00 ("UPC1 Loan"). The UPC1 Agreement is governed by the laws

of England & Wales.

54.     A person with the name "Winstone Carrington" whose title appears to be "Senior

Vice President" signed the UPC1 Agreement on behalf of UPC1. Plaintiff had never heard of or

met this person prior to the signing of the UPC1 Agreement and has never received any

communication from this person.

55.     Upon information and belief, Winstone Carrington is a fictitious name fabricated

by Defendants. In addition, Defendants carefully concealed their identities including by using

generic email addresses such as compliance@unionpacificcapital.com,

info@unionpacificcpital.com, underwriting@unionpacificcapital.com to communicate with

Plaintiff on behalf of UPC1.

56.     Purportedly to secure the loan, Defendants through UPC1 demanded that Plaintiff

provide a total of 80,000,000 Class B shares of the ListCo and pursuant thereto Plaintiff

deposited that Collateral Shares with the same custodian broker, Weiser. The value of the Class

B shares, based on their trading prices at the time the shares were deposited was approximately

$31,729,653.04.

57.     Plaintiff had been making regular and timely payments on the UPC1 Loan until in

or about April 2023, when it discovered Defendants' fraudulent scheme. As of the end of 2023,

Plaintiff had paid $2,037,307.53 in loan principal plus $992,651.36 in interest, $122,760.00 as

---

[2] The UPC1 Agreement was dated September 18, 2020, but it was executed by Chenming on
October 19, 2020.

maintenance fees, $371,372.64 as custody fees, $440,234.79 in loan generation fees, and $5,000 in closing costs as demanded by Defendants.

58.    Defendants through UPC1 directed Plaintiff to send payments to the following bank accounts in this district:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: █████2100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> UPC Holdings Ltd
> 155 E. 44th Street
> New York, NY 10017, USA
> Bank: Community Federal Savings Bank
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: ███████7861
> Beneficiary bank SWIFT: CMFGUS33
>
> Lviv Estate Holdings Ltd
> 142 Gold Springs Ct
> Canton, GA 30114, USA
> Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: ██████5510
> Beneficiary bank SWIFT: CHASUS33

59.    Upon information and belief, Defendant Val Sklarov is the sole shareholder and ultimate beneficial owner of Defendant UPCH.  Val Sklarov is the individual authorized to manage CFSB account ██████7861 maintained by Defendant UPCH.  CFSB account ███████7861 was opened on October 20, 2021 and closed on June 9, 2022.

60.    Upon information and belief, Defendants Jaitegh Singh and Tetyana Sklarov are the "Signer" and "President," respectively, of Lviv, as provided in the account opening forms for the Chase Platinum Business Checking account ██████5510.  The account was opened on June 2,

2021.

61.     In or about early May 2023, Plaintiff sought to determine the whereabouts of the
B Shares provided as collateral under the UPC1 Agreement.  Concerned about the security of the
shares, Plaintiff wrote to UPC1 on May 5, 2023, seeking disclosure of the whereabouts of the
shares and proposing a conference call with UPC1 to discuss the same.  Several hours later,
UPC1 sent Plaintiff a false and fraudulent Margin Call Notice purportedly based upon a drop of
the price of the Collateral Shares, and demanded that Plaintiff deposit additional shares or cash
as further security, but otherwise refused to disclose the whereabouts of the shares or hold a
conference call with Plaintiff.

62.     To date, Defendants through UPC1 have failed and refused to disclose the
whereabouts of and return to Plaintiff the shares of stock it deposited as collateral in the
approximate value of $31,729,653.04.

**E.  The Vanderbilt Stock Loan Fraud**

63.     On April 17, 2021, Plaintiff entered into a Collateralized Securities Loan
Agreement ("Vanderbilt Agreement")[3] with Vanderbilt pursuant to which Vanderbilt agreed to
loan Plaintiff up to $45,000,000 ("Vanderbilt Loan").

