UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHENMING HOLDINGS (HONG KONG) LIMITED, *a Hong Kong limited company*,<br><br>       Plaintiff,<br><br>    -against-<br><br>Val Sklarov, Tetyana Sklarov, Jaitegh "JT" Singh, Jurist IQ Corp, Sierra Universal Corp, UPC Holdings Ltd, Lviv Estate Holdings Ltd, C Vanderbilt Management Ltd.,<br><br>       Defendants. | Civil Case No. 1:24-cv-00935-KPF<br><br>Hon. Katherine P. Failla<br><br>**VERIFIED SECOND AMENDED COMPLAINT AND JURY TRIAL DEMANDED** |

   Plaintiff Chenming Holdings (Hong Kong) Limited ("Chenming" or "Plaintiff"), by and through its attorneys, King & Wood Mallesons LLP, as and for its Second Verified Amended Complaint against Defendants Val Sklarov, Tetyana Sklarov, Jaitegh "JT" Singh (together with Val Sklarov and Tetyana Sklarov, the "Individual Defendants"), Jurist IQ Corp ("Jurist IQ"), Sierra Universal Corp ("SUC"), UPC Holdings Ltd ("UPCH"), Lviv Estate Holdings Ltd, ("Lviv"), and C Vanderbilt Management Ltd. ("CVM," together with SUC, UPCH and Lviv, the "Servicer Defendants"), alleges as follows:

## NATURE OF THE ACTION

   1.  This is a civil action asserting claims for fraud in the inducement, fraud, aiding and abetting fraud, conspiracy to commit fraud, conversion, and conspiracy to commit conversion arising under the laws of the State of New York.

   2.  Plaintiff seeks relief under the laws of the State of New York, including equitable and monetary relief, punitive damages, costs, legal expenses and reasonable attorneys' fees, and all other appropriate relief to which it is entitled under law.

## PARTIES

3.      Chenming is a company organized under the laws of the Hong Kong Special

Administrative Region ("Hong Kong") with its registered address at No. C, 16/F., Chinaweal

Centre, 414-424 Jaffe Road, Wanchai, Hong Kong.

4.      Upon information and belief, Defendant Val Sklarov is a natural person and

United States citizen, residing at 142 Gold Springs Court, Canton, Georgia 30114 and/or in

Chicago, Illinois.[1]  As part of his established *modus operandi*, Val Sklarov regularly uses the

aliases "Gregory Mitchell," "Thomas Mellon" and "Mark Simon Bently," and passes himself off

as multiple fictious names and self-run companies using names confusingly similar to well-

known wealthy family financial institutions.  Over the years, Val Sklarov has used at least the

following entities to facilitate his frauds: Astor Capital Fund Ltd. ("Astor Capital"), America

2030 Capital Limited ("America 2030"), and Bentley Rothschild Capital Limited ("Bentley

Rothschild").  He is the sole shareholder and ultimate beneficiary owner of both Defendants

UPCH and CVM.

5.      Upon information and belief, Defendant Tetyana Sklarov is the wife of Defendant

Val Sklarov, resides with him, and assists him in perpetrating his fraudulent activity, including as

alleged herein.

6.      Upon information and belief, Defendant Jaitegh "JT" Singh is a registered New

---

[1] Val Sklarov testified in his sworn witness statement filed in the English Action (defined infra in
paragraph 163) that "Although I was named Vladimir at birth, I officially changed my name to
'Val' on 20 September 2006 by a court process in Illinois, USA. . . . I have lived in the USA
most of my adult life, consider myself an American and did not wish to remain 'Vladimir'."  He
also testified that he currently resides in Georgia—the first line of his witness statement reads "I,
VAL SKLAROV, of 142 Gold Springs Court, Canton, Georgia 30114, USA. . . ."

York attorney, the proprietor of Singh Law Firm, P.A. with offices in New York and Miami, and the Chief Executive Officer ("CEO") of Defendant Juris IQ Corp.  Singh has been Val Sklarov's collaborator in fraud, his counsel for many years and has represented Val Sklarov in several fraud related litigations.

7.      Upon information and belief, Defendant Jurist IQ is a corporation organized under the laws of the State of New York, with its principal address located at 530 Fifth Ave, 9th Floor, New York, NY 10036.

8.      Upon information and belief, Defendant SUC is a corporation organized under the laws of the State of Wyoming, with its principal address located at 5830 E 2nd St, STE 7000 #2419, Casper, WY 82609.

9.      Upon information and belief, Defendant UPCH is a corporation organized under the laws of the State of New York.  Its principal place of business is located at 155 E 44th Street, New York, New York 10017.

10.      Upon information and belief, Defendant Lviv is a domestic business corporation organized under the laws of the State of New York, with its principal place of business located at 142 Gold Springs Ct, Canton, GA30114-6333, which is also Defendant Val Sklarov's home address.

11.      Upon information and belief, Defendant CVM is a corporation organized under the laws of the State of New York with its principal place of business located at 600 Broadway, Albany, New York 12207.

## JURISDICTION AND VENUE

12.      Jurisdiction is proper in this Judicial District pursuant to 28 U.S.C. § 1332. Complete diversity exists in this action because Plaintiff is a Hong Kong company and

Defendants are citizens and/or subjects of the States of New York, Georgia, Illinois, or Wyoming.  The amount in controversy exceeds $75,000.

13.     Personal jurisdiction exists over Defendants Jaitegh Singh, Jurist IQ, UPCH, Lviv, and CVM because, among other things, they either reside in, were incorporated in, and/or have their principal places of business in this district.

14.     Personal jurisdiction exists over Defendants Val Sklarov and Tetyana Sklarov pursuant to New York's long-arm statute CPLR 302(a)(2) based upon, among other things, (i) their conspiracy to commit and commission of tortious acts within the State of New York; (ii) they established Defendants UPCH, Lviv, and CVM, all of which are domestic New York corporations, for purposes of concealing their true identities and perpetrating the fraud against Plaintiff; (iii) they control and manage these New York-based companies in their capacity as shareholder, beneficial owner and/or officer; and (iv) they opened several bank accounts in this district which were used to advance the conspiracy to defraud Plaintiff.  Personal jurisdiction over Defendants Val Sklarov and Tetyana Sklarov further exists under the conspiracy and agency theories of jurisdiction because the acts of their in-state co-conspirators, including Defendants Jaitegh Singh, Jurist IQ, UPCH, Lviv, and CVM, are attributed to them.

15.     Personal jurisdiction exists over Defendant SUC pursuant to CPLR 302(a)(2) because, among other things, it participated, along with the other Defendants, in a conspiracy to defraud Plaintiff, and committed overt acts in furtherance of the conspiracy within the State of New York as alleged herein.

16.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts complained of herein occurred in this district, including but not limited to: (i) the Individual Defendants established Defendants UPCH and Lviv in or about

March 2021 in this district shortly after they induced Plaintiff to enter into the sham UPC1 Loan (defined hereinafter); (ii) the Individual Defendants established Defendant CVM in or about November 2021 in this district shortly after they induced Plaintiff to enter into the sham Vanderbilt Loan (defined hereinafter); and (iii) Defendants are the ultimate beneficiaries of multiple bank accounts located at Chase, Citi, and CFSB (each defined hereinafter), which were established in this district and Defendants, through the Sham Lenders (defined hereinafter), directed Plaintiff to send deposits, interest, so-called maintenance fees and/or custody fees, purportedly in connection with the sham loan transactions to the bank accounts located in this district.

## FACTUAL BACKGROUND

### A.  Interrelationships Between Defendants

17.     Upon information and belief, the Individual Defendants are the ultimate beneficiary owners and/or alter egos of three shell companies posing as legitimate lending institutions—Union Pacific Capital 1 Ltd. ("UPC1"), Astor Asset Management 2 Limited ("Astor2"), Cornelius Vanderbilt Capital Management LTD ("Vanderbilt," together with UPC1 and Astor2, the "Sham Lenders").  The Individual Defendants, acting through the Sham Lenders induced Plaintiff to enter into three sham loan transactions intended to facilitate Defendants' fraudulent scheme directed at Plaintiff.

18.     Upon information and belief, Individual Defendants Val Sklarov, Tetyana Sklarov, and Jaitegh Singh, exercise dominion and control over Jurist IQ and the Servicer Defendants as well as the Sham Lenders, disregard the corporate form of those entities to such an extent that the independent existence of those entities should be disregarded, and the corporate veil pierced rendering the Individual Defendants personally liable for any acts purportedly

undertaken through those corporate entities.

19.     Upon information and belief, Defendant Val Sklarov is the sole shareholder and ultimate beneficial owner of Defendants UPCH and CVM.  UPCH and CVM in turn are the beneficiaries of record for two New York-based Community Federal Savings Bank ("CFSB") accounts ███████7861 and ███████1912, respectively, which were used by Defendants and the Sham Lenders to receive payments from Plaintiff.  Defendant Val Sklarov is authorized to manage both CFSB accounts.

20.     Upon information and belief, Defendant Tetyana Sklarov is the President of Defendants SUC and Lviv.  On or about June 2, 2021, she opened the JPMorgan Chase Bank N.A. ("Chase") account ████5510 (Chase Platinum Business Checking) on behalf of Defendant Lviv and signed Chase's Business Signature Card as "President" of Lviv.  Chase account ████5510 is used by Defendants through UPC1 to receive payments from Plaintiff.  On June 3, 2021, she upgraded the Chase account ████9672 from "Chase Performance Business Checking" to "Chase Platinum Business Checking" on behalf of Defendant SUC and signed Chase's Business Signature Card as the "President" of Defendant SUC.  Chase account ████9672 is used by Defendants through Astor2 to receive payments from Plaintiff.

21.     Upon information and belief, Defendant Jaitegh Singh, personally and through his law firms Singh Law Firm, P.A. and Jurist IQ, has received significant financial benefits from his participation with Val Sklarov in multiple fraud schemes.  Jaitegh Singh and Singh Law Firm, P.A. directed financial transactions through the Chase account ████9621 and CFSB account ███████1912, both of which held funds from Plaintiff.  In another action pending in the High Court of Justice in England and Wales, Val Sklarov was found to have transferred "$271,685,472 . . . to client accounts controlled by Mr. JT Singh through his company Jurist IQ

or his US Law Firm."

22.     Defendant Jurist IQ was incorporated on January 7, 2021, four (4) months after Plaintiff entered into the second sham Astor2 loan transaction (on September 17, 2020) and the sham UPC1 loan transaction (on September 18, 2020).  Upon information and belief, Astor2 maintains a "client escrow account" or Interest on Lawyers' Trust Account ("IOLTA") with Jurist IQ.  Jurist IQ represented UPC1 in the sham UPC1 transaction with Plaintiff and serves as "general counsel" for UPC1.

23.     Jurist IQ between August 2020 and March 2021 engaged in six (6) financial transactions through the Citibank, N.A. ("Citi") account ▮▮▮▮0089 which was used by all three Sham Lenders to receive funds from Plaintiff.

24.     Defendant Tetyana Sklarov is the President, Director, Treasurer, and Secretary of SUC.  Upon information and belief, she, along with the other Individual Defendants, organized and established Defendant SUC on October 13, 2020—only one (1) month after Defendants through Astor2 induced Plaintiff to enter the second fraudulent stock loan transaction on September 17, 2020.  SUC was administratively dissolved on December 9, 2023.

25.     SUC is the beneficiary of record for Chase account ▮▮▮9672, which was opened by Defendants Jaitegh Singh and Tetyana Sklarov, and was used by Defendants through Astor2 to receive funds from Plaintiff.  Chase account ▮▮▮9672 was also used for financial transactions in connection with Chase account ▮▮▮9621 that was used by Defendants through another Sham Lender Vanderbilt to receive funds from Plaintiff.

26.     Defendant UPCH was incorporated on March 1, 2021, only five (5) months after Defendants through UPC1 induced Plaintiff to enter the UPC1 Agreement on September 18, 2020.

7

27.     Upon information and belief, UPCH is the beneficiary of record for the CFSB account ████ 7861 that was used by Defendants through UPC1 to receive funds from Plaintiff.

28.     Defendant Lviv was incorporated on March 29, 2021, four (4) weeks after and for the same unlawful purpose that Defendant UPCH was incorporated.