64.     A person using the name "Christopher Warner" and title of "Executive Vice
President" signed the agreement on behalf of Vanderbilt.  Plaintiff had never heard of this person
prior to seeing the name signed on the Vanderbilt Agreement and has never received any
communication from this person.

65.     Upon information and belief, Christopher Warner is a fictitious name fabricated

---

[3] The Vanderbilt Agreement was dated April 12, 2021.

by Defendants.  Defendants carefully concealed their identities, including by using generic email addresses such as LoanServices@vanderbilt.world and legal@vanderbilt.world to communicate with Plaintiff on behalf of Vanderbilt.

66.     Purportedly to secure the loan, Defendants through Vanderbilt demanded that Plaintiff deposit 58,414,000 Class H shares of the ListCo with Weiser as custodian broker.

67.     In response to false and fraudulent Margin Call Notices issued by Defendants through Vanderbilt, on August 2, 2021 and June 16, 2022, Plaintiff deposited additional cash in the amount of $5,640,000 and $5,851,421.50, respectively, as further security for the Vanderbilt Loan.  In response to false and fraudulent Margin Call Notices issued by Defendants through Vanderbilt, in or about February 2023, Plaintiff deposited an additional 20,717,563 shares of Class B stock of the ListCo with another broker appointed by Defendants through Vanderbilt, Armira Capital Limited.  The approximate value of the Class B and H shares provided to Defendants, based on their trading prices at the time the shares were deposited, was approximately $48,594,383.04.

68.     As of April 2023, Plaintiff paid $6,150,327.92 in loan principal, $439,614.77 in interest, and, as demanded by Defendants, $62,860.94 as maintenance fees, $182,602.45 as custody fees, $408,596.09 in loan generation fees, and $5,000 in closing costs.

69.     Defendants through Vanderbilt directed Plaintiff to send payments to the following bank accounts in this district:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: ███2100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> C Vanderbilt Management Ltd.

600 Broadway Albany, NY 12207
Beneficiary Bank: JP Morgan Chase Bank NA
Beneficiary Bank Address: 270 Park Ave
New York, NY 10017, USA
Beneficiary Account Number: ███9621
Beneficiary Bank SWIFT: CHASEUS33

C Vanderbilt Management Ltd.
600 Broadway Albany, NY 12207
Beneficiary Bank: Community Federal Savings
Beneficiary Bank Address: 89-16 Jamaica Ave
Woodhaven, NY 11421, USA
Beneficiary Account Number: ███1912
Beneficiary Bank SWIFT: CMFGUS33

70.     Upon information and belief, Defendant Jaitegh Singh is identified as the
"President" of CVM and signed its account opening forms for the Chase Platinum Business
Checking account ███9621 which was opened on June 13, 2022.

71.     Upon information and belief, Defendant Val Sklarov is the sole shareholder and
ultimate beneficial owner of Defendant CVM.  Val Sklarov is the individual who is authorized to
manage CFSB account ███1912, which was opened on November 26, 2021, and closed on
June 9, 2022.

72.     To date, Defendants through Vanderbilt have failed and refused to disclose the
whereabouts of and return to Plaintiff the shares of stock and cash it deposited as collateral in the
approximate value of $54,445,804.54.

**F.  Defendants Further Impede Plaintiff's Efforts to Recover the Collateral**

73.     In an attempt to dissuade Plaintiff from seeking to recover the substantial amounts
of collateral deposited with Defendants, on or about June 14, 2023, UPC1 commenced an
arbitration in the London Court of International Arbitration ("LCIA") against Plaintiff, seeking,
among other things, a declaratory judgment and damages for alleged disparaging statements
made by Plaintiff ("LCIA Arbitration") despite the limitations of liability and damages clauses

17

present int the UPC1 Agreement.

74.     The LCIA Arbitration is another concerted attempt by Defendants to further their fraudulent scheme and impede Plaintiff's efforts to recover the collateral.  The alleged "disparaging statements" are those made in Plaintiff's demand letters to UPC1 requesting that UPC1 disclose the whereabouts of and return its Collateral Shares which Defendants through UPC1 have fraudulently and unlawfully sold and kept the proceeds for themselves.