29.     Upon information and belief, Lviv is the beneficiary of record for Chase account ████ 5510 that was opened by Defendants Jaitegh Singh and Tetyana Sklarov and used by Defendants through UPC1 to receive funds from Plaintiff.

30.     Defendant CVM was incorporated on November 11, 2021 and, upon information and belief, used to perpetrate Defendants' fraudulent scheme associated with the sham Vanderbilt loan.

31.     Upon information and belief, CVM is the beneficiary of record for Chase account ████ 9621 opened by Defendant Jaitegh Singh and CFSB account ████ 1912 opened by Defendant Val Sklarov.  Both bank accounts were used by Defendants through Vanderbilt to receive funds from Plaintiff.  The CFSB account was also used for financial transactions with Defendant Jaitegh Singh's law firm Singh Law Firm P.A.

**B.  Defendants' Fraudulent Scheme**

32.     Between January 2020 and April 2021, Defendants, through the use of separate shell companies, fraudulently induced Plaintiff to enter three sham securities-backed loan transactions ("Sham Loans"), and perpetrated a sophisticated fraud against Plaintiff.  Defendants carefully concealed their true identities by acting under fictious names and sham entities which posed as legitimate financial institutions.

33.     Defendants through intentional misrepresentations and material omissions of fact

misled Plaintiff into believing that it was dealing with legitimate lending institutions associated with the famous and wealthy Astor and Vanderbilt families.  Defendants purposefully concealed from and failed to reveal to Plaintiff the fact that the person behind the Sham Lenders and the entire fraud scheme, Val Sklarov, had a significant felony criminal record and was previously convicted and sentenced to prison for Medicare fraud.

34.     Plaintiff is the shareholder of the public company Shandong Chenming Paper Holdings Limited ("ListCo"), whose shares are listed on the Shenzhen Stock Exchange and Hong Kong Stock Exchange.

35.     Defendants through the Sham Lenders required that Plaintiff secure the Sham Loans by providing 210,717,563 Class B shares and 153,414,000 Class H shares of the ListCo (200488:SZ; 01812:HK) as purported collateral ("Collateral Shares").  Defendants concealed from and failed to reveal to Plaintiff that the Collateral Shares would not be used as collateral, but instead would be immediately sold by them and the proceeds would be used, in part, to fund the Sham Loans and unlawfully enrich themselves.

36.     Upon information and belief, the Individual Defendants executed the sham loan agreements on behalf of the Sham Lenders under different fictitious names, including Michael Romanoff (for Astor2), Christopher Warner (for Vanderbilt), and Winstone Carrington (for UPC1).

37.     These fictitious names had never appeared in any communication between Plaintiff and the Sham Lenders prior to the execution of the sham loan agreements and have never appeared in any subsequent communications, except that Plaintiff received two letters regarding account statements on April 13, 2021, signed by Michael Romanoff, whose title was falsely indicated by the Individual Defendants to be "Compliance Officer."  These fictitious

9

names do not appear in any account opening documents or transaction records associated with the various bank accounts produced by the non-party banks or corporate filings made by any of the Servicer Defendants.

38.     Plaintiff performed its obligations under the sham loan agreements, including by making payments for purported principal and interest as required by Defendants, and upon Defendants' demand "topping up" a substantial amount of additional shares of the ListCo as well as cash collateral, following repeated threats made by Defendants through the Sham Lenders in or about May 2022 (sham Astor2 Loan), May and October 2022 (sham Vanderbilt Loan), and May 2023 (sham UPC1 Loan), asserting that the Collateral Shares would be subject to immediate forfeiture due to a falsely asserted significant drop in market price or decline of trading volume.

39.     Defendants concealed and failed to reveal to Plaintiff that the Collateral Shares had already been unlawfully sold between May 2020 and August 2021, upon information and belief, to fund the Sham Loans and enrich themselves.

40.     On or about February 10, 2023, upon full repayment of the purported loan principal under the sham Astor2 Agreements (defined hereinafter), Plaintiff demanded the return of shares provided as collateral to secure the sham Astor2 Loan.  Defendants through Astor2, however, ignored Plaintiff's multiple requests made in February and March 2023, and then refused to return the shares and refund the additional cash deposited by Plaintiff following Defendants' false and fraudulent Margin Calls[2] made in May 2022.  Defendants failed again to

_____

[2] "Margin Calls" is defined in the fraudulent Astor2 Agreements and requires Chenming to top up shares or cash equal to 20% more than the fair market price of the Collateral in the event the Collateral falls to less than 60% of its fair market price.

reveal that they had sold the Collateral Shares between May 2020 and January 2021.

41.    In or about May 2022, Val Sklarov using the name Gregory Mitchell made repeated misrepresentations about the existence of a fake "loan committee" which supposedly would review and approve Plaintiff's request for the return of the Collateral Shares.

42.    On or about February 17, 2023, Jaitegh Singh and Jurist IQ further misrepresented to Plaintiff that a mandatory "AML and KYC" due diligence review requirement was in process and necessary before the Collateral Shares could be returned.  Jaitegh Singh and Jurist IQ also did not reveal to Plaintiff that the Collateral Shares were already sold by Defendants.

43.    It was at this time Plaintiff began to realize that the Sham Lenders, acting under the direction and control of Defendants, never intended to return the Collateral Shares to Plaintiff.

44.    By March 2023, however, Plaintiff had already substantially paid the purported principal amount of the sham Vanderbilt Loan (defined below) and had been making regularly scheduled payments on the sham UPC1 Loan (defined below).

45.    Concerned for the security of the Collateral Shares, Plaintiff withheld further payments on the sham UPC1 and Vanderbilt Loans and demanded that UPC1 and Vanderbilt provide proof that the shares it deposited for the respective Sham Loans remained in safe custody and reassurances that UPC1 and Vanderbilt intend to return the shares upon the full repayment of the sham UPC1 Loan and Vanderbilt Loan.

46.    Defendants through UPC1 refused to do so, refused to provide any assurances, and failed to reveal that they had already sold the Collateral Shares between November 2020 and January 2021.  Instead, Defendants through UPC1 accused Plaintiff of breaching the sham UPC1 Agreement (defined below) by failing to make further payments and used that assertion as the

basis to issue notices of default against Plaintiff.

47.    Defendants through Vanderbilt, on the other hand, never responded to Plaintiff's requests and failed to reveal that they had already sold the Collateral Shares between June and July 2021 for that sham Loan.

48.    With no other recourse, in or about July 2023, Plaintiff made an application to the High Court of Hong Kong to locate the Collateral Shares, only to learn on or about October 4, 2023 that by that date almost all of the shares had been fraudulently transferred or sold by Defendants through the Sham Lenders shortly after Plaintiff deposited those shares with the custodian broker.

49.    Through the fraudulent and unlawful sale of the Collateral Shares, Defendants significantly enriched themselves in amounts substantially higher than the face value of the Sham Loans and used those proceeds in part to fund the Sham Loans to further their fraudulent scheme.

50.    Defendants through the Sham Lenders failed to disclose those sales to Plaintiff and relentlessly pressed the fraudulent scheme by, among other things, in May, November and December 2022 (sham Astor2 Loan), in July 2021 and May, June, October and November 2022 (sham Vanderbilt Loan), and in May 2023 (sham UPC1 Loan) falsely demanding Plaintiff repay the Sham Loans (which were funded in part by unlawful sales of Plaintiff's stock collateral) and make additional deposits of stock and cash collateral by misrepresenting that the Sham Loans would be in default if such payments and transfers were not made.

**C.  The Astor2 Stock Loan Fraud**

51.    In or about late 2019 and early 2020, Plaintiff was introduced to Defendants posing as Astor2 through certain business contacts including Messrs. Qiang "Alex" Liu and

Yang Li.

52.    At that same time, Defendants misrepresented to Plaintiff that the funding party Astor2 is associated with Astor Capital, a subsidiary of the Astor Trust Company owned by the wealthy Astor family in the U.S.  Plaintiff was also falsely informed that the CEO of Astor Capital, Thomas Mellon, had discussed providing financing to Plaintiff directly with Alex Liu. Upon information and belief, these representations were all falsely provided by Val Sklarov and the other Individual Defendants, who nonetheless, never revealed themselves to Plaintiff at any time and that Astor2 had no association with the Astor family, and that Thomas Mellon, was in fact Val Sklarov.

53.    Plaintiff relied on these intentional misrepresentations and material omissions in entering into the transactions with Astor2, believing that it was dealing with a legitimate financial institution that regularly engaged in honest securities-backed lending activities.  In later correspondence, Val Sklarov, hiding his identity by using the name Gregory Mitchell, repeatedly misrepresented to Plaintiff that it was dealing with a legitimate lending institution including in an email dated March 20, 2023, representing Astor2 as "a private finance company."

54.    The names of the entities associated with Astor2, including Astor Capital, Astor Asset Group, and Astor Wealth Group were intentionally selected by Defendants to be confusingly similar to entities related to the famous Astor family and a legitimate mutual fund manager known as Astor Investment Management LLC.  Defendants, by selecting those names, intended to induce Plaintiff's reliance on Defendants' misrepresented facts.  Plaintiff relied on these intentional misrepresentations and material omissions in entering into the Sham Loans and providing the Collateral Shares and cash payments to Defendants, and did not discover until much later that Defendants were impersonating well-known legitimate financial institutions.

55.     Defendants, at all relevant times herein, through Astor2 and its website, falsely represented to Plaintiffs that Astor 2 is a wealth management and advisory entity registered in Vancouver, British Columbia.[3]

56.     Relying on these intentional misrepresentations and material omissions, on January 17 and September 17, 2020, Plaintiff entered into two sham Stock Loan Agreements ("Astor2 Agreements") with Astor2, pursuant to which Astor2 agreed to loan Plaintiff up to $35,000,000 ("Astor2 Loan").

57.     Purportedly to secure the loan, Defendants through Astor 2 demanded that Plaintiff provide 110,000,000 Class B shares of the ListCo under the first agreement ("Astor2 B Shares Agreement"), and 95,000,000 Class H shares of the ListCo under the second agreement ("Astor2 H Shares Agreement").  The value of the Class B and H shares was based on their trading prices at the time the shares were deposited with the custodian broker, approximately $88,662,546.86.

58.     Pursuant to two Custodian Management Agreements, between April 2020 and January 2021, Plaintiff deposited those shares with a custodian broker controlled and designated by Defendants through Astor2, Weiser Global Capital Markets, an entity registered in Bahamas ("Weiser").  Weiser, however, is not a qualified holder of B or H shares, and in turn appointed

_____

[3] Unknown to Plaintiff at the time, an Early Intervention Alert issued by the British Columbia Securities Commission stated that, "Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services. Astor is not registered to trade in, or advise on, securities or derivatives in BC. We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC." *See* British Columbia Securities Commission, Warning against Astor Capital Fund Limited (Astor), available at: https://www.bcsc.bc.ca/enforcement/early-intervention/investment-caution-list/2020/astor-capital-fund-limited (Apr. 9, 2020).

China Merchants Securities (HK) Co., Ltd ("CMS") and ICBC International Securities Limited ("ICBCI"), who are qualified holders, as sub-custodians.

59.    Weiser subsequently opened accounts with CMS and ICBCI and, at the direction of Defendants, instructed Plaintiff to deposit the Collateral Shares into these accounts between April 2020 and January 2021 through six (6) transfers.

60.    Upon information and belief, to hide his identity from Plaintiffs, Val Sklarov used the name "Michael Romanoff" and false title of "Managing Member" to sign the agreements on behalf of Astor2. On April 13, 2021, Plaintiff received two letters purportedly from Astor2, signed by Val Skalrov under the name Michael Romanoff, but this time his title was falsely stated to be "Compliance Officer."

61.     Upon information and belief, the Individual Defendants also concealed their identities from Plaintiff by creating fictitious characters said to be officers or employees of Astor 2 and using generic email addresses such as operations@astorassetgroup.com, operations@astorcapitalfund.com and compliance@astorcapitalfund.com to communicate with Plaintiff.