75.     In response to the UPC1 arbitration, Plaintiff asserted counterclaims seeking redemption of the UPC1 collateral, or, in the alternative, monetary damages equal to the difference between the value of the shares provided to UPC1 and the face value of the UPC1 Loan, as of the date of the appropriation of the Collateral Shares or the Award, and the return of its paid interests, costs and fees.

76.     On August 17, 2023, Defendants through UPC1 suddenly changed their position and revised the value of their arbitration claims from $264,423,911.01 to $1.00.  The false and fraudulent explanation offered by Defendants through UPC1 was that they decided to lower the amount of its claimed damages "based solely upon the par value of the shares pledge by the [Plaintiff] as collateral for the loan" and "given the shares have no par value, this claim should now be valued as a nominal amount of $1.00 USD."

77.     On October 31, 2023, Defendants through UPC1 further changed course by adjusting again the amount of their claims by, among other things, seeking the forfeiture of the UPC1 collateral and monetary damages in the amount of $1,000,000.

78.     Not surprisingly, UPC1 has resisted all discovery in the LCIA Arbitration, including by refusing to produce any fact witness. Although the tribunal has ordered the parties to complete document production by June 2024, it has been substantially delayed by UPC1's

improper conduct, including without limitation refusing to pay its share of the arbitration fee deposit as instructed by the LCIA and the arbitral tribunal which resulted in the arbitral panel deeming UPC1's claims to have been withdrawn.  To date, it remains doubtful whether and to what extent UPC1 will obey the document production order in view of its conduct and tactics employed in the arbitration.

**G.  Further Evidence of Defendants' Fraudulent Scheme**

79.     In or about July 2023, Plaintiff made an application before the High Court of Hong Kong seeking a Norwich Pharmacal Order requiring non-party disclosures from the two custodian banks CMS and ICBCI seeking the transaction documents of the accounts that received the Collateral Shares under the subject loan agreements.

80.     On October 4, 2023, CMS and ICBCI disclosed certain transaction documents to Plaintiff upon the orders by the High Court of Hong Kong which reveal that Defendants began transferring or trading the Collateral Shares pledged by Plaintiff shortly after they were deposited and well *before* the fraudulently alleged occurrence of any Event of Default.

81.     These disclosures show that the first share transfer by Defendants through Astor2 occurred on May 15, 2020, merely 38 days after the shares were deposited, when it transferred 5,000,000 Class B shares to DBS Vickers Securities.  By no later than December 8, 2020, Defendants through Astor2 had fraudulently sold or transferred the entirety of 110,000,000 Class B shares that were deposited as collateral.  By no later than January 27, 2021, Defendants through Astor2 had fraudulently sold or transferred the entirety of the 95,000,000 Class H shares that were deposited as collateral.

82.     By January 21, 2021, Defendants through UPC1 had transferred or sold the entirety of the 80,000,000 Class B shares that Plaintiff deposited as collateral on November 27,

2020 and January 7, 2021.

83.     By August 4, 2021, Defendants through Vanderbilt had transferred or sold 58,000,000 out of the 58,414,000 Class H shares that were deposited by Plaintiff as collateral. Upon information and belief, as of this date, Defendants have transferred and sold all of these Class H shares of stock and the additional 20,717,563 Class B shares Chenming deposited on February 20, 2023.

84.     Upon information and belief, all these transfers and sales were carried out unilaterally and fraudulently by Defendants through the Lenders, without Plaintiff's knowledge or consent and prior to any purported breach or Event of Default by Plaintiff under the subject loan agreements.

85.     Through their fraudulent scheme, Defendants have realized and received a tremendous amount of proceeds from the unauthorized fraudulent sale of the Collateral Shares totaling HK$540,983,978.63, approximately $69,280,000, by trading a total of 185,000,000 Class B shares.  The remaining 5,000,000 Class B shares, valued at approximately $1,812,903.23, have been transferred and as of this date may also have been sold upon the instruction of Defendants.