62.    Upon information and belief, none of the following alleged Astor2 officers or employees exist, they are fictions created by Val Sklarov and his co-conspirators: (1) Gregory Mitchell (gregory.mitchell@astorcapitalfund.com), said to be Managing Director of North America and Managing Director of Astor Wealth Group; (2) Thomas Mellon (thomas.mellon@astorcapitalfund.com), said to be CEO of Astor Wealth Group; (3) Richard Fein, said to be with the fabricated Compliance Department; (4) Mariia Mitsa, said to be a Managing Member; (5) Corey McCormick (c.mccormick@astorassetgroup.com), said to be Treasury Management at Astor Asset Group; and (6) Brandon Miller

(b.miller@astorassetgroup.com) and David Duncan (d.duncan@astorassetgroup.com) with undefined titles. They were all created by the Individual Defendants to hide their identities from Plaintiff and induce Plaintiff's reliance on the intentional misrepresentations and material omissions made in connection with the fraudulent scheme alleged herein.

63. Val Sklarov has admitted, and the High Court of Justice in England and Wales has found that Gregory Mitchell and Thomas Mellon do not exist as separate individuals, but are both Val Sklarov. *See infra* ¶¶ 167 and 168.

64. Upon information and belief, the Individual Defendants also misrepresented the existence of corporate departments within Astor2, including a "Loan Committee," "Accounting Department," "Underwriting Department," and "Payment Processing Center," to hide their unlawful sales and transfers of the Collateral Shares and assist with their intentional misrepresentations and material omissions made in response to Plaintiff's demand for the return of the Collateral Shares.

65. To induce Plaintiff to deposit the Collateral Shares with Weiser under the sham Astor2 Loan, Val Sklarov through Astor2 misrepresented to Plaintiff, including in an email posing as Gregory Mitchell dated October 2, 2021, that Plaintiff would remain "the beneficial owner" of the Collateral Shares, Astor2 "does not take title to the collateral," and that the agreement with Weiser "is just a custody technicality. Shares still belong to Chenming," and failed to disclose to Plaintiff that he and the other Individual Defendants intended to unlawfully sell the Collateral Shares to in part fund the Sham Loans and otherwise enrich themselves.

66. In another email dated October 10, 2021, Val Sklarov posing as Gregory Mitchell falsely stated that Astor2 was "willing to terminate the loan early as you had requested and return the stock to you. Please let us know if you are prepared to pay-off the loan this week. We will

issue a Pay-Off Letter." Val Sklarov failed to disclose to Plaintiff that he and the other Individual Defendants had already sold the Collateral Shares, and therefore when Plaintiff attempted to pay off the sham Astor2 Loan prior to its maturity in exchange for immediate return of the Collateral Shares, Defendants through Astor2 refused to return the Collateral Shares.

67.     On or about May 9, 2022, Val Sklarov posing as Gregory Mitchell sent Plaintiff two false Margin Call Notices issued by a fake "Loan Operations" Department. The notices declared a false Event of Default that would be curable by "immediately . . . depositing additional cash or securities to the Depository Broker." The notices state that Astor 2 "does not want to issue an Event of Default" and urged Plaintiff to immediately deposit over $17 million cash to the Chase account beneficially held by SUC or 48 million Class B and Class H shares to Astor2's "London based custodian account." Val Sklarov failed to reveal to Plaintiff that the sham Astor2 Loan was funded through the sale of the Collateral Shares and therefore there was no principal to pay off and there could be no Event of Default.

68.     Between May 9 and 12, 2022, Defendants through Astor 2 and Val Sklarov posing as Gregory Mitchell, issued additional false and fraudulent Margin Call requests on Plaintiff. On May 15, 2022, Plaintiff tried to repay the sham Astor2 Loan in exchange for the return of the Collateral Shares. Defendants through Astor2 declined Plaintiff's proposal, and failed to reveal that they had already sold the Collateral Shares.

69.     On or about May 19, 2022, in reliance upon Defendants' threats to forfeit the Collateral Shares which, unknown to Plaintiff, were false because they had already been sold, Plaintiff deposited additional cash in the amounts of $8,105,800 and $7,866,000 into the bank account designated by Defendants through Astor2 as directed by Defendants to cure the false Margin Calls. On May 24, 2024, Val Sklarov still posing as Gergory Mitchell sent a letter to

Plaintiff falsely stating that future Margin Call events "can be cured by an additional top-up of shares or securities."

70.    Between January and April 2023, Defendants through Astor2 intentionally and fraudulently induced Plaintiff to make full payment on the sham Astor2 Loan by falsely stating that Astor2 would ask its fake "loan committee" to approve and "swift[ly]" process the return of the Collateral Shares upon the full satisfaction of all loan amounts.  For example, on or about January 5, 2023, Val Sklarov posing as Gregory Mitchell falsely stated in an email that funds "will need to be remitted to our lawyer's trust account at Jurist IQ IOLTA account" because "Astor Capital Fund is a regulated entity," and misrepresented that the Collateral Shares would be immediately returned "upon satisfaction of all loan amounts due to us, a petition within 1 week is submitted to loan committee" and that "once approved, return process is swift, a matter of few days to initiate and coordinate the transfers."  All of these statements were false because, among other things, there were no actual loans, and at the time they were made, the Individual Defendants had already sold the Collateral Shares.

71.    Relying on these intentional misrepresentations and material omissions, on February 10, 2023, Plaintiff fully repaid the sham Astor2 Loan to the IOLTA account held by Defendants Jurist IQ and Jaitegh Singh.

72.    Defendants through Astor2, including with the assistance of Jurist IQ acting as Astor2's purported "Escrow Agent," repeatedly made misrepresentations intended to excuse or delay the return of the Collateral Shares.  On February 7, 2023, after Plaintiff remitted payments as requested by Defendants to the IOLTA account with Jurist IQ, Val Sklarov posing as Gregory Mitchell refused to submit Plaintiff's request for the return of the Collateral Shares to the fake "loan committee," arguing rather confusingly that "you have not paid us, you paid Jurist IQ and

we do not have the funds."

73.     On February 17, 2023, Defendants Jaitegh Singh and Jurist IQ acting in concert with Val Skalrov, issued a letter to Plaintiff misrepresenting that Jaitegh Singh and his law firm Jurist IQ were conducting due diligence to ensure compliance with anti-money laundering laws upon receipt of funds from Plaintiff.  Astor2, however, had been receiving regular payments as well as additional cash deposits from Plaintiff for months, yet this so-called due diligence requirement was never stated to be a condition for the return of the Collateral Shares. Defendants made intentional misrepresentations regarding Jurist IQ's IOLTA account, the fabricated loan committee, and the purported due diligence requirements to hide the fact that Defendants had already sold a majority of the Collateral Shares, conceal their fraudulent scheme, and further induce Plaintiff to deposit additional stock as collateral for another Sham Loan (the sham Vanderbilt Loan) on February 20, 2023.

74.     Following the issuance of his letter, between February and March 2023, Jaitegh Singh and Jurist IQ made repeated misrepresentations in emails, including that they were "diligently working to satisfy our AML and KYC requirements behind the scenes," and would process Plaintiff's requests "as expeditiously as possible" upon receipt of "third-party investigative reports which are necessary to satisfy our due diligence requirements," while requesting an extensive list of documents such as tax returns, board resolutions, and apostilled corporate documents from Plaintiff, all of which were unnecessary and falsely requested to further hide Defendants' unlawful sales and transfers of the Collateral Shares.

75.     When Plaintiff requested access to the "third-party investigative reports," Jaitegh Singh and Jurist IQ refused to provide them claiming "[n]o financial institution would disclose who is retained for 3rd party reports."  These statements were all false, and intentionally made to

19

hide the fact that Defendants had already sold the Collateral Shares.

76.    In or about April 2023, Defendants through Astor2 further misrepresented to Plaintiff the necessity for a fake "loan committee" to convene and approve Plaintiff's request to return the Collateral Shares.  For example, in emails from March and April 2023, Val Sklarov posing as Gregory Mitchell asked Plaintiff to submit "Transfer Forms" evidencing Plaintiff's payment of the loan funds misrepresenting them to be necessary "[i]n preparation of file to be submitted to loan committee for approval of return of collateral."  Initially, Val Sklarov posing as Gregory Mitchell informed Plaintiff that the fake loan committee "convene[d] each Thursday."

77.    On April 2, 2023, Val Sklarov misrepresented to Plaintiff that the fake loan committee "did not meet this past Thursday" but "will meet this coming Thursday."  On April 11, 2023, Val Sklarov posing as Gregory Mitchell used a holiday as an excuse to further stall the process by misrepresenting that "key decision makers are away until the week of April 24th." Upon information and belief, Val Sklarov was and is the key decision maker.

78.    On April 17, 2023, Defendants through Astor2 issued a letter to Plaintiff misrepresenting that the fake "loan committee" had "rejected [Plaintiff's] petition for return of collateral" and declared the immediate acceleration of the loan.  The letter failed to disclose that the Collateral Shares had already been sold by Defendants.  The letter was signed using the false moniker "Loan Operations" and dated April 14, 2023, on a day when the key Astor2 personnel were purportedly away for the holiday.

79.    On May 11, 2023, Val Sklarov posing as Gregory Mitchell misrepresented in a follow-up email to Plaintiff that "[w]e would like to advise Weiser that Chenming had committed multiple defaults and we consider the file closed" and "[i]t seems Chenming does not

recall that the collateral was transferred to Astor with their knowledge and approval few [sic]

years ago."  Val Sklarov's statements also contradict his prior statements in October 2021

providing that the custody arrangement with Weiser was merely a "technicality" and Astor2

"does not take title to the collateral."

80.     Plaintiff has fully repaid the sham Astor2 Loan as of February 2023.  In addition,

Plaintiff made purported interest and fee payments on the sham Astor2 Loan to Defendants in the

amounts of: (i) $2,178,386.31 in interest, $116,992.56 as maintenance fees, $243,174.00 as

custody fees, $864,465.90 as origination fees, and $1,000 in legal expenses under the sham

Astor2 B Shares Agreement; and (ii) $1,312,023.79 in interest, $136,329.52 as maintenance fees,

$281,867.59 as custody fees, $486,348.00 as origination fees, and $1,000 in legal expenses under

the sham Astor2 H Shares Agreement.

81.     Defendants through Astor2 directed Plaintiff to send payments to the following

bank accounts in this district:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Bank: Citibank, NA, New York
> Beneficiary Account Number: ██2100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> Sierra Universal Corp
> 5830 E. 2nd Street, Ste. 7000 #2419 Casper, WY 82609
> Bank: JPM Chase
> Beneficiary Account Number: ██9672
> Beneficiary Bank: JPM Chase
> Beneficiary Bank Address: 270 Park Ave 31st Floor, New York, NY 10017,
> United States
> Beneficiary Bank ABA: 021000021
> Beneficiary Bank SWIFT: CHASUS33XXX

82.     Defendant Jaitegh Singh is identified as the "President" of SUC on its account

opening forms associated with Chase account ██9672 opened on December 24, 2020.  At the

time of opening, the account type was "Chase Performance Business Checking." On June 3, 2021, the same account was upgraded to "Chase Platinum Business Checking" and on the relevant forms, Tetyana Sklarov is also identified as the "President" and Jaitegh Singh the "Signer."

83.    Defendant Tetyana Sklarov is identified as the President, Director, Treasurer, and Secretary of SUC in its filings with the Wyoming Secretary of State.

84.    To date, Defendants through Astor2 have failed and refused to disclose that they sold the shares of stock deposited as collateral to fund the sham Astor2 Loan as well as the subsequent sham UPC1 and Vanderbilt Loans and return to Plaintiff the shares of stock and cash deposited as collateral in the approximate total value of $104 million.

**D.  The UPC1 Stock Loan Fraud**

85.    In or about August 2020, Plaintiff was remotely introduced to UPC1 through third-party business contacts, including Mr. Zhen Zhang from Hongkong Majordomo Family Office, which purportedly provides loan related services to wealthy clients and foreign institutions.

86.    In an initial document sent at Defendants' direction to Plaintiff on or about August 10, 2020, UPC1 was misrepresented to "be part of a British family fund." Upon information and belief, that was a misrepresentation provided by Val Sklarov and the Individual Defendants, who directed Mr. Zhang to provide that misinformation to Plaintiff. Relying on those misrepresentations, Plaintiff believed that UPC1 was a bona fide and honest financial institution. In later correspondence, including in a May 9, 2023 email sent, upon information and belief, from the Individual Defendants posing as underwriting@unionpacificcapital.com, Defendants through UPC1 misrepresented UPC1 as having connections with wealthy family

offices in Hong Kong and having "been in business a long time" and "serve[d] many clients globally, including other financial institutions, governments and public companies."