86.     Through their fraudulent scheme, Defendants have realized and received HK$321,027,564.16, which is more than $41,110,000 in proceeds, by trading a total of 77,462,000 Class H shares.  They have further transferred 75,538,000 Class H shares, valued at approximately $47,204,452.82,[4] to third-party custodians Citibank, Zundiao Securities Limited,

---

[4] The average share price was calculated by dividing total value of the Class H shares deposited by the total number of Class H shares deposited under each agreement.

and Fidelity Clearing Canada, and as of this date may have sold those shares.

H. **Plaintiff Discovers the Relationship Between Lenders and Defendants**

87.     Upon information and belief, all three Lenders are closely affiliated, owned, and controlled by Defendants and used as instruments of Defendants' fraudulent scheme.

i.     *Astor2 and UPC1 Are Represented by the Same U.S. Law Firm*

88.     In or about January 2023, Defendants through Astor2 directed Plaintiff to send payments to the "client escrow account" of its law firm Jurist IQ.   Defendant Jaitegh Singh is the CEO of Jurist IQ.

89.     On August 17, 2023, Defendant Jurist IQ served Plaintiff on behalf of UPC1 a demand letter seeking the return of loan funds under the UPC1 Agreement.

90.     Defendants and Jurist IQ made multiple misrepresentations in the demand letter including that Plaintiff caused multiple defaults under the UPC1 Agreement, was engaged in "disingenuous conduct and bad faith," "intererer[ed] with the [agreement]," and threatened to immediately foreclose on the UPC1 Loan.

91.     In the LCIA Arbitration commenced by Defendants through UPC1, UPC1's counsel, Fred W. Freitag IV, Esq., submitted a letter from Jurist IQ confirming Jurist IQ's payment of the deposit of arbitration fees on behalf of UPC1.   In that letter, Jurist IQ expressly states that it "regularly acts as general counsel for UPC."  Based on information published by the Disciplinary Board of the Supreme Court of Pennsylvania,[5] Mr. Freitag is an active member of

_____

[5] On June 28, 2019, Mr. Freitag received a Public Reprimand from the Disciplinary Board of the Supreme Court of Pennsylvania, for engaging in professional misconduct by failing to segregate client-entrusted funds and personal funds and misappropriating client funds.  The Disciplinary Board also found that Mr. Freitag "has a substantial history of professional discipline," which constitutes "an aggregating factor" warranting a Public Reprimand.  *See* DB Order No. 188 DB

the State Bar of Pennsylvania with a business address at 1041 Applejack Drive, Gibsonia, PA 15044.

92.     Moreover, on October 19, 2023, in his communication with the LCIA, Mr. Freitag inadvertently attached documents from what appears to be another arbitration concerning a similar fraudulent loan scheme, wherein Astor Asset Management 1 Limited ("Astor1") was the claimant.  Upon information and belief, Astor1 and Astor2 are affiliated entities.

   ii.   *UPC1 and Vanderbilt Are Interconnected*

93.     On or about May 5, 2023, Plaintiff received an email from UPC1 mistakenly attaching a document entitled "Vanderbilt Chenming MOU Addendum – May 3, 2023 – 6-42 PM.pdf."  The document, however, is an addendum to the UPC1 Agreement and does not concern Vanderbilt.

   iii.  *Defendants Manage the Bank Accounts Used by The Lenders*

94.     Defendants through Defendant Val Sklarov manage and hold the two CFSB account ███████ 7861 and ██████████ 1912 used by Lenders UPC1 and Vanderbilt.

95.     Upon information and belief, multiple payment and/or transfer transactions were initiated from CFSB account ██████████ 1912 to Singh Law Firm P.A. and Singh Law Firm in May 2022.