87.    In or about September 2022, during which period the parties exchanged comments to relevant transaction documents, Plaintiff raised concerns about several terms relating to the Collateral Shares.  In response, upon information and belief, the Individual Defendants posing as an agent of UPC1 with the name "Jenny" misrepresented to Plaintiff that the Collateral Shares along with dividends will be returned to Plaintiff once the sham UPC1 Loan is concluded.

88.    Relying on these misrepresentations and that UPC1 was a legitimate lending institution, on October 19, 2020, Plaintiff and UPC1 entered into a Securities Loan Agreement ("UPC1 Agreement")[4] for UPC1 to provide Plaintiff up to $17,000,000 in loan funds in return for Plaintiff's stock as collateral ("UPC1 Loan").

89.    Upon information and belief, Val Sklarov using the name "Winstone Carrington" whose title appears to be "Senior Vice President" signed the sham UPC1 Agreement on behalf of UPC1.  Upon information and belief, Winstone Carrington is a fictitious name fabricated by Val Sklarov and/or other Individual Defendants and used by them to hide Val Sklarov's identity, and induce Plaintiff's reliance upon their intentional misrepresentations and material omissions.

90.    Upon information and belief, the Individual Defendants concealed their identities by creating fictitious characters and misrepresenting them to be employees of UPC1, including: (1) Harold Brighton, said to be from the Underwriting Department, and (2) Paul French with an

_____

[4] The sham UPC1 Agreement was dated September 18, 2020, but it was executed by Chenming on October 19, 2020.

unidentified title.  These fabricated individuals do not have a designated UPC1 email account but used false and fabricated corporate departmental email addresses such as compliance@unionpacificcapital.com, info@unionpacficcpital.com, underwriting@unionpacificapital.com to communicate with Plaintiff in furtherance of the fraudulent scheme.

91.    Upon information and belief, Defendants misrepresented the existence of corporate departments within UPC1, including a fake "Underwriter Team," "Legal Department" and "Compliance Department" to assist in hiding the fact that the Collateral Shares had been unlawfully sold.

92.    Misrepresenting that it was to secure the sham loan, Defendants through UPC1 demanded that Plaintiff provide a total of 80,000,000 Class B shares of the ListCo as collateral when in fact they intended to sell those shares and use the proceeds to in part fund the Sham Loans, and otherwise unlawfully enrich themselves.

93.    In reliance on those misrepresentations, Plaintiff deposited the Collateral Shares with the same custodian broker, Weiser, that was used for the sham Astor2 Loan.  The value of the deposited Class B shares, based on their trading prices at the time the shares were deposited in or about November 2020 and January 2021 was approximately $31,729,653.04.

94.    Plaintiff had been making regular and timely purported principal and interest payments until in or about April 2023, when it discovered Defendants' intentional misrepresentations and material omissions.  As of the end of 2023, Plaintiff had paid $2,037,307.53 in loan principal plus $992,651.36 in interest, $122,760.00 as maintenance fees, $371,372.64 as custody fees, $440,234.79 in loan generation fees, and $5,000 in closing costs as demanded by Defendants.

95.     Defendants through UPC1 directed Plaintiff to send payments to the following

bank accounts in this district:

>Deltec Bank and Trust Limited
>Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
>Beneficiary Bank: Citibank, NA, New York,
>Beneficiary Account Number: ■■■2100
>Beneficiary Bank ABA: 021000089
>Beneficiary Bank SWIFT: CITIUS33XXX
>
>UPC Holdings Ltd
>155 E. 44th Street
>New York, NY 10017, USA
>Bank: Community Federal Savings Bank
>Beneficiary Bank Address: 89-16 Jamaica Ave
>Woodhaven, NY 11421, USA
>Beneficiary Account Number: ■■■■7861
>Beneficiary bank SWIFT: CMFGUS33
>
>Lviv Estate Holdings Ltd
>142 Gold Springs Ct
>Canton, GA 30114, USA
>Bank: JP Morgan Chase Bank NA
>Beneficiary Bank Address: 270 Park Ave
>New York, NY 10017, USA
>Beneficiary Account Number: ■■■5510
>Beneficiary bank SWIFT: CHASUS33

96.     Upon information and belief, Defendant Val Sklarov is the sole shareholder and

ultimate beneficial owner of Defendant UPCH.  Val Sklarov is authorized to manage CFSB

account ■■■7861 maintained by Defendant UPCH.  CFSB account ■■■7861 was

opened by Val Sklarov on October 20, 2021 and closed on June 9, 2022.

97.     Upon information and belief, Defendants Jaitegh Singh and Tetyana Sklarov are

the "Signer" and "President," respectively, of Defendant Lviv, an entity connected with Sham

Lender UPC1, as provided in the account opening forms for the Chase Platinum Business

Checking account ■■■5510.  The account was opened by Defendant Jaitegh Singh and

Tetyana Sklarov on June 2, 2021.

98.     In or about early May 2023, Plaintiff sought to confirm the security and maintenance of the Class B Shares provided as collateral under the sham UPC1 Agreement. Concerned about the security of the shares, Plaintiff wrote to UPC1 on May 5, 2023, seeking confirmation of the same and proposing a conference call with UPC1.  Several hours later, Defendants through UPC1 sent Plaintiff a false and fraudulent Margin Call Notice, and demanded that Plaintiff deposit additional shares or cash as further security, but otherwise refused to confirm the security of the shares or hold a conference call with Plaintiff.

99.     To date, Defendants through UPC1 have failed and refused to disclose that they sold the shares of stock deposited as collateral to fund the sham UPC1 and Vanderbilt Loans and return to Plaintiff the shares of stock deposited as collateral in the approximate value of $31,729,653.04.

### E.  The Vanderbilt Stock Loan Fraud

100.     Upon information and belief, in or about January 2021, Defendants through a Ms. Nicole Ling approached Plaintiff to introduce a stock loan financing opportunity.  Vanderbilt was falsely represented by Defendants through Ms. Ling to have an office address of SK, Regina - Royal Bank Building, 2010 11th Avenue, Regina, S4P 0J3, Canada.  Vanderbilt, however, does not have a physical office at that location, and is not registered in the United Kingdom, Canada or the United States.

101.     In an email dated January 30, 2021, Defendants through Ms. Ling misrepresented to Plaintiff that Vanderbilt "is an investment bank based in Canada," it "provides stock-backed financing programs to listed companies in Hong Kong, Singapore, Korea, and Thailand," its financing program primarily includes "stock pledge loan services," and that Vanderbilt provided "nearly $4 billion in stock-backed loans last year."  In the marketing brochure attached to that

email, Vanderbilt is misrepresented to be "a financial services provider that focuses on all aspects of wealth management and multifaceted mergers and acquisitions, including debt management, equity financing, restructuring, valuation and strategic advisory services."

102.    On February 6, 2021, the Individual Defendants posing as a person named Susan from Vanderbilt (Susan.l@vanderbilt.world) sent a brochure to Plaintiff via email.  Upon information and belief, the brochure misrepresents Vanderbilt to be part of the family business of the shipping and railroad tycoon Cornelius Vanderbilt and misrepresents that Vanderbilt had invested in railroad and shipping in the 1800s.  It also misrepresents that Vanderbilt currently owns a portfolio of infrastructure investments in the transportation, utilities and energy sectors.

103.    Relying on these intentional misrepresentations and material omissions, Plaintiff believed it was dealing with a legitimate financial institution connected to the famous Vanderbilt family.  On April 14, 2023, to further induce Plaintiff to enter into the transaction and provide collateral shares of stock, the Individual Defendants sent an email to Plaintiff through the sham email address LoanServices@vanderbilt.world misrepresenting that Vanderbilt "offer[s] very low interest rates compared to local banks and broker dealers in [Hong Kong]."

104.    Consequently, on April 17, 2021, Plaintiff entered into a Collateralized Securities Loan Agreement ("Vanderbilt Agreement") with Vanderbilt pursuant to which Vanderbilt agreed to loan Plaintiff up to $45,000,000 ("Vanderbilt Loan") in return for Plaintiff's stock as collateral.

105.    Upon information and belief, Val Sklarov using the name "Christopher Warner" with the false title of "Executive Vice President" signed the agreement on behalf of Vanderbilt. Upon information and belief, Christopher Warner is a fictitious name fabricated by the Individual Defendants.

106.    Upon information and belief, Defendants concealed their identities by creating fictitious characters and at all relevant times misrepresenting them to be officers or employees of Vanderbilt, including: (1) Mortimer Amadeus Lindemann, from Vanderbilt Loan Services; (2) Gladiolus Jojansson, from Loan Services Team, Global Operations Department; and (3) Buzya Cornell, from Loan Services Team, Global Compliance Department.  These fabricated individuals used fake corporate departmental email addresses such as LoanServices@vanderbilt.world, operations@vanderbilt.world, legal@vanderbilt.world, and compliance@vanderbilt.world to communicate false information to Plaintiff.

107.    Upon information and belief, Defendants fabricated corporate departments within Vanderbilt and misrepresented there to be a Loan Committee, Executive Committee, Underwriting Department, Legal Department and Compliance Department to further their fraudulent scheme to sell the Collateral Shares which proceeds they would then use in part to fund the Sham Loans and unlawfully enrich themselves.

108.    Misrepresenting that they would be used as collateral to secure the sham loan, Defendants through Vanderbilt demanded that Plaintiff deposit 58,414,000 Class H shares of the ListCo with Weiser as custodian broker.

109.    On July 28, 2021, the Individual Defendants through Vanderbilt sent an email to Plaintiff misrepresenting that "[t]he collateral is returned to [Plaintiff] at loan maturity, provided there has not been an Event of Default."  Defendants failed to disclose that they intended to sell these shares to in part fund the sham Vanderbilt Loan, and otherwise enrich themselves.

110.    In reliance upon false and fraudulent Margin Call Notices issued by Defendants through Vanderbilt, on August 2, 2021 and June 16, 2022, and similar to those issued by Defendants in connection with the other Sham Loans, Plaintiff deposited additional cash

collateral in the amount of $5,640,000 and $5,851,421.50, respectively.

111.    In reliance upon these false and fraudulent Margin Call Notices issued by Defendants through Vanderbilt, in or about February 2023, Plaintiff deposited an additional 20,717,563 shares of Class B stock of the ListCo with another broker appointed by Defendants through Vanderbilt, Armira Capital Limited.  The approximate value of the Class B and H shares provided to Defendants, based on their trading prices at the time the shares were deposited, was approximately $48,594,383.04.

112.    In an email dated September 28, 2021, the Individual Defendants through Vanderbilt misrepresented to Plaintiff that due to "risks prevalent in today's global financial market," Weiser had "decided to terminate the [agreement with Plaintiff]" and planned to transfer the Collateral Shares pledged by Plaintiff under the sham Vanderbilt Loan from Plaintiff's account to a sub-account to be created under Vanderbilt's account.

113.    When Plaintiff expressed concerns about its ownerships and other rights in the Collateral Shares, the Individual Defendants through Vanderbilt responded on September 29, 2021, further misrepresenting to Plaintiff that the sub-account to be created will be a "segregated" account and the Collateral Shares "are held by lender for the benefit of the shareholder, therefore, it is not loss of ownership."

114.    Plaintiff was not convinced and explicitly rejected the transfer.  Plaintiff also proposed to "end the loan ahead of schedule" if Vanderbilt is concerned about its risk.  On October 6, 2021, Defendants responded through Vanderbilt, contradicting their prior statements stating that Plaintiff "do[es] not have the right to choose how and where the shares of funded loans are held" and that "[t]he shares are under the domain of Vanderbilt."

115.    Defendants failed to disclose to Plaintiff that the Collateral Shares had already

been sold between June and August 2021 and the proceeds of those sales were used in part to fund the sham Vanderbilt Loan and otherwise enrich themselves.

116.    As of April 2023, Plaintiff paid $6,150,327.92 in loan principal, $439,614.77 in interest, and, as demanded by Defendants, $62,860.94 as maintenance fees, $182,602.45 as custody fees, $408,596.09 in loan generation fees, and $5,000 in closing costs.