96.     Defendants through all three Lenders directed Plaintiff to send payments to three Chase bank accounts controlled by the same Individual Defendants Jaitegh Singh and/or Tetyana Sklarov, who, upon information and belief, are the authorized Signer and/or President of the

---

2017, available at https://www.pacourts.us/assets/opinions/DisciplinaryBoard/out/188DB2017-Freitag.pdf (last visited November 29, 2023).

companies that beneficially hold those bank accounts. Specifically:

> **Astor2**: Chase account ▮▮9672, held by SUC, to which Jaitegh Singh is identified as the President[6] and Signer and Tetyana Sklarov as the President of SUC.

> **UPC1**: Chase account ▮▮5510, held by Lviv, to which Jaitegh Singh is identified as Signer and Tetyana Sklarov as President of Lviv.

> **Vanderbilt**: Chase account ▮▮9621, held by CVM, to which Jaitegh Singh is identified as President of CVM.

97.     Relevant bank statements evidence the transfer of funds from SUC's account ▮▮9621 to CVM's account ▮▮9672.

98.     Defendants through all three Lenders further directed Plaintiff to send payments to the same Citi correspondent bank account ▮▮2100 established by, upon information and belief, Deltec Bank and Trust Limited on behalf of Defendants. The transaction records of these accounts reveal multiple transactions involving Singh Law Firm P.A. and Jurist IQ between August 2020 and March 2021. For example, Singh Law Firm P.A. received $2.6 million in August, $2.4 million in September, $2.84 million in October, and $2.5 million in December 2020. Jurist IQ received transfers in the amounts of $2.785 million and $8 million in each of January and March 2021. In total, Singh realized from his role in the fraudulent scheme, personally and through Jurist IQ, over $21 million.

> ### iv.     *Jaitegh Singh, Juris IQ, and Singh Law Firm P.A.*

99.     CFSB and Citi bank statements evidence multiple transactions to Singh Law Firm P.A originating in the bank accounts beneficially held by Defendants.

100.     Singh Law Firm P.A.'s website identifies Defendant Jaitegh Singh as the owner

---

[6] In account opening forms dated December 24, 2020, he was later identified as Signer.

of the firm.  Jaitegh Singh also serves as the CEO of Defendant law firm Jurist IQ.

101.    Defendant Jaitegh Singh has previously represented Val Sklarov and his related entities in multiple state and federal litigations alleging similar fraudulent conduct, including in *Brent Satterfield v. Vstock Transfer, LLC et al* (N.Y. Sup., index no. 650311-2019) and *Two Rivers Water & Farming Company v. America 2030 Capital Limited et al* (Dist. Colo), Case No. 1:19-cv-01640-CMA-STV, representing corporate defendants affiliated with Val Sklarov in an action for declaratory and injunctive relief to prevent defendants from selling restricted shares pledged by plaintiff as security for a loan.

## I.    Other Fraud Committed by Val Sklarov and His Co-conspirators

102.    This action is one of several in which Val Sklarov, his corporate affiliates, and co-conspirators have been accused of fraud, conspiracy, and stock-loan fraud.

103.    Among those actions, *Brent Satterfield* involves facts substantially similar to those alleged herein.  Plaintiff Satterfield sued Val Sklarov and his corporate affiliates for stock loan fraud.  The complaint alleges that the Sklarov defendants participated in a scheme to defraud plaintiff Satterfield by convincing him to pledge over two million shares in non-party Co-Diagnostics, Inc. as security for a loan of up to $3.5 million.  The Sklarov defendants began to sell the collateral shares before issuing any loan funds and realized over $1.1 million in proceeds.

104.    The *Brent Satterfield* court ordered defendants to place the shares in escrow and subsequently to return the shares to plaintiff.  Defendants, however, repeatedly failed to comply and Val Sklarov failed to appear at a court-ordered hearing.  In June 2022, the court held Val Sklarov in contempt and issued a warrant for his arrest.  Val Sklarov appealed the contempt order and warrant on July 1, 2022.  Defendant Jaitegh Singh represented Val Sklarov and his

corporate affiliates in the action and represented Val Sklarov in the appeal.  On November 15,

2023, the First Department upheld the Supreme Court's contempt order and arrest warrant.