117.    Defendants through Vanderbilt directed Plaintiff to send payments to the following bank accounts in this district:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: ███2100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: ████9621
> Beneficiary Bank SWIFT: CHASEUS33
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: Community Federal Savings
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: ██████1912
> Beneficiary Bank SWIFT: CMFGUS33

118.    Defendant Jaitegh Singh is identified as the "President" of CVM and signed its account opening forms for the Chase Platinum Business Checking account ████9621 which was opened on June 13, 2022.

119.    Upon information and belief, Defendant Val Sklarov is the sole shareholder and ultimate beneficial owner of Defendant CVM.  Val Sklarov is authorized to manage CFSB

account ████ 1912, which was opened on November 26, 2021, and closed on June 9, 2022.

120. To date, Defendants through Vanderbilt have failed to disclose that they sold the shares of stock deposited as collateral to fund the sham Vanderbilt Loan and return the shares of stock and cash deposited as collateral in the approximate total value of $54,445,804.54.

**F. Defendants Further Impede Plaintiff's Efforts to Recover the Collateral**

121. In an attempt to impede Plaintiff from recovering the substantial amounts of collateral deposited with Defendants, on or about June 14, 2023, Defendants through UPC1 commenced an arbitration in the London Court of International Arbitration ("LCIA") against Plaintiff, seeking, among other things, a declaratory judgment and damages for alleged disparaging statements made by Plaintiff ("LCIA Arbitration") despite the limitations of liability and damages clauses present int the UPC1 Agreement.

122. The alleged "disparaging statements" are those made in Plaintiff's demand letters to UPC1 requesting that UPC1 disclose the whereabouts of and return its Collateral Shares which Defendants through UPC1 have fraudulently and unlawfully sold and kept the proceeds for themselves.

123. In response to the UPC1 arbitration, Plaintiff asserted counterclaims seeking redemption of the UPC1 collateral, or, in the alternative, monetary damages equal to the difference between the value of the shares provided to UPC1 and the face value of the sham UPC1 Loan, as of the date of the appropriation of the Collateral Shares or the Award, and the return of its paid interests, costs and fees.

124. On August 17, 2023, Defendants through UPC1 changed their position and revised the value of their arbitration claims from $264,423,911.01 to $1.00. The false and fraudulent explanation offered by Defendants through UPC1 was that they decided to lower the

amount of its claimed damages "based solely upon the par value of the shares pledge by the [Plaintiff] as collateral for the loan" and "given the shares have no par value, this claim should now be valued as a nominal amount of $1.00 USD."

125.    On October 31, 2023, Defendants through UPC1 further changed course by adjusting again the amount of their claims by, among other things, seeking the forfeiture of the UPC1 collateral and monetary damages in the amount of $1,000,000.

126.    Not surprisingly, UPC1 has resisted any discovery in the LCIA Arbitration, including by refusing to produce any fact witness or document.  Although the tribunal ordered the parties to complete document production by June 2024, UPC1 has failed to produce any document as of November 2024.  UPC1 has further engaged in other improper conduct to indefinitely delay the arbitration proceeding, including without limitation refusing to pay its share of the arbitration fee deposit and security for costs as instructed by the LCIA and the arbitral tribunal.  As a result, UPC1's claims have been deemed permanently withdrawn pursuant to the tribunal's decision dated September 13, 2024.

127.    Six days later, on September 19, 2024, UPC1's counsel Fred W. Freitag IV, Esq. withdrew from the LCIA Arbitration without proper explanation.  On October 24, 2024, Plaintiff received an email from UPC1's replacement counsel Mr. Maiyaz Al Islam, said to be the Managing Director of a Singapore-based law firm Magna Law LLC.  On the same day, Plaintiff received a Notice of Arbitration filed by Vanderbilt with the Singapore International Arbitration Center.  Apparently, Mr. Maiyaz Al Islam also represents Vanderbilt in the Singapore arbitration.  Tellingly, Defendants no longer even try to hide the fact that they are the alter egos of and control the Sham Lenders, which are sham entities established for the sole purpose of perpetrating the fraudulent scheme alleged herein.

G. **Further Evidence of Defendants' Fraudulent Scheme**

128.    In or about July 2023, Plaintiff made an application before the High Court of

Hong Kong seeking a Norwich Pharmacal Order requiring non-party disclosures from the two

custodian banks CMS and ICBCI seeking the transaction documents of the accounts that

received the Collateral Shares under the subject sham loan agreements.

129.    On October 4, 2023, CMS and ICBCI disclosed certain transaction documents to

Plaintiff upon the orders by the High Court of Hong Kong which reveal that Defendants began

transferring or trading the Collateral Shares pledged by Plaintiff shortly after they were deposited

and well *before* the Defendants' several misrepresented Events of Default.  Upon information

and belief, Defendants had quickly disposed of the Collateral Shares in part to fund the Sham

Loans and to unlawfully enrich themselves.

130.    These disclosures show that the first share transfer by Defendants through Astor2

occurred on May 15, 2020, merely 38 days after the shares were deposited, when it transferred

5,000,000 Class B shares to DBS Vickers Securities.  By no later than December 8, 2020,

Defendants through Astor2 had fraudulently sold or transferred the entirety of 110,000,000 Class

B shares that were deposited as collateral.  By no later than January 27, 2021, Defendants

through Astor2 had fraudulently sold or transferred the entirety of the 95,000,000 Class H shares

that were deposited as collateral.  Upon information and belief, Defendants used the proceeds of

the fraudulent sales in part to fund the sham Astor2 Loans as well as the subsequent sham UPC1

and Vanderbilt Loans, and to enrich themselves.

131.    By January 21, 2021, Defendants through UPC1 had transferred or sold the

entirety of the 80,000,000 Class B shares that Plaintiff deposited as collateral on November 27,

2020 and January 7, 2021.

132.    Immediately after Plaintiff deposited the 80,000,000 Class B shares under the UPC1 transaction, Defendants through UPC1 immediately began trading those shares and sold off the entirety of those shares during the period between November 27, 2020 and January 21, 2021.  During the same period, Defendants through Astor2 sold the remaining 15,108,779 Class B shares deposited by Plaintiff under the sham Astor2 Loan.  Defendants control UPC1 and Astor2 and caused the Class B shares deposited pursuant to two separate loan transactions to be collectively sold during the same short period of time.  Upon information and belief, Defendants used the proceeds of the fraudulent sales in part to fund the sham UPC1 Loan and the subsequent sham Vanderbilt Loan, and to enrich themselves.

133.    By August 4, 2021, Defendants through Vanderbilt had transferred or sold 58,000,000 out of the 58,414,000 Class H shares that were deposited by Plaintiff as collateral.  Upon information and belief, as of this date, Defendants have transferred and disposed all of these Class H shares of stock and the additional 20,717,563 Class B shares Chenming deposited on February 20, 2023.

134.    Upon information and belief, these transfers and sales were carried out unilaterally and fraudulently by Defendants, without Plaintiff's knowledge or consent and prior to any purported Event of Default.

135.    Through their fraudulent scheme, Defendants have realized and received a tremendous sum of proceeds from the unauthorized fraudulent sale of the Collateral Shares totaling HK$540,983,978.63, approximately $69,280,000, by trading a total of 185,000,000 Class B shares.  The remaining 5,000,000 Class B shares, valued at approximately $1,812,903.23, have been transferred and as of this date may also have been sold upon the instruction of Defendants.

136.    Through their fraudulent scheme, Defendants have realized and received HK$321,027,564.16, which is more than $41,110,000 in proceeds, by trading a total of 77,462,000 Class H shares.  They have further transferred 75,538,000 Class H shares, valued at approximately $47,204,452.82,[5] to third-party custodians Citibank, Zundiao Securities Limited, and Fidelity Clearing Canada, and as of this date may have sold those shares.

137.    Upon information and belief, Defendants used these proceeds in part to fund the Sham Loans, and to unlawfully enrich themselves.

**H.  <u>Plaintiff Discovers the Relationship Between Sham Lenders and Defendants</u>**

138.    Upon information and belief, all three Sham Lenders are owned and controlled by Defendants and used as instruments of Defendants' fraudulent scheme.

  *i.* *<u>Astor2 and UPC1 Are Represented by Defendant Singh</u>*

139.    In or about January 2023, Defendants through Astor2 directed Plaintiff to send payments to the "client escrow account" of Defendants Jaitegh Singh and Jurist IQ.   Defendant Singh is the CEO of Defendant Jurist IQ.

140.    On August 17, 2023, Defendants Jaitegh Singh and Jurist IQ served Plaintiff on behalf Defendants through UPC1 a demand letter seeking the return of misrepresented loan funds under the UPC1 Agreement.

141.    Defendants Jaitegh Singh and Jurist IQ made multiple misrepresentations in the demand letter including that Plaintiff caused defaults under the UPC1 Agreement, was engaged in "disingenuous conduct and bad faith," "interefer[ed] with the [agreement]," and threatened to

---

[5] The average share price was calculated by dividing total value of the Class H shares deposited by the total number of Class H shares deposited under each agreement.

immediately foreclose on the sham UPC1 Loan, and failed to disclose that the sham loan was not a *bona fide* loan but part of a fraudulent scheme pursuant to which Defendants unlawfully sold the Collateral Shares and used the proceeds in part to make the purported "loan."

142.    In the LCIA Arbitration commenced by Defendants through UPC1, UPC1's former counsel, Fred W. Freitag IV, Esq., submitted a letter from Defendants Jaitegh Singh and Jurist IQ confirming Jurist IQ's payment of the deposit of arbitration fees on behalf of UPC1.  In that letter, Defendants Jaitegh Singh and Jurist IQ expressly state that they "regularly acts as general counsel for UPC."  Based on information published by the Disciplinary Board of the Supreme Court of Pennsylvania, Mr. Freitag is an active member of the State Bar of Pennsylvania with a business address at 1041 Applejack Drive, Gibsonia, PA 15044.

143.    On October 19, 2023, in his communication with the LCIA, Mr. Freitag inadvertently attached documents from what appears to be another arbitration concerning a similar fraudulent loan scheme, wherein Astor Asset Management 1 Limited ("Astor1") was the claimant.  Upon information and belief, Astor1 and Astor2 are owned and controlled by the Individual Defendants and used by them to perpetrate securities-backed loan fraud schemes, including the fraudulent scheme alleged herein.

ii.    *UPC1 and Vanderbilt Are Owned and Controlled by Defendants*

144.    On or about May 5, 2023, Plaintiff received an email from Defendants through UPC1 mistakenly attaching a document entitled "Vanderbilt Chenming MOU Addendum – May 3, 2023 – 6-42 PM.pdf."  The document, however, is an addendum to the UPC1 Agreement and does not concern Vanderbilt.

145.    The same attorney, Mr. Maiyaz Al Islam from Magna Law LLC, now represents both UPC1 in the LCIA Arbitration and Vanderbilt in the recently commenced Singapore

arbitration.

      *iii.*     *Defendants Manage the Bank Accounts Used by The Sham Lenders*

      146.     Defendant Val Sklarov manages and holds the two CFSB account ████7861

and ████ 1912 used by Sham Lenders UPC1 and Vanderbilt.

      147.     Multiple payment and/or transfer transactions were initiated from CFSB account

████ 1912 to Singh Law Firm P.A. in May 2022.

      148.     Defendants through all three Sham Lenders directed Plaintiff to send payments to

three Chase bank accounts controlled by the same Individual Defendants Jaitegh Singh and/or

Tetyana Sklarov, who, upon information and belief, are the authorized Signer and/or President of

the companies that beneficially hold those bank accounts.  Specifically:

> **Astor2**: Chase account ████9672, held by SUC, to which Jaitegh Singh is
> identified as the President[6] and Signer and Tetyana Sklarov as the President
> of SUC.

> **UPC1**: Chase account ████5510, held by Lviv, to which Jaitegh Singh is
> identified as Signer and Tetyana Sklarov as President of Lviv.

> **Vanderbilt**: Chase account ████9621, held by CVM, to which Jaitegh
> Singh is identified as President of CVM.

      149.     Relevant bank statements evidence the transfer of funds from SUC's account

████9621 to CVM's account ████9672.