Upon information and belief, Defendants have yet to comply with the order or return the shares,

and the arrest warrant against Val Sklarov remains outstanding.

105.    Upon information and belief, in a case entitled *USA v. Sklarov, et al.*, 97-cr-00176

(DJL) (W.D. Pa.), defendant Val Sklarov was convicted of committing Medicare fraud and

sentenced to one year one day in prison and ordered to pay $500,000 in fines.  He served this

time in prison.  He also entered a settlement agreement to pay $14,000,000 in restitution.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Fraud in the Inducement
(Against Val Sklarov, Tetyana Sklarov,
and Jaitegh Singh)

106.    Plaintiff repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

107.    The Individual Defendants through the Lenders created fictious names and used

generic corporate email addresses to communicate with and make repeated material

misrepresentations to Plaintiff and thereby induced Plaintiff to enter the Loan transactions.

108.    Plaintiff executed the loan agreements and delivered the Collateral Shares in

reliance on material misrepresentations by the Individual Defendants, including material

misrepresentations made through the Lenders and Jurist IQ, that they would return the Collateral

Shares to Plaintiff upon full repayment of the Loan funds.

109.    Those material misrepresentations are distinct and separate from the Lenders'

representations or obligations under the respective loan agreements.

110.    The Individual Defendants through the Lenders intentionally made those

25

misrepresentations designed to induce Plaintiff to enter into the loan agreements and deliver the Collateral Shares to and for the benefit of the Individual Defendants.

111.    The Individual Defendants acted with scienter by making knowingly false representations through the Lenders and Jurist IQ including that they would return the Collateral Shares upon Plaintiff's performance of its obligations under the loan agreements, when in fact they had no intention, from day one, of doing so.  The Individual Defendants made the material misrepresentations as part of a fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral Shares.

112.    Plaintiff had no reason to doubt the truthfulness of the Individual Defendants' false representations made through the Lenders and Jurist IQ concerning their intention to return the Collateral Shares upon Plaintiff's performance of its contractual obligations.

113.    Plaintiff relied to its detriment on those material misrepresentations by entering into the loan agreements and delivering the Collateral Shares.

114.    As a direct and proximate result of the Individual Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

115.    The Individual Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fraud
(Against Val Sklarov, Tetyana Sklarov,
and Jaitegh Singh)

116.    Plaintiff repeats and realleges paragraphs 1 through 115 as if fully set forth herein.

117.    The Individual Defendants acting in concert with the Lenders and the Corporate

Defendants intentionally and falsely represented to Plaintiff that they were providing financing to Plaintiff in exchange for Plaintiff's execution of loan agreements and delivery of the Collateral Shares to be held as security for the Loans.

118.    The Individual Defendants never intended to provide financing to Plaintiff.  Their plan all along was to keep the Collateral Shares for themselves and realize gains by unlawfully selling the Collateral Shares, while requiring Plaintiff to repay the Loan principal and interest in full and deposit additional shares and cash collateral that the Individual Defendants intended to unlawfully take, sell and keep the proceeds for themselves.

119.    Following the execution of the loan agreements, the Individual Defendants through the Lenders and Jurist IQ repeatedly threatened to forfeit the Collateral Shares by manufacturing false Events of Default used to coerce Plaintiff into depositing additional shares and cash as security under the agreements.  The Individual Defendants then secretly and unlawfully transferred and sold a majority of the Collateral Shares, in some cases immediately after they were deposited and before the occurrence of any alleged Event of Default.

120.    The Individual Defendants realized significant gains through their secret sales of the Collateral Shares.  Nonetheless, they continued through the Lenders to require Plaintiff to pay off the Loan principal and interest by knowingly and deliberately misrepresenting to Plaintiff that they were prepared to return the Collateral Shares upon full payment of the Loans.  They never intended to return the Collateral Shares.  In fact, they *cannot* return the Collateral Shares, a significant majority if not all of which have already been sold by them.