      150.     Defendants, through all three Sham Lenders, further directed Plaintiff to send

payments to the same Citi correspondent bank account ████2100 established by, upon

information and belief, Deltec Bank and Trust Limited on behalf of Defendants.  The transaction

records of these accounts reveal multiple transactions involving Singh Law Firm P.A. and

---

[6] In account opening forms dated December 24, 2020, he was later identified as Signer.

Defendant Jurist IQ between August 2020 and March 2021. For example, Singh Law Firm P.A. received $2.6 million in August, $2.4 million in September, $2.84 million in October, and $2.5 million in December 2020. Defendant Jurist IQ received transfers in the amounts of $2.785 million and $8 million in each of January and March 2021. In total, Defendant Jaitegh Singh realized from his role in the fraudulent scheme, personally and through Defendant Jurist IQ, over $21 million.

    *iv.*   *Jaitegh Singh and His Law Firms Juris IQ, and Singh Law Firm P.A. Are Key Participants in Val Sklarov's Fraud Schemes*

    151.   CFSB and Citi bank statements evidence multiple transactions to Singh Law Firm P.A originating in the bank accounts beneficially held by Defendants.

    152.   Defendant Jaitegh Singh is an important member of the enterprise created by Val Sklarov to perpetrate the fraudulent scheme including by creating front companies that he beneficially owns and opening bank accounts to receive funds realized from Defendants' fraudulent loan schemes.

    153.   In *Satterfield v. Vstock Transfer, LLC et al* (N.Y. Sup., index no. 650311-2019), after the New York Supreme Court confirmed the Final Award against Val Sklarov and ordered him to return the collateral shares and after Val Sklarov had lost both motions to stay enforcement of the judgment, in January 2022, Defendant Jaitegh Singh acting as "personal counsel for Sklarov" contacted plaintiff's counsel and "offered to cooperate in the share transfer in exchange for millions of dollars' worth of stock and judgment forgiveness," and threatened bankruptcy if settlement was not reached. *Id.*, NYSCEF No. 476 ¶ 10. Apparently, Val Sklarov's "personal counsel (not of record) . . . acted independently on behalf of Mr. Sklarov, without our knowledge or participation" of then counsel of record (Shapiro Arato Bach LLP) for Val Sklarov and his co-defendants. *Id.*, NYSCEF No. 512 ¶ 4.

154.    Jateigh Singh represented Val Sklarov in *Two Rivers Water & Farming Company v. America 2030 Capital Limited et al* (Dist. Colo), Case No. 1:19-cv-01640-CMA-STV, where plaintiff obtained declaratory and injunctive relief against Val Sklarov and his co-conspirators to prevent them from selling restricted shares pledged as security pursuant to two loan agreements.

155.    Jateigh Singh was the legal representative of Astor Capital, a foreign corporation registered to do business in Indiana, and one of Val Sklarov's entities known for engaging fraudulent stock lending activities.  In a July 2019 filing submitted shortly after Astor Capital was registered, Val Sklarov was listed as the CEO of the company.  By April 30, 2020, "Thomas Mellon" had replaced Val Sklarov and became the CEO and director.  Defendant Jateigh Singh signed the document naming "Thomas Mellon" as replacement CEO and Director for the company.

156.    Upon information and belief, Defendant Jaitegh Singh has realized substantial financial benefits from his role in Defendant Val Sklarov's fraudulent schemes.  The English High Court of Justice found that Defendant Val Sklarov admitted that proceeds from fraudulent transfer of shares were "disposed of by way of a transfer of US$271,685,472 . . . *to client accounts controlled by Mr. JT Singh through his company Jurist IQ or his US Law Firm. Mr. Singh is an associate of Mr. Sklarov*."  *See* Judgment ¶ 33 (emphasis added).

I.    **Val Sklarov's Prior Criminal Conviction**

157.    Defendant Val Sklarov has a long history of committing fraud dating back to the 1990s.  Upon information and belief, in a case entitled *United States v. Sklarov, et al.*, 97-cr-00176 (DJL) (W.D. Pa.), Val Sklarov was convicted of committing Medicare fraud, sentenced to one year and one day in prison, which he served, and ordered to pay $14,000,000 in restitution and $500,000 in fines.

J. **Other Fraud Committed by Val Sklarov and His Co-conspirators**

158.    In recent years, Defendant Val Sklarov has shifted gears and established a notorious enterprise for securities-backed lending fraud. He has a well-established *modus operandi* where he and his companies impersonate legitimate financial institutions such as the Astor family, the Vanderbilt family, Barclays, and Rothschild, lure unwitting victims into entering loan transactions with him and delivering shares of stock as collateral for the loans, before quickly misappropriating and disposing of the collateral shares so that he can fund the so-called loans. This action is one of several in which Val Sklarov, his corporate affiliates and co-conspirators have been accused of fraud, conspiracy, and securities-backed lending fraud. Among those actions, *Satterfield* and the English Action involve facts substantially similar to those alleged herein.

i.    *Satterfield v. Vstock Transfer, LLC, et al, index no. 650311-2019 (N.Y. Sup.)*

159.    In early 2018, plaintiff Dr. Satterfield was introduced by email to Val Sklarov who said that his company would provide a loan of up to $3.5 million to Dr. Satterfield to be secured by Dr. Satterfield's 2,269,795 shares in Co-Diagnostics, Inc., which were then worth over $7 million. Val Sklarov provided only $67,000—a fraction of the total loan amount they promised to finance—and began to sell the collateral shares before issuing additional loan funds, realizing over $1.1 million in proceeds. Dr. Satterfield commenced the action in New York Supreme Court on March 13, 2019. The court referred the case to arbitration before the American Arbitration Association ("AAA") pursuant to a mandatory arbitration clause in the underlying loan agreement.

160.    On July 9, 2021, the AAA tribunal issued a final arbitral award ("Final Award") in favor of Dr. Satterfield. *See* NYSCEF No. 431. The tribunal found that the transaction and Val Sklarov's and his companies' implementation of the loan agreement "were permeated by

40

fraud which each of the Respondents committed and aided and abetted.  Sklarov and through him

the other Respondents fraudulently induced Satterfield to enter into the Agreement and to

cooperate with Sklarov in convincing [the transfer agent] to permit Sklarov and his Entities to

trade in the Shares." *Id.* at 45.

161.    The tribunal singled out one "memorable example" of Val Sklarov's

misrepresentations when he told Dr. Satterfield that "if the Shares could be freed up for trading

that day, Respondents would make the Loan to him in the amount of $6 million"—instead of the

agreed $3.5 million. *Id*. at 46.  In concluding that Val Sklarov's "intent to sell Satterfield's stock

and convert the Proceeds is dispositive," the tribunal discredited his testimony at the hearing "in

material aspects" and, in particular, relied on a sworn affidavit Val Sklarov had submitted to the

Superior Court of Cherokee County, State of Georgia on April 13, 2018, where Val Sklarov

testified that he:

(i)     "is indigent with no economic resources whatsoever and is struggling to survive on a daily basis;"

(ii)    "has been surviving by selling off his personal belongings and borrowing money; and

(iii)   "along with his family, are indeed on the imminent verge of moving to a shelter and becoming a public charge and a burden on society."

*Id*. at 49-50.  The tribunal went on to order Val Sklarov to return the collateral shares to Dr.

Satterfield. *Id*. at 63.  Val Sklarov failed to comply.

162.    On November 12, 2021, the New York Supreme Court confirmed the Final

Award in its entirety and further ordered Val Sklarov to return the collateral shares to Dr.

Satterfield.  After Val Skalrov's repeated failures to comply with multiple court orders, to purge

his contempt, and to appear at a hearing on the contempt motion, the court issued a warrant for

his arrest on June 2, 2022.  Val Sklarov appealed the contempt order and warrant on July 1,

2022.  On November 15, 2023, the First Department upheld the New York Supreme Court's

order and arrest warrant.  Upon information and belief, Defendants have yet to comply with the order or return the shares, and the arrest warrant against Val Sklarov remains outstanding.

     ii.    _Salinas English Action against Val Sklarov and His Companies_

    163.    A case pending before the High Court of Justice in England and Wales bearing claim number CL-2024-000450 ("English Action") involves a strikingly similar fraud scheme. The action was brought by the Mexican billionaire Mr. Richardo Benjamin Salinas Pleigo ("Mr. Salinas") and his company Corporacion RBS SA de CV ("RBS") against (1) Val Sklarov, (2) Astor Asset Management 3 Limited ("Astor3"), (3) Vanderbilt, (4) Weiser, (5) Astor Capital, and (6) Tavira Monaco SAM ("Tavira").

    164.    Mr. Salinas and RBS entered into a stock-lending agreement ("SLA") with Astor3 (as the lender) on July 28, 2021, whereby Astor3 agreed to advance loans of up to MXN 3,008,580,000 (approximately $151 million) to RBS (as the borrower).  The loans were secured by Mr. Salinas' 7,204,296 shares in the Mexican company Grupo Elektra SAB De CV ("Elektra"), with a value of MXN 7,565,879,616 or $415 million (at then current exchange rate). Unbeknownst to Mr. Salinas, Val Sklarov began to misappropriate and sell the Elektra shares, using a large portion of the proceeds thereof to fund the very loans which were to be made to RBS by Astor3 and paying away the remainder of the proceeds of sale to himself and various third parties.  On August 2, 2024, the High Court of Justice granted a worldwide freezing order and proprietary injunctions against Val Sklarov and his co-conspirators, enjoining them from further dealing with or trading the Elektra shares or proceeds thereof.

    165.    Val Sklarov made a late appearance to apply to set aside the worldwide freezing order and proprietary injunctions, the High Court of Justice, King's Bench Division, issued a judgment on October 7, 2024 ("Judgment") denying his application and maintaining the freezing

order and injunctions in place.  In the Judgment, Justice Calver expressly rejected Val Sklarov's argument that the case "is a naked attempt to turn a breach of contract claim into a (fraudulent) misrepresentation claim," and concluded that claimants have established a valid case for fraud. In particular, the court found that (i) "there is clearly a good arguable case that it was impliedly represented to Claimants, through [intermediaries], that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities (i.e. key representation 2)," (ii) "that that representation was false and the Claimants were induced as a result to enter into the SLA," and (iii) Claimants were "led to believe that [Astor 3] was part of the highly reputable and well-known Astor group of companies engaged in honest stock-lending activities, when it was not."  *See* Judgment ¶¶ 73, 77.

166.    The court also found that "it was impliedly represented to the Claimants that Astor 3 intended to comply with its obligations under the SLA including in particular its obligation not to sell the Elektra shares prior to maturity or default (i.e. key representation 2)." *Id*. ¶ 74.  Moreover, the court inferred that Astor 3 never intended to honor its obligations under the SLA based on Val Sklarov's previous frauds:

> It was that Mr. Sklarov's use of the Astor name, and his track record of similar stock lending frauds (whereby he disposed of collateral and failed to return it), allowed the court to infer that Astor 3 (Sklarov's company) did not intend to comply with his obligations under the SLA, in particular that it would not sell or short sell the Collateral on any publicly traded securities exchange, as it was clearly the case that Astor 3 understood that it could not do that under the terms of the SLA. I consider that the Claimants had, and have, a good arguable case to that effect.

*Id*. ¶ 76.

167.    Conspicuously, this case involves two familiar characters "Gregory Mitchell" and "Thomas Mellon," both involved in the negotiation and implementation of the SLA.  While Val Skalrov initially testified that he was hired by Gregory Mitchell and Thomas Mellon to act as "a

technical consultant" for Astor3, Vanderbilt, and Astor Capital (*see* Sklarov First WS ¶¶ 12, 93), only two weeks later, he reversed that testimony admitting that "Gregory Mitchell was in fact Mr. Sklarov himself."  *See* Judgment ¶ 59.  In his Fourth Witness statement submitted to the High Court of Justice, Val Sklarov admitted that "Gergory Mitchell . . . was a name I had been using in business deals since around 2018, and continued to use since then. I never thought that there was anything inappropriate about this, and I always felt I had good reasons for it."