121.    In reliance upon the Individual Defendants' material misstatements made through the Lenders and Jurist IQ, Plaintiff entered into the loan agreements, delivered the Collateral Shares, deposited additional shares and cash, and paid off the entirety of the principal of the

Astor2 Loan and a significant portion of the principal of the UPC1 and Vanderbilt Loans.

122.    As a direct and proximate result of the Individual Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

123.    The Individual Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

#### Aiding and Abetting Fraud
(Against Jurist IQ, SUC, UPCH,
Lviv, and CVM)

124.    Plaintiff repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.    The Corporate Defendants had actual knowledge of the Individual Defendants' fraud and substantially assisted their perpetration of the fraud.

126.    Defendants Jurist IQ, SUC, UPCH, Lviv, and CVM were created for the purpose of perpetrating the fraud against Plaintiff.  Each was created shortly after Plaintiff entered into the respective loan agreements with each Lender: (i) Defendant SUC was established in October 2020, a month after Plaintiff was induced to sign the second Astor2 Stock Loan Agreement; (ii) Defendants UPCH and Lviv were both established in March 2021, five months after the UPC1 Agreement was signed; and (iii) Defendant CVM was established in November 2021, seven months after Plaintiff signed the Vanderbilt Agreement.  These same Defendants beneficially hold various bank accounts to receive payments from Plaintiff under the respective loan agreements.

127.    Defendant Jaitegh Singh is Jurist IQ's CEO.  Jurist IQ was the Escrow Agent for Astor2 and, together with Astor2, induced Plaintiff to make loan repayments to Astor2's client

28

escrow account with Jurist IQ.  Jurist IQ serves as general counsel to UPC1 and acted as counsel to UPC1 in the underlying loan transaction.  It served a demand letter on Plaintiff fabricating breaches by Plaintiff under the UPC1 Agreement and made fraudulent demands for the return of the loan funds, with knowledge that UPC1 was the breaching party and a participant in the Individual Defendants' fraudulent scheme directed at Plaintiff.

128.    The Corporate Defendants further materially assisted the Individual Defendants' fraudulent scheme by helping conceal the identities of the Individual Defendants, and facilitating the financial structure of the fraudulent scheme through the opening of bank accounts in their names, among other assistance.

129.    As a direct and proximate result of the Corporate Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

130.    The Corporate Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

#### Conversion
(Against Individual Defendants)

131.    Plaintiff repeats and realleges paragraphs 1 through 130 as if fully set forth herein.

132.    Plaintiff is the legal owner of the Collateral Shares, which is a specific identifiable property.  Plaintiff had ownership, possession and control over the Collateral Shares before their conversion by the Individual Defendants.

133.    The Individual Defendants through the Lenders exercised an unauthorized dominion over the Collateral Shares to the exclusion of Plaintiff's rights and deprived Plaintiff of its interest in the same, by, among other things, refusing to return the Collateral Shares and

coercing Plaintiff into forfeiting the same by fraudulently and wrongfully manufacturing Events of Default under the loan agreements.

134.     As a direct and proximate result of the Individual Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

## FIFTH CAUSE OF ACTION

### Conspiracy to Commit Fraud
(Against All Defendants)

135.     Plaintiff repeats and realleges paragraphs 1 through 134 as if fully set forth herein.

136.     The Individual Defendants are the ultimate beneficial owners and/or alter egos of the Lenders and Corporate Defendants.

137.     Defendants and Lenders acting in concert agreed and conspired to defraud Plaintiff.  Each Defendant committed overt acts in furtherance of the conspiracy to defraud, including by fraudulently inducing Plaintiff to enter into sham loan transactions and wrongfully exercising dominion over and taking possession of the Collateral Shares, among other things.

138.     Defendants knowingly and voluntarily participated in the conspiracy.

139.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

140.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Conspiracy to Commit Conversion
(Against All Defendants)

141.    Plaintiff repeats and realleges paragraphs 1 through 140 as if fully set forth herein.

142.    The Individual Defendants are the ultimate beneficial owners and/or alter egos of the Lenders and Corporate Defendants.