168.    Likewise, the High Court of Justice found that Thomas Mellons "too does not appear to exist, with the name being an alias for a Mr. Aleskei Skachkov, a business associate of Mr. Sklarov, as Mr. Sklarov now admits."  *See* Judgment ¶ 60.  In an eleventh-hour attempt to save his credibility before the High Court of Justice, Val Sklarov explained that he used the pseudonyms because his birth name "Vladimir" had led him to being discriminated against.  *Id*. The High Court of Justice dismissed that argument as nonsensical given Val Sklarov "legally changed his name to Mark Simon Bently" in April 2018, long before the SLA was signed.  *Id*.

iii.    *Barclays Consent Judgment against Val Sklarov and Jateigh Singh*

169.    In October 2020, Barclays Plc and Barclays Capital Inc. sued Val Sklarov, Jaitegh Singh and others for their attempts to masquerade under the Lehman Brothers' trademarks, alleging that Val Sklarov "was the 'ring-leader' of the fraudulent scheme" to mislead and to deceive members of the public by seeking to "pass themselves off as the legitimate Lehman Brothers."  On March 19, 2021, Judge Kaplan entered a consent judgment permanently enjoining Val Sklarov and his attorney Jaitegh Singh from using Barclays' trademarks worldwide.  Both Val Sklarov and Jaitegh Singh signed the consent judgment.  *See Barclays PLC et al v. Sklarov et al.*, 1:20-cv-08437-LAK (S.D.N.Y.), Dkt. 43.

170.    The Barclays' complaint identifies the same *modus operandi* of Val Sklarov's

fraudulent schemes and describes it as follows:

> Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds.

    iv.    *Two Rivers Water & Farming Co. v. Am. 2030 Cap. Ltd.*

171.    In June 2019, plaintiff Two Rivers Water & Farming Company brought an action in the United States District Court for the District of Colorado against America 2030 and Bentley Rothschild—Val Sklarov was the CEO of both companies. Defendant Jaitegh Singh represented both companies in that action. Plaintiff sought a temporary restraining order and preliminary injunction to prevent Val Sklarov's companies from trading 6,800,000 restricted shares of the plaintiff, pledged as security in exchange for a loan from the companies. *Two Rivers Water & Farming Co. v. Am. 2030 Cap. Ltd.*, No. 19-CV-01640-CMA, 2019 WL 10301526 (D. Colo. June 13, 2019). The court granted the temporary restraining order, finding that plaintiff would likely prevail on the merits of its claims because "it is well established that a contract is void and unenforceable if procured through fraud." *Id*. at *1.

172.    On July 2, 2019, the court granted plaintiff's motion for preliminary injunction, enjoining the companies from selling or transferring, or removing the restrictive legends on the restricted shares through trial.

    v.    *Sunpower Business Group Pte Ltd v. America 2030*

173.    This case was brought before the Eastern Caribbean Supreme Court, Saint Christopher and Nevis. Plaintiffs Sunpower Business Group Pte Ltd and Tournan Trading Pte Ltd entered into a loan agreement with Val Sklarov's company America 2030 in October 2018

by pledging 28 million collateral shares of Sunpower Group Limited ("Sunpower"), a listed

company in Singapore, after they were introduced to Val Sklarov, who operated under the name

"Mark Simon Bently."  Weiser was the designated custodian for the shares.  In early November

2018, plaintiffs discovered that the missing went missing from Weiser's account, before the loan

was disbursed.

174.    The plaintiffs sued Val Skalrov and his companies for fraud in Nevis court and

obtained a worldwide freezing order against him.  In its decision denying Val Sklarov's

application to strike out the claims, the Nevis court found that claimants have alleged that:

> [Val Sklarov's] most recent activity centered on an elaborate stock loan
> fraud scheme carried out through a number of companies incorporated in a
> number of jurisdictions. These companies all contain variations of the
> names America 2030 or Bentley Rothchild. The claimants assert in their
> Statement of Claim that the schemes entail Sklarov's representations,
> through a number of commercial entities under his control, purporting to
> offer substantial non-recourse loan facilities on attractive terms to
> shareholders of listed companies, secured against the shares of those
> companies.

175.    Shortly after the issuance of the decision, Val Sklarov ceased to participate in the

proceedings.  In June 2020, the Nevis court issued a default judgment against him.  His

application seeking to set aside the default judgment was again dismissed.  The Nevis court

found that Val Sklarov had carried out a stock-backed loan fraud and that the loan agreements

were vitiated due to fraud.  Val Sklarov appealed the Nevis court's decision, and the appeal was

dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court.  On August 9, 2023

the Supreme Court of the Bahamas made an order for the registration and enforcement of the

Nevis judgment in the Bahamas.

176.    The Nevis court further indicated that Sklarov "adopts significant tactics of

intimidation against victims, for example by lodging actions for defamation claiming ruinous

sums in damages."  Indeed, in one of his retaliation lawsuits, Val Sklarov's company America

2030 sued Sunpower among other parties for publishing a statement that Sunpower's "share price underwent a series of sharp corrections" shortly after its shareholders "entered into a loan agreement with America 2030 Capital Limited" before the "shareholders discovered that their collateral shares were no longer in the designated account, although the loan has not been disbursed."

177.    The U.S. District Court for the District of Colorado dismissed the case with prejudice based on plaintiff's "failure to prosecute and failure to comply with court orders." *See Am. 2030 Cap. Ltd. v. Sunpower Grp. Ltd.*, No. 19-CV-02676-CMA-KMT, 2020 WL 2079187, at *3 (D. Colo. Apr. 30, 2020).  Defendant Jaitegh Singh represented America 2030 in that action.  Notably, the court stated in its decision that "Plaintiff's Counsel, Jaitegh Singh, has a habit of failing to comply with court orders when he appears before this Court," and ordered that "[a]ny further conduct by Plaintiff's counsel which demonstrates willful disregard of this Court's orders or of his duty of candor to the court will be referred to the appropriate attorney regulation committee."  *See id*. n. 1 (quoting *Two Rivers Water & Farming Co. v. Am. 2030 Capital Ltd.*, No. 19-cv-01640-CMA-STV, 2020 WL 1676768, at *1 (D. Colo. Apr. 6, 2020) (noting America 2030, which was represented by Jaitegh Singh, "failed to comply with the Court's order [to file a response to a motion] without explanation.")).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Fraud in the Inducement
(Against Val Sklarov, Tetyana Sklarov,
and Jaitegh Singh)

178.    Plaintiff repeats and realleges paragraphs 1 through 177 as if fully set forth herein.

179.    The Individual Defendants concealed their true identities from Plaintiff by

creating fictious characters, namely Gregory Mitchel and Thomas Mellon, among other fake

officers and employees of the Sham Lenders, and used fake corporate departmental email

addresses to make misrepresentations to Plaintiff.

180.    Val Sklarov has admitted that he is both Gregory Mitchel and Thomas Mellon.

181.    The Individual Defendants intentionally misrepresented the true nature and

identity of the Sham Lenders and misrepresented their connection to well-known financial

institutions and wealthy families such as Astor Investment Management LLC, the Astor family

and the Vanderbilt family.

182.    The Individual Defendants intended these misrepresentations to induce Plaintiff to

believe that the Sham Lenders engaged in legitimate securities-backed lending activities and hide

the fact that the Individual Defendants, including Val Sklarov, a convicted felon, are the Sham

Lenders behind the Sham Loans.

183.    The Individual Defendants through the Sham Lenders repeatedly misrepresented

to Plaintiff the true nature of the Sham Loans which Defendants intended to and did fund through

the unlawful immediate sale of the Collateral Shares and from other valuable collateral provided

by Plaintiff, and that the Collateral Shares would not be disposed of or sold absent a legitimate

Event of Default, among other intentional misrepresentation and material omissions alleged

herein..

184.    Relying on the Individual Defendants' intentional misrepresentations and material

omissions, Plaintiff believed that it was dealing with legitimate financial institutions and

delivered the Collateral Shares to Defendants' custody and control.

185.    The Individual Defendants intentionally concealed and failed to disclose that they

had unlawfully sold the Collateral Shares in part to fund the Sham Loans and unlawfully enrich

themselves, and continued to misrepresent to Plaintiff that the Collateral Shares would be returned to induce Plaintiff to make full payment on the Sham Loans and deliver additional stock and cash collateral to Defendants.

186.    In reliance upon those intentional misrepresentations and material omissions, Plaintiff paid the entirety of the purported principal of the sham Astor2 Loan and a significant portion of the purported principal of the sham UPC1 and Vanderbilt Loans and deposited additional stock and cash collateral to Defendants' custody and control.

187.    Those intentional misrepresentations and material omissions are sufficiently distinct from and collateral and extraneous to the Sham Lenders' representations or obligations under the sham loan agreements, to which the Individual Defendants are not parties.

188.    The Individual Defendants through the Sham Lenders intentionally made those misrepresentations and material omissions to induce Plaintiff to enter into the Sham Loans, deliver the Collateral Shares, make loan payments and deposit additional stock and cash collateral to and for the benefit of the Individual Defendants.

189.    Plaintiff relied to its detriment on those intentional misrepresentations and material omissions by entering into the sham loan transactions, delivering the Collateral Shares, making loan payments, and providing additional stock and cash collateral to Defendants.

190.    Had it not been for the Individual Defendants' intentional misrepresentations and material omissions with respect to their true identities, their connection with well-known and legitimate financial institutions, and the serious felony charges against and conviction of Val Sklarov, among others alleged herein, Plaintiff would have never entered into the sham loan agreements with the Sham Lenders or deposited the Collateral Shares to Defendants' custody and control.

191.    As a direct and proximate result of the Individual Defendants' conduct as alleged herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million plus pre- and post-judgment interest.

192.    The Individual Defendants' actions are wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

<b><u>SECOND CAUSE OF ACTION</u></b>

<b>Fraud</b><br>(Against Val Sklarov, Tetyana Sklarov,<br>and Jaitegh Singh)

193.    Plaintiff repeats and realleges paragraphs 1 through 192 as if fully set forth herein.

194.    The Individual Defendants acting through and/or in concert with the Sham Lenders, Jurist IQ, and the Servicer Defendants intentionally misrepresented to Plaintiff that the Sham Lenders were legitimate financial institutions engaged in the honest business of securities-backed lending activities, and would provide *bona fide* financing to Plaintiff in exchange for the delivery of the Collateral Shares to be held as security for the Sham Loans.

195.    The Individual Defendants concealed their true identities by creating fictious characters such as Gregory Mitchel and Thomas Mellon, among other fake officers and employees of the Sham Lenders, and using fake corporate departmental email addresses to communicate their misrepresentations to Plaintiff.

196.    Val Sklarov has admitted that he is both Gregory Mitchel and Thomas Mellon.

197.    Throughout their interactions with Plaintiff, the Individual Defendants intentionally failed to reveal their involvement in the Sham Loans and that Val Sklarov, a convicted felon, is the key person behind the Sham Loans.

198.    The Individual Defendants never intended to provide financing to Plaintiff.  Their

plan was to immediately sell the Collateral Shares upon delivery to them, in part to finance the Sham Loans and otherwise to enrich themselves, while requiring Plaintiff to repay the purported principal and interest on the Sham Loans and further inducing Plaintiff through misrepresented Events of Default to deposit additional stock and cash collateral that the Individual Defendants intended to unlawfully take, sell and keep the proceeds for themselves.

199.    The Individual Defendants through the Sham Lenders and Jurist IQ repeatedly failed to reveal to Plaintiff that they had sold the Collateral Shares to fund the Sham Loans, and misrepresented to Plaintiff that they would return the Collateral Shares upon repayment of the Sham Loans (which loans were funded by the sale of Plaintiffs' own Collateral Shares).

200.    When Plaintiff sought confirmation of the maintenance and security of the Collateral Shares, the Individual Defendants, acting through Jurist IQ and the Sham Lenders, failed to reveal that they had sold the Collateral Shares, misrepresented false Events of Default, and issued false and fraudulent Margin Call Notices to further induce Plaintiff into providing additional stock and cash collateral to them.

201.    Among other things, the Individual Defendants, through Jurist IQ and the Sham Lenders, fabricated the existence of a "loan committee" and a fraudulent "AML and KYC" due diligence process to conceal the fact that the Collateral Shares had already been unlawfully sold.

202.    The Individual Defendants secretly and unlawfully transferred and sold a majority of the Collateral Shares to fund the Sham Loans, in some cases immediately after they were deposited, and before the occurrence of any misrepresented Event of Default.