143.    Defendants and Lenders acting in concert agreed and conspired to commit conversion against Plaintiff.  Each Defendant committed overt acts in furtherance of the conspiracy to commit conversion, including by wrongfully exercising dominion over and taking possession of the Collateral Shares, among other things.

144.    Defendants knowingly and voluntarily participated in the conspiracy.

145.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

146.    Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment
(Against All Defendants)

147.    Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

148.    Defendants have wrongfully and unjustly been enriched through its exercise of unauthorized dominion over the Collateral Shares, by, among other things, refusing to return the Collateral Shares to Plaintiff and unlawfully transferring and selling the Collateral Shares for their own financial gain.

149.     Plaintiff has conferred a benefit upon Defendants and Defendants have obtained and retained that benefit without adequately compensating Plaintiff.  It is against equity and good conscience to permit Defendants to retain the benefit without compensation to Plaintiff.

150.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor against all Defendants as follows:

A.  As to the First and Second Causes of Action, awarding Plaintiff compensatory and punitive damages against Defendants Val Sklarov, Tetyana Sklarov, and Jaitegh Singh including interest thereon, in an amount to be determined at trial, but in any event not less than $175 million and $100 million, respectively;

B.  As to the First and Second Causes of Action, ordering Defendants Val Sklarov, Tetyana Sklarov, and Jaitegh Singh to disgorge any proceeds and profits procured from unlawfully transferring selling, and/or trading the Collateral Shares, in an amount to be determined at trial, but in any event, not less than $175 million;

C.  As to the Third Cause of Action, awarding Plaintiff compensatory and punitive damages against Defendants Jurist IQ, SUC, UPCH, Lviv, and CVM including interest thereon, in an amount to be determined at trial, but in any event not less than $175 million, and $100 million, respectively;

D.  As to the Fourth Cause of Action, permanently enjoining and restraining all Defendants, their agents, servants, employees, representatives, and all persons acting in concert or participating with Defendants or any one of them, from

further trading, transferring, or otherwise disposing of any remaining Collateral

Shares;

E.   As to the Fourth and Seventh Causes of Action, ordering all Defendants to

immediately return any remaining Collateral Shares to Plaintiff;

F.   As to the Fifth and Sixth Causes of Action, awarding Plaintiff compensatory and

punitive damages against all Defendants including interest thereon, in an amount

to be determined at trial, but in any event not less than $175 million and $100

million, respectively;

G.   As to the Seventh Cause of Action, ordering all Defendants to disgorge any

proceeds and profits procured from unlawfully transferring, selling, and/or trading

the Collateral Shares, in an amount to be determined at trial, but in any event, not

less than $175 million;

H.   As to all Causes of Action, awarding Plaintiff its costs, legal expenses, and

reasonable attorneys' fees incurred in connection with this action; and

I.   As to all Causes of Action, awarding Plaintiff such other and further relief as the

Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil

Procedure 38.


Dated:  New York, New York
          June 28, 2024

                                   Respectfully submitted,
                                   KING & WOOD MALLESONS LLP

                                   By:    /s/ Vincent Filardo, Jr.
                                        Vincent Filardo, Jr.
                                        Aaron T. Wolfson
                                        500 Fifth Avenue, 50th Floor
                                        New York, NY 10110
                                        (212) 319-4755
                                        vincent.filardo@us.kwm.com
                                        aaron.wolfson@us.kwm.com

## VERIFICATION

SHANDONG PROVINCE            )

                                              ) ss.:

PEOPLE'S REPUBLIC OF CHINA  )

Zheng Chunxing, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I am an employee of Chenming Holdings Co., Ltd., Plaintiff Chenming Holdings (Hong Kong) Limited's sole shareholder, in the above captioned case and have authorized the filing of this amended complaint. I have reviewed the allegations made in the amended complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information and documents kept by Plaintiff in the ordinary course of business, and I believe them to be true.

Zheng Chunxing

Chenming Holdings (Hong Kong) Limited

35