203.    The Individual Defendants realized significant gains through their secret and unlawful sales of the Collateral Shares.  Nonetheless, they continued the fraud, including through the Sham Lenders, by requiring Plaintiff to pay the Sham Loans' purported principal and interest

and deposit additional stock and cash collateral by intentionally misrepresenting to Plaintiff that they were prepared to return the Collateral Shares upon full payment of the Sham Loans and cure of misrepresented Events of Default.

204.    The Individual Defendants never intended to return the Collateral Shares because they had already sold a significant majority if not all of the Collateral Shares.

205.    In reliance upon the Individual Defendants' intentional misstatements and material omissions made through the Sham Lenders and Jurist IQ as alleged herein, Plaintiff delivered the Collateral Shares, deposited additional stock and cash, and paid the entirety of the principal of the sham Astor2 Loan and a significant portion of the principal of the sham UPC1 and Vanderbilt Loans to Defendants' custody and control.

206.    As a direct and proximate result of the Individual Defendants' conduct as alleged herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million plus pre- and post-judgment interest.

207.    The Individual Defendants' actions are wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**Aiding and Abetting Fraud**
(Against Jurist IQ, SUC, UPCH,
Lviv, and CVM)

208.    Plaintiff repeats and realleges paragraphs 1 through 207 as if fully set forth herein.

209.    Jurist IQ and the Servicer Defendants SUC, UPCH, Lviv, and CVM had actual knowledge of the Individual Defendants' fraud as alleged herein and substantially assisted the fraud perpetrated upon Plaintiff.

210.    Defendants Jurist IQ and Servicer Defendants were created for the purpose of

perpetrating the fraud upon Plaintiff. Each was created shortly after Plaintiff entered into the respective sham loan agreements with each Sham Lender: (i) Defendant SUC was established in October 2020, one (1) month after the execution of the second Astor2 Stock Loan Agreement; (ii) Defendants UPCH and Lviv were both established in March 2021, five (5) months after the execution of the UPC1 Agreement; and (iii) Defendant CVM was established in November 2021, seven (7) months after the execution of the Vanderbilt Agreement.

211. These same Servicer Defendants beneficially hold bank accounts owned and/or controlled by the Individual Defendants to receive payments from Plaintiff under the sham loan agreements.

212. Defendant Jaitegh Singh is Jurist IQ's CEO. Defendant Jurist IQ is the Escrow Agent for Astor2. The Individual Defendants through Jurist IQ and Astor2 induced Plaintiff to make loan payments to Astor2's client escrow account with Jurist IQ through the intentional misstatements and material omissions alleged herein.

213. Jurist IQ, acting under the direction of its CEO Jaitegh Singh and in concert with the other Individual Defendants, misrepresented the existence of a fake "loan committee" and a false "AML and KYC" due diligence process to conceal the fact that the Collateral Shares had already been unlawfully sold by Defendants.

214. Jurist IQ further misrepresented to Plaintiff the requirement that it pay the Sham Loans' purported principal and interest and deposit additional stock and cash collateral by intentionally misrepresenting to Plaintiff that the Sham Lenders were prepared to return the Collateral Shares upon full payment of the Sham Loans and Plaintiff's cure of misrepresented Events of Default.

215. Jurist IQ, acting under the direction of its CEO Jaitegh Singh and in concert with

the other Individual Defendants, served a purported demand letter on Plaintiff making demands for the return of the misrepresented loan funds issued under the sham UPC1 Loan, while intentionally omitting the fact that Defendants had sold the Collateral Shares deposited by Plaintiff under the sham UPC1 Loan so that it could in part fund that sham loan, and before initiating an LCIA arbitration asserting false allegations to further impede Plaintiff's efforts to recover the Collateral Shares.

216.    Defendant Jurist IQ and the Servicer Defendants further assisted the Individual Defendants' fraudulent scheme by concealing the identities of the Individual Defendants, and facilitating the financial structure of the fraudulent scheme through the opening of bank accounts in their names, among other assistance alleged herein.

217.    As a direct and proximate result of Defendant Jurist IQ and the Servicer Defendants' conduct as alleged herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million plus pre- and post-judgment interest.

218.    The Jurist IQ and the Servicer Defendants' actions are wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Conspiracy to Commit Fraud
(Against All Defendants)

219.    Plaintiff repeats and realleges paragraphs 1 through 218 as if fully set forth herein.

220.    The Individual Defendants are the ultimate beneficial owners and/or alter egos of the Sham Lenders, Jurist IQ and the Servicer Defendants.

221.    Defendants, including by acting through the Sham Lenders, agreed and conspired to defraud Plaintiff.

222.    Defendants intentionally misrepresented to Plaintiff that the Sham Lenders were legitimate financial institutions engaged in *bona fide* securities-backed lending, and would provide legitimate financing to Plaintiff in exchange for the delivery of the Collateral Shares to be held as security for the Sham Loans.

223.    Defendants acting through the Sham Lenders concealed their true identities by creating fictious characters such as Gregory Mitchel and Thomas Mellon, among other fake officers and employees of the Sham Lenders, and by using fake corporate departmental email addresses to make misrepresentations to Plaintiff.

224.    Throughout their interactions with Plaintiff, Defendants intentionally failed to reveal their involvement in the Sham Loans and that Val Sklarov, a convicted felon, is the key person behind the Sham Loans.

225.    Defendants never intended to provide financing to Plaintiff.  Their plan was to sell the Collateral Shares upon delivery to them in part to finance the Sham Loans and otherwise enrich themselves, while requiring Plaintiff to repay the purported principal and interest on the Sham Loans and further inducing Plaintiff through misrepresented Events of Default to deposit additional stock and cash collateral that Defendants intended to unlawfully take, sell and keep the proceeds for themselves.

226.    Defendants through the Sham Lenders repeatedly failed to reveal to Plaintiff that they had sold the Collateral Shares to fund the Sham Loans, and misrepresented to Plaintiff that they would return the Collateral Shares upon repayment of the Sham Loans (which loans were funded by the sale of Plaintiff's own Collateral Shares).

227.    When Plaintiff sought confirmation of the maintenance and security of the Collateral Shares, Defendants, acting through the Sham Lenders, failed to reveal that they had

sold the Collateral Shares, misrepresented Events of Default, and issued false and fraudulent Margin Call Notices to further induce Plaintiff into providing additional stock and cash collateral. Among other things, Defendants, through the Sham Lenders, misrepresented the existence of a fake "loan committee" and misrepresented a fraudulent "AML and KYC" due diligence process to conceal the fact that the Collateral Shares had already been unlawfully sold.

228. Defendants secretly and unlawfully transferred and sold a majority of the Collateral Shares to fund the Sham Loans, in some cases immediately after they were deposited, and before the occurrence of any misrepresented Event of Default.

229. Defendants realized significant gains through their secret and unlawful sales of the Collateral Shares. Nonetheless, they continued the fraud, including through the Sham Lenders, by requiring Plaintiff to pay the Sham Loans' purported principal and interest and deposit additional stock and cash collateral by intentionally misrepresenting to Plaintiff that they were prepared to return the Collateral Shares upon full payment of the Sham Loans and cure of misrepresented Events of Default.

230. Defendants never intended to return the Collateral Shares. In fact, they *cannot* return the Collateral Shares because they sold a significant majority, if not all, of them.

231. Each Defendant committed overt acts in furtherance of the conspiracy to defraud, including by, among others alleged herein, creating the Sham Lenders, fictitious characters and fake corporate departmental email addresses, taking possession, custody and/or control of the Collateral Shares before quickly and unlawfully selling them, creating the Servicer Defendants to open bank accounts to receive payments and cash collateral, and issuing misrepresented Events of Default.

232. Defendants knowingly and voluntarily participated in the conspiracy.

233.    As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million plus pre- and post-judgment interest.

234.    Defendants' actions are wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Conversion
(Against Individual Defendants)

235.    Plaintiff repeats and realleges paragraphs 1 through 234 as if fully set forth herein.

236.    Plaintiff is the owner of the Collateral Shares, which are specific identifiable properties.  Plaintiff had ownership, possession and control over the Collateral Shares before their conversion by the Individual Defendants.

237.    The Individual Defendants through the Sham Lenders and other Defendants exercised unauthorized dominion over the Collateral Shares to the exclusion of Plaintiff's rights and deprived Plaintiff of its interest in them, by, among other things, unlawfully selling and transferring them, refusing to return them and misrepresenting false Events of Default under the sham loan agreements.

238.    As a direct and proximate result of the Individual Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million plus pre- and post-judgment interest.

## SIXTH CAUSE OF ACTION

### Conspiracy to Commit Conversion
(Against All Defendants)

239.    Plaintiff repeats and realleges paragraphs 1 through 238 as if fully set forth herein.

240.    The Individual Defendants are the ultimate beneficial owners and/or alter egos of the Sham Lenders, Jurist IQ and the Servicer Defendants.

241.    Plaintiff is the owner of the Collateral Shares, which are specific identifiable properties.  Plaintiff had ownership, possession and control over the Collateral Shares before their conversion by Defendants.

242.    Defendants through the Sham Lenders conspired to exercise unauthorized dominion over the Collateral Shares to the exclusion of Plaintiff's rights and deprived Plaintiff of its interest in them, by, among other things, unlawfully selling and transferring them, refusing to return them and misrepresenting false Events of Default under the sham loan agreements.

243.    Defendants, including by acting through the Sham Lenders, agreed and conspired to commit conversion.  Each Defendant committed overt acts in furtherance of the conspiracy to commit conversion, including by, among other allegations herein, wrongfully and unlawfully taking possession of the Collateral Shares before quickly and unlawfully selling them.

244.    Defendants knowingly and voluntarily participated in the conspiracy.

245.    As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $175 million plus pre- and post-judgment interest.

246.    Defendants' actions are wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor against all Defendants as follows:

   A.  As to the First and Second Causes of Action, awarding Plaintiff compensatory and punitive damages against Defendants Val Sklarov, Tetyana Sklarov, and

Jaitegh Singh including pre- and post-judgment interest thereon, in an amount to be determined at trial, but in any event not less than $175 million;

B.  As to the First and Second Causes of Action, ordering Defendants Val Sklarov, Tetyana Sklarov, and Jaitegh Singh to disgorge any proceeds and profits procured from unlawfully transferring selling, and/or trading the Collateral Shares, in an amount to be determined at trial, but in any event, not less than $175 million plus pre- and post- judgment interest;

C.  As to the Third Cause of Action, awarding Plaintiff compensatory and punitive damages against Defendants Jurist IQ, SUC, UPCH, Lviv, and CVM including pre- and post-judgment interest thereon, in an amount to be determined at trial, but in any event not less than $175 million;

D.  As to the Fifth Cause of Action, permanently enjoining and restraining all Defendants, their agents, servants, employees, representatives, and all persons acting in concert or participating with Defendants or any one of them, from further trading, transferring, or otherwise disposing of any remaining Collateral Shares;

E.  As to the Fifth Cause of Action, ordering all Defendants to immediately return any remaining Collateral Shares to Plaintiff;

F.  As to the Fourth and Sixth Causes of Action, awarding Plaintiff compensatory and punitive damages against all Defendants including pre- and post-judgment interest thereon, in an amount to be determined at trial, but in any event not less than $175 million;

G.  As to all Causes of Action, awarding Plaintiff its costs, legal expenses, and

reasonable attorneys' fees incurred in connection with this action; and

H.  As to all Causes of Action, awarding Plaintiff such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated:  New York, New York
        November 22, 2024

Respectfully submitted,

KING & WOOD MALLESONS LLP

By: ___/s/ Vincent Filardo, Jr.____
    Vincent Filardo, Jr.
    Aaron T. Wolfson
    500 Fifth Avenue, 50th Floor
    New York, NY 10110
    (212) 319-4755
    vincent.filardo@us.kwm.com
    aaron.wolfson@us.kwm.com

## VERIFICATION

SHANDONG PROVINCE                )

                                 ) ss.:

PEOPLE'S REPUBLIC OF CHINA       )

Zheng Chunxing, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I am an employee of Chenming Holdings Co., Ltd., Plaintiff Chenming Holdings (Hong Kong) Limited's sole shareholder, in the above captioned case and have authorized the filing of this amended complaint. I have reviewed the allegations made in the amended complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information and documents kept by Plaintiff in the ordinary course of business, and I believe them to be true.

Zheng Chunxing
Chenming Holdings (Hong Kong) Limited