**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHENMING HOLDINGS (HONG KONG) LIMITED, *a Hong Kong limited company*,

Plaintiff,

v.

VAL SKLAROV, TETYANA SKLAROV, JAITEGH "JT" SINGH, JURIST IQ CORP, SIERRA UNIVERSAL CORP, UPC HOLDINGS LTD, LVIV ESTATE HOLDINGS LTD, and C VANDERBILT MANAGEMENT LTD.,

Defendants.

Case No. 24-cv-935

**ORAL ARGUMENT REQUESTED**

# MEMORANDUM OF LAW OF DEFENDANTS SIERRA UNIVERSAL CORP, UPC HOLDINGS LTD, LVIV ESTATE HOLDINGS LTD., AND C VANDERBILT MANAGEMENT LTD. IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S VERIFIED SECOND AMENDED COMPLAINT

BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ..... 1

ALLEGATIONS OF THE SECOND AMENDED COMPLAINT ..... 2

ARGUMENT ..... 3

I. Plaintiff's Claims against the Servicer Defendants are Barred by Release ..... 3

II. Plaintiff's Allegations Are Insufficient to Maintain Claims against the Servicer Defendants for Either Aiding and Abetting Fraud (Count III) or Conspiracy to Commit Fraud (Count IV) ..... 7

A. Plaintiff Has Not Sufficiently Alleged a Primary Fraud By the Individual Defendants, Requiring Dismissal of Its Secondary Fraud Claims. ..... 8

1. Plaintiff's Fraud Allegations Are Insufficiently Particular ..... 8

2. Plaintiff Fails to Establish Its Reasonable Reliance on any Misrepresentation ..... 12

3. Plaintiff's Fraud Claims Are Poorly Disguised Contract Claims ..... 14

B. Even if the SAC States Claims for Fraud against the Individual Defendants, Plaintiff's Allegations Against the Servicer Defendants Cannot Support Claims for Aiding and Abetting or Conspiracy to Commit Fraud ..... 17

1. Plaintiff Fails to Allege that the Servicer Defendants Were Aware of or Agreed To the Alleged Fraud ..... 18

2. Plaintiff Does Not Allege that the Servicer Defendants Substantially Assisted in the Alleged Fraud or Even Participated at all in the Alleged Scheme ..... 20

III. Plaintiff's Claim for Conspiracy to Commit Conversion (Claim 6) Is Also Subject to Dismissal as a Matter of Law ..... 23

A. Plaintiff Fails to Plead a Valid Primary Conversion Claim ..... 24

B. Plaintiff Fails To Allege the Servicer Defendants' Participation in a Conspiracy to Convert ..... 25

CONCLUSION ..... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
587 F.Supp 2d 513 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ....23

*Apex Mar. Co., Inc. v. OHM Enterprises, Inc.*,
10 CIV. 8119 SAS, 2011 WL 1226377 (S.D.N.Y. Mar. 31, 2011) ....8

*Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*,
888 F. Supp. 2d 508 (S.D.N.Y. 2012) ....23

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021) ....23

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996) ....15

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F.Supp. 1260 (S.D.N.Y.1991) ....23

*Clark v. Hemphill Artworks, LLC*,
22 CIV. 7537 (PGG), 2024 WL 1157170 (S.D.N.Y. Mar. 16, 2024) ....10

*Command Cinema Corp. v. VCA Labs, Inc.*,
464 F. Supp. 2d 191 (S.D.N.Y. 2006) ....24

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*,
544 F. Supp. 2d 178 (S.D.N.Y. 2008) ....3, 5, 6

*Corines v. Charter One Bank*,
365 F. App'x 237 (2d Cir. 2010) ....3

*Daly v. Castro Llanes*,
30 F. Supp. 2d 407 (S.D.N.Y. 1998) ....25

*Deutsche Bank Nat'l Trust Co. v. Sinclair*,
68 A.D.3d 914 (2d Dep't 2009) ....16

*DirectTV Group, Inc. v. Darlene Investments*, *LLC*,
05 civ 5819, 2006 WL 2773024 (S.D.N.Y. Sept. 27, 2006) ....6

*Emergent Capital Inv. Mgmt. LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir.2003) ....12, 14

*Exch. Listing, LLC v. Inspira Techs., Ltd.*,
661 F. Supp. 3d 134 (S.D.N.Y. 2023) (J. Failla) ....................14, 15

*Flickinger v. Harold C. Brown & Co., Inc.*,
947 F.2d 595 (2d Cir. 1991)....................5

*Harsco Corp. v. Segui*,
91 F.3d 337 (2d Cir.1996)....................12, 14

*Ho Myung Moolsan Co., Ltd. v. Manitou Min. Water, Inc.*,
665 F. Supp. 2d 239 (S.D.N.Y. 2009)....................23

*Intl. Bus. Machines Corp. v. Simon*,
376 F. Supp. 3d 292 (S.D.N.Y. 2019)....................6

*Kirschner v. Bennett*,
648 F. Supp. 2d 525 (S.D.N.Y. 2009)....................7, 8, 18

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013)....................4

*Kolbeck v. LIT America, Inc.*,
923 F.Supp. 557 (S.D.N.Y.1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ....................10

*Locafrance U. S. Corp. v. Intermodal Sys. Leasing, Inc.*,
558 F.2d 1113 (2d Cir. 1977)....................4

*Manufacturers Hanover Tr. Co. v. Yanakas*,
7 F.3d 310 (2d Cir. 1993)....................14

*Meisel v. Grunberg*,
651 F. Supp. 2d 98 (S.D.N.Y. 2009)....................24

*Minnie–Rose LLC v. Yu*,
169 F. Supp. 3d 504 (S.D.N.Y. 2016)....................15

*Morin v. Trupin*,
711 F. Supp. 97 (S.D.N.Y. 1989) ....................7

*Moses v. Martin*,
360 F. Supp. 2d 533 (S.D.N.Y. 2004)....................24

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*,
102 F.3d 660 (2d Cir. 1996)....................5

*In re Platinum-Beechwood Litig.*,
18-CV-10936 (JSR), 2020 WL 30335 (S.D.N.Y. Jan. 2, 2020) ....................18

*Pope v. Rice*,
04-cv-4171 (DLC), 2005 WL 613085 (S.D.N.Y. Mar. 14, 2005) ....................................7, 18

*Renner v. Chase Manhattan Bank, N.A.*,
85 Fed. App'x 782 (2d Cir. 2004)........................................................................................7

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..................................................................................................24

*Ryan v. Hunton & Williams*,
99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) .......................................20

*S.G. v. Bank of China Ltd.*,
23-CV-2866 (LAK), 2024 WL 1861158 (S.D.N.Y. Apr. 29, 2024), *aff'd sub. Nom. S.G. v. Bank of China U.S.A.*, 24-1426, 2024 WL 4891390 (2d Cir. Nov. 26, 2024) .....................................................................................................8

*Shapiro v. NGFTV, Inc.*,
16 CIV 9452 (PGG), 2018 WL 2127806 (S.D.N.Y. Feb. 9, 2018) ........................................6

*Simon v. Castello*,
172 F.R.D. 103 (S.D.N.Y.1997) ...........................................................................................10

*Solutia Inc. v. FMC Corp.*,
385 F. Supp. 2d 324 (S.D.N.Y. 2005)......................................................................................5

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir 2018)..............................................................................................20, 22

*Treppel v. Biovail Corp.*,
03 CIV. 3002 (PKL), 2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005)................................8, 20

*VeroBlue Farms USA, Inc. v. Canaccord Genuity LLC*,
20 CIV 4394 (JPC), 2021 WL 3913555 (S.D.N.Y. Sept. 1, 2021), *aff'd*, 21-2465-cv, 2022 WL 2133780 (2d Cir. June 14, 2022) ...............................................................6

*W.B. David & Co. Inc. v. DWA Commc'ns, Inc.*,
02-cv-8479 (BSJ), 2004 WL 369147 (S.D.N.Y. Feb. 26, 2004) ..........................................14

*Wall v. CSX Transp., Inc.*,
471 F.3d 410 (2d Cir. 2006)....................................................................................................14

*Wurtsbaugh v. Bank of America Sec. LLC*,
05 Civ. 6220 (DLC), 2006 WL 1683416 (S.D.N.Y. June 20, 2006) ...............................12, 13

*Zappin v. Comfort*,
18CV01693ALCOTW, 2022 WL 6241248 (S.D.N.Y. Aug. 29, 2022) ..................................12

**Other Authorities**

Rule 9(b) ........................................................................................................................ *passim*

## PRELIMINARY STATEMENT

This case arises out of loan agreements between Plaintiff, parent company of publicly traded Chenming Paper Holdings Limited ("ListCo"), and three non-party lenders ("Lenders"). (Second Amended Complaint ("SAC"), ¶¶ 34, 35.) Plaintiff pledged ListCo shares to the Lenders as collateral for four loans totaling nearly $100 million that it received pursuant to loan agreements with the Lenders (the "Loan Agreements").[1] (*Id,* ¶¶ 56, 88, 104.) Plaintiff by its own account received the loan proceeds and defaulted on its payment obligations under the Loan Agreements. It nonetheless makes the conclusory assertion that the Lenders were "shams" and breached the Loan Agreements, without even attempting to specify how the alleged non-return of collateral to a defaulting party violated the agreements. (*See, e.g., id.*, ¶¶ 43, 45.) But rather than sue the Lenders with whom it contracted, Plaintiff here seeks to recover from other parties, including four companies that, after the loans at issue were extended, acted as loan servicers for the Lenders by receiving interest payments from Plaintiff: Sierra Universal Corp ("SUC"); UPC Holdings Ltd ("UPCH"); Lviv Estate Holdings Ltd ("Lviv"); and C Vanderbilt Management Ltd. ("CVM") (collectively, the "Servicer Defendants"). (*See id*. ¶¶ 25, 27, 29, 31.) The claims against them fail as a matter of law.

---

[1] The Loan Agreements are attached to the declaration of Jaitegh Singh ("Singh Decl.") filed in support of the motion to dismiss filed by co-Defendants Jaiteigh Singh and Jurist IQ Corp. ("Jurist IQ"). [ECF 102, Exs. 1-4]

## ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

The four loans at issue in this action were extended between January 2020 and April 2021:

- Plaintiff entered into two separate loan agreements with non-party lender Astor Asset Management 2 Limited ("Astor2"), on January 17 and then on September 17, 2020, for which defendant SUC was servicer;[2] (*id*., ¶¶ 56, 81)
- Plaintiff entered into a loan agreement with non-party lender Union Pacific Capital 1 Ltd. ("UPC1") on October 19, 2020, for which both defendants UPCH and Lviv served as servicers; (*id*., ¶¶ 88, 95) and
- Plaintiff entered into a loan agreement with non-party lender Cornelius Vanderbilt Capital Management LTD ("CVCM") on April 17, 2021, for which defendant CVM was servicer. (*Id*., ¶ 104, 117.)

In all, Plaintiff alleges that it received $97 million in loan proceeds, for which it pledged approximately 233 million shares of either Class B or Class H ListCo shares.

Plaintiff attempts to allege a fraudulent scheme in which the named individual defendants, Val Sklarov, Tetyana Sklarov, and Jaitegh Singh (the "Individual Defendants), acting through the Lenders, (i) misrepresented their identity and their intention to fulfill Lenders' obligations under the Loan Agreements, (ii) prematurely transferred or sold the ListCo shares Plaintiff provided as collateral for the Loans (the "Collateral Shares"), and (iii) asserted "false Events of Default" under the Loan Agreements. (*See, e.g., id*. ¶¶ 181-185, 198-200.) The alleged aim of the fraud was to induce Plaintiff to contract with the Lenders and require Plaintiff to pay principal and interest, as well as additional collateral pursuant to the terms of the Loan Agreements. (*Id*. ¶¶ 188, 203.) Despite asserting claims that the Servicer Defendants assisted and/or conspired with the Individual Defendants in inducing Plaintiff to enter into the Loan Agreements, Plaintiff admits that the Servicer Defendants were created after Plaintiff entered into the respective Loan Agreements with

---

2 Plaintiff refers to these two loans collectively in the Amended Complaint as the "Astor2 Loan," and their terms are substantially identical. (SAC., ¶ 56; *see generally* Singh Decl., Exs. 1, 2 (Astor2 Loan Agreements).)

each Lender and after most, if not all, of the Collateral Shares were allegedly transferred by the Lenders. (*Id*. ¶ 210.)

Plaintiff conspicuously does not allege that it timely complied with its full obligations under any of the Loan Agreements, does not cite to any Loan Agreement provision in support of its claim that the Collateral Shares were wrongfully transferred or withheld, and otherwise alleges no facts supporting its contention that the Lenders were required under the terms of the Loan Agreements to return the Collateral Shares. Indeed, Plaintiff acknowledges that it defaulted under two of the Loan Agreements, and that at least two of the three Lenders commenced arbitration proceedings against Plaintiff where claims and defenses relating to alleged breaches of the Loan Agreements are being adjudicated. (*Id.*, ¶¶ 44, 45, 121, 127.)

## **ARGUMENT**

The Complaint asserts six causes of action. The first, for Fraud in the Inducement; the second, for Fraud; and the fourth, for Conversion, are asserted solely against the Individual Defendants. The Servicer Defendants are named as defendants in the third, for Aiding and Abetting Fraud; the fifth, for Conspiracy to Commit Fraud; and the sixth, for Conspiracy to Commit Conversion. As set forth below, Plaintiff fails to state any valid cause of action against the Servicer Defendants.

### **I. Plaintiff's Claims against the Servicer Defendants are Barred by Release**

Plaintiff released all claims against third parties, like the Servicer Defendants, that assisted the Lenders in relation to those agreements. It is axiomatic that "a clear and unambiguous release should be enforced according to its terms," *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (quotations omitted), particularly where, as here, "parties of comparable bargaining power enter into a release with ready access to counsel," and "the intent of the parties is indicated by the language employed in the release." *Corines v. Charter One Bank*,

365 F. App'x 237, 238 (2d Cir. 2010); *see also Locafrance U. S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977) (quotations and citations omitted) ("[T]he general rule is that, if the language of the release is clear, the intent of the parties is indicated by the language employed.").

The respective Loan Agreements provide:[3]

- [redacted] (Singh Decl., Exs. 1, 2 (Astor2) at § IV(4).)[4]
- [redacted] (*Id.*, Ex. 3 (UPC1) at § 5.6.)
- [redacted]

3 On this motion, this Court may consider documents incorporated into the complaint by reference or that Plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

4 In the Astor2 Loan Agreements, [redacted] (Singh Decl., Ex. 1 at § IX(17); 2 at § IX(16).)

[redacted] (*Id.*, Ex. 4 (Vanderbilt) at § 6(g).)[5]

Plaintiff alleges that the Servicer Defendants were created to collect loan payments due from Plaintiff to Lenders. (SAC, ¶¶ 25, 27, 29, 31.) As such, the Servicer Defendants are alleged to be [redacted] who [redacted] and [redacted] Lenders in connection with the Loan Agreements. Plaintiff also acknowledged its own sophistication and ready access to counsel. (*See* Singh Decl. Exs. 1, 2 (Astor2) at §§ IV(3), IV(5), pg. 18 at (i), pg. 19; Ex. 3 (UPC1) at §§ 6.3, 14.9; Ex. 4 (Vanderbilt) at §§ 6(h), 7(ii).)

Therefore, Plaintiff's claims against the Servicer Defendants are barred. The Servicer Defendants may enforce the releases as third party beneficiaries. *See Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir. 1991) (a third party may enforce a contract "if that third party is an intended beneficiary of the contract.") (citations omitted); *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 336 (S.D.N.Y. 2005) (same). The same is true even where the third party is not specifically named in the contract. *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996). And, where, as here, general language is used in a release, "the release is to be construed most strongly against the releasor," and the "burden is on the releasor to establish that the release should be limited." *Consorcio Prodipe,* 544 F. Supp. 2d at 189-190. (citations and quotations omitted).

---

[5] In the Vanderbilt Loan Agreement, [redacted] (Singh Decl., Ex. 4 at § 16(l).)

Plaintiff cannot establish any limitation to the applicable releases, including through the fraud allegations of the SAC. Broad release language as used here encompasses fraud claims, even where the releasing party claims not to have contemporaneously known of the fraud subsequently alleged. *See id*. at 191 ("A general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud."); *VeroBlue Farms USA, Inc. v. Canaccord Genuity LLC*, 20 CIV 4394 (JPC), 2021 WL 3913555, at *7 (S.D.N.Y. Sept. 1, 2021), *aff'd*, 21-2465-cv, 2022 WL 2133780 (2d Cir. June 14, 2022) (release applicable even if executed "before any semblance of fraud has come to light.") (citations and quotations omitted).

For example, in *Consorcio*, the plaintiff complained that the defendants had fraudulently induced it into entering into an agreement containing a release by failing to disclose prior fraudulent acts. *See id*. at 188-189. The court determined, however, that the general release executed by the plaintiff applied, and that such releases can only be challenged for fraudulent inducement where there is "a separate and distinct fraud from that contemplated by the agreement." *Id*. at 190 (citations omitted); *see also Intl. Bus. Machines Corp. v. Simon*, 376 F. Supp. 3d 292, 301-02 (S.D.N.Y. 2019) (fraudulent inducement claim did not overcome general release); *Shapiro v. NGFTV, Inc.*, 16 CIV 9452 (PGG), 2018 WL 2127806 (S.D.N.Y. Feb. 9, 2018) (same); *DirectTV Group, Inc. v. Darlene Investments*, LLC, 05 civ 5819 (WHP), 2006 WL 2773024 (S.D.N.Y. Sept. 27, 2006) (same). Plaintiff has not made such a challenge, and the releases in the Loan Agreements bar Plaintiff's claims against the Servicer Defendants.

The releases at issue here cover [redacted] and [redacted] respectively. (*See* Singh Decl., Exs. 1, 2 (Astor2) at § IV(4); Ex. 3 (UPC1) at § 5.6; Ex. 4 (Vanderbilt) at § 6(g).) In turn, the

fraud Plaintiff alleges involves purported misrepresentations intended to induce Plaintiff into executing the Loan Agreements and then taking action pursuant to their terms. (*See, e.g.,* SAC ¶¶ 188, 203.) Such allegations are not "separate and distinct" from the Loan Agreement. They solely relate to the Loan Agreements and thus fall squarely within the scope of the respective releases. Consequently, the SAC should be dismissed in its entirety as against the Servicer Defendants.

## II. Plaintiff's Allegations Are Insufficient to Maintain Claims against the Servicer Defendants for Either Aiding and Abetting Fraud (Count III) or Conspiracy to Commit Fraud (Count IV)

To plead aiding and abetting fraud, Plaintiff must allege: (1) a primary violation by another; (2) actual knowledge of the violation by the aider and abettor; and (3) substantial assistance by aider and abettor. *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009). Because the primary violation Plaintiff alleges rests on purported fraud, the aiding and abetting claim must also satisfy Rule 9(b). *Renner v. Chase Manhattan Bank, N.A*., 85 Fed. App'x 782, 784 (2d Cir. 2004). Conclusory assertions of aider liability, which attribute wrongdoing generally to multiple defendants, are insufficient. *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) ("where plaintiffs have not advised the [] defendants of exactly which defendants' misdeeds they allegedly aided and abetted, the claim is too broad to be sustained.")

To plead conspiracy to commit fraud Plaintiff must plead a primary fraud and four additional elements: (1) a corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." *Pope v. Rice*, 04-cv-4171 (DLC), 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005). Plaintiff fails to establish the elements of either of its secondary liability claims against the Servicer Defendants related to alleged fraud by the Individual Defendants, and those claims should be dismissed, with prejudice.

### A. Plaintiff Has Not Sufficiently Alleged a Primary Fraud By the Individual Defendants, Requiring Dismissal of Its Secondary Fraud Claims

Plaintiff's secondary tort claims against the Servicer Defendants are conditioned on Plaintiff's first sufficiently supporting its primary fraud claim against the Individual Defendants. *See Kirschner*, 648 F. Supp. 2d at 533; *Treppel v. Biovail Corp.*, 03 CIV. 3002 (PKL), 2005 WL 2086339, at *5 (S.D.N.Y. Aug. 30, 2005) ("a claim for civil conspiracy may stand only if it is connected to a separate underlying tort."). In addition to relying on the numerous arguments raised by the Individual Defendants in their respective briefs concerning the insufficiency of Plaintiff's fraud claims, which are incorporated by reference, the Servicer Defendants highlight the three most glaring reasons why those claims, and thus Plaintiff's secondary liability claims, must fail.

First, Plaintiff consistently, and impermissibly, relies on generalities in its allegations against the Defendants, more often than not lumping them together and running afoul of the particularity requirements of Fed. R. Civ. P. 9(b). Second, Plaintiff, a sophisticated entity which borrowed almost $100 million, fails to plausibly plead that it reasonably relied on any misrepresentation by the Individual Defendants. Third, Plaintiff's fraud claims are simply re-characterized claims for breach of contract that should be asserted against the Lenders in arbitration, not against Defendants here.

#### *1. Plaintiff's Fraud Allegations Are Insufficiently Particular*

Alleging fraud against multiple defendants, Plaintiff must "plead with particularity by setting forth separately the acts complained of by each defendant." *Apex Mar. Co., Inc. v. OHM Enterprises, Inc.*, 10 CIV. 8119 SAS, 2011 WL 1226377, at *3 (S.D.N.Y. Mar. 31, 2011) (citations and quotation omitted). But Plaintiff, throughout the SAC, "lumps" all of Defendants, or even just the Individual Defendants, together, which is fatal to Plaintiff's fraud claims. *See id.; S.G. v. Bank of China Ltd.*, 23-CV-2866 (LAK), 2024 WL 1861158, at *3 (S.D.N.Y. Apr. 29, 2024), *aff'd sub.*

*Nom. S.G. v. Bank of China U.S.A.*, 24-1426, 2024 WL 4891390 (2d Cir. Nov. 26, 2024) (dismissing fraud claim "[w]here, as here, a complaint lists the defendants' names individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these defendants to ascertain what particular acts they are alleged to have committed.").

As to the Astor2 Loan, Plaintiff generally pleads it was introduced to "Defendants" through "certain business contacts," who are only alleged "upon information and belief" to have an unspecified connection to Val Sklarov, and that "Defendants" misrepresented that the funding party was associated with Astor Capital."[6] (SAC ¶ 52.) Plaintiff also insufficiently pleads that it was "falsely informed" of information regarding Astor2 without alleging how, when, or by whom, other than grouping together the Individual Defendants as a whole. (*Id.*) Regarding the UPC loan, Plaintiff similarly alleges without particularity that it was sent a document containing misrepresentations "provided by Val Sklarov and the Individual Defendants," despite also alleging that a non-party, Mr. Zhen Zhang, was the source of these communications, without specifying any particular basis for connecting Mr. Zhang to any of the Individual Defendants beyond "information and belief." (*Id.* ¶ 85-86.) Likewise, Plaintiff's allegations concerning the Vanderbilt loan only intimate that a Ms. Nicole Ling was a conduit for "Defendants" to provide misrepresentations. (*Id.* ¶ 100-101.) These allegations do not establish a valid fraud claim.

Plaintiff has not established the requisite particularity concerning its alleged inducement into the Loan Agreements. Despite alleging it was misled by non-party individuals into believing the Lenders were legitimate (*supra*), Plaintiff fatally provides no support for its unstated assumptions, upon information and belief only, that those individuals were agents of Defendants.

---

[6] The Servicer Defendants are included in the term "Defendants," despite the contradictory allegation that the Servicer Defendants did not even exist at the time the Loan Agreements were executed. *See infra*, pgs. 18-20.

*See Kolbeck v. LIT America, Inc.*, 923 F.Supp. 557, 568–69 (S.D.N.Y.1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998). (agency relationship involved in perpetrating alleged fraud must also be pleaded with particularity). Moreover, Plaintiff makes no effort to distinguish among the Defendants, generally attributing almost every purported misrepresentation prior to execution of the Loan Agreements to either "Defendants" or the "Individual Defendants" collectively. Its fraud claims fail. *See Simon v. Castello*, 172 F.R.D. 103, 106 (S.D.N.Y.1997) (complaint replete with "sweeping references to defendants," but devoid of any specific references to any one defendant, failed to satisfy Rule 9(b)).

Plaintiff's post-inducement allegations of fraud are also infirm. First, Plaintiff consistently alleges that "Defendants"—"through" others—made misrepresentations or failed to disclose information to it without describing how or when those alleged misrepresentations were conveyed, or how these alleged statements were connected to any particular Defendant. (*See, e.g.,* SAC ¶¶ 57, 66, 68, 81, 86, 92, 95, 98, 100, 108, 110, 117, 130-133, 148.) Second, Plaintiff's allegations that the Lenders prematurely transferred the Collateral Shares also fails to support a fraud claim. This allegation does not identify any representation by any Defendant, much less identify it with specificity. A transfer or sale is not a representation, and Plaintiff fails to show that any Lender had a duty to it to disclose how it was handling the Collateral Shares. *See Clark v. Hemphill Artworks, LLC*, 22 CIV. 7537 (PGG), 2024 WL 1157170, at *13 (S.D.N.Y. Mar. 16, 2024) (in addition to elements of fraud, a fraud based on an omission requires pleading a defendant's duty to disclose material information and failure to do so) (citations omitted).

Indeed, Plaintiff's allegations concerning the Lenders' handling of the Collateral Shares are critically inconsistent. Plaintiff specifically alleges that documents obtained via the High Court of Hong Kong revealed "that Defendants began *transferring or trading* the Collateral Shares"

prematurely. (SAC, ¶ 129.) Nonetheless, in the remainder of the SAC—without any explanation, much less particularity—Plaintiff baldly asserts that Defendants "sold" the Collateral Shares. (*See, e.g., id.* ¶ 130). Plaintiff's blatant attempt to blur the distinctions between "transferring or trading" and "sold" cannot underlie its fraud claim, particularly where the Loan Agreements each explicitly permit the Lenders to exercise dominion over, pledge, and/or transfer the Collateral Shares during the term of the loans. (*See* Singh Decl., Exs. 1, 2 (Astor2) at pg. 19 [redacted]); Ex. 3 (UPC1) at § 14.28 [redacted]; Ex. 4 (Vanderbilt) at § 17 [redacted].) Omitting any particularized detail from the court documents allegedly revealing what has happened to the Collateral Shares, while instead alleging those documents showed only that "Defendants" "transferred or traded" them—not "sold" (SAC, ¶ 129)—Plaintiff fails to plead with particularity whether Lenders' dealings in the Collateral Shares were "unlawful," as alleged, or, in fact, permissible under the applicable Loan Agreements.

Likewise, Plaintiff complains of false "Margin Call Notices" in connection with the Astor2 loans but leaves unclear how such notices were fraudulent. (SAC ¶ 67-68.) The Astor2 Loan Agreements provide that if the value of the Collateral Shares falls below 60% of the fair market price used to determine the amount of the loan for three consecutive business days, then Plaintiff would have to provide additional shares or cash to cure the deficiency or face an event of default. (Singh Decl., Exs. 1, 2 at § VI(3)(b).) Since Plaintiff's only specific allegation indicates that Astor2 dealt in the Collateral Shares as permitted under its Loan Agreement, Plaintiff fails to

establish why a margin call was not permitted, much less how it was defrauded by the contents of the margin call, particularly where Plaintiff would have known the share price.

### *2. Plaintiff Fails to Establish Its Reasonable Reliance on any Misrepresentation*

Where, as here, the party asserting reliance is "sophisticated," and the allegedly misleading "statement or omission relates to a business transaction that has been formalized in a contract," courts are "generally reluctant to find reliance on oral communications to be reasonable." *Wurtsbaugh v. Bank of America Sec. LLC*, 05 Civ. 6220 (DLC), 2006 WL 1683416, at *6 (S.D.N.Y. June 20, 2006) (citations omitted). In assessing reasonableness of a party's reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt. LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir.2003). "In the appropriate circumstances, a claim of fraud may be dismissed on the pleadings because as a matter of law a plaintiff will not be able to establish that reliance on the alleged representation was reasonable." *Wurtsbaugh*, 2006 WL 1683416, at *6 (citing *Emergent Capital*, 343 F.3d at 196; *Harsco Corp. v. Segui*, 91 F.3d 337, 342-43 (2d Cir.1996)). A plaintiff must also demonstrate its reliance on an alleged misrepresentation with particularity. *Zappin v. Comfort*, 18-CV-1693 (ALC) (OTW), 2022 WL 6241248, at *14 (S.D.N.Y. Aug. 29, 2022), *report and recommendation adopted*, 18-CV-1693 (ALC) (OTW), 2022 WL 4592551 (S.D.N.Y. Sept. 30, 2022), *aff'd*, 23-7363, 2024 WL 5001624 (2d Cir. Dec. 6, 2024).

Here, Plaintiff acknowledged itself as a sophisticated entity that understood the risks of securities lending in each of the Loan Agreements. (*See* Singh Decl., Exs. 1, 2 (Astor2) at §§ IV(3), IV(5), pg. 18 at (i), pg. 19; Ex. 3 (UPC1) at §§ 6.3, 14.9; Ex. 4 (Vanderbilt) at §§ 6(h), 7(ii.) Moreover, the loans at issue were consummated over the course of more than a year where Plaintiff

borrowed $97 million through four different loan transactions. (SAC, ¶¶ 56, 88, 104.) Yet, according to the SAC, upon executing the Loan Agreements, under which it could potentially forfeit shares alleged to be worth over $100 million, and without any other investigation or due diligence, Plaintiff relied solely on alleged oral statements by unrelated and previously unknown individuals to form a belief that the Lenders were "associated with the famous and wealthy Astor and Vanderbilt families." (SAC, ¶ 33.) Such reliance could not be reasonable based on the pleaded facts, and Plaintiff makes no attempt to provide any plausible explanation otherwise.

Plaintiff's own allegations further show that it could easily have discovered the incorrectness of the alleged statements it now purports to have somehow relied on. Plaintiff alleges that "Nicole Ling" misrepresented that Lender Vanderbilt had a home office in Regina, Canada, but Plaintiff also alleges that Vanderbilt does not have an address there and "is not registered in the United Kingdom, Canada or the United States." (*Id.* ¶ 100.) Plaintiff likewise claims (albeit without necessary specificity) that Astor2 misrepresented that it was registered in British Columbia, Canada, but further alleges that the British Columbia Securities Commission issued a public alert about the company and its status prior to Plaintiff's execution of the second Astor2 Loan Agreement. (SAC, ¶ 55, fn. 3.) Despite its allegations that the Lenders were not registered and not affiliated with wealthy families, Plaintiff does nothing to explain why it could not determine such facts before entering into the Loan Agreements. Given Plaintiff's sophistication and the amount of money it sought to borrow, Plaintiff cannot allege reasonable reliance without some particularized explanation as to why it failed to look into even the most fundamental aspects of Lenders before executing the Loan Agreements. *See Wurtsbaugh*, 2006 WL 1683416, at *6 ("[A] party will not be heard to complain that he has been defrauded when it is his own evident

lack of due care which is responsible for his predicament.") (quoting *Emergent Capital*, 343 F.3d at 195). Plaintiff's fraud claim should be dismissed.

Finally, Plaintiff also explicitly acknowledged in each of the Loan Agreements that it was not relying on any representations outside of those contracts further precluding its ability to show the requisite reliance. (*See* Singh Decl., Exs. 1, 2 (Astor2) at § IV(3); Ex. 3 (UPC1) at § 5.3; Ex. 4 (Vanderbilt) at § 6(c).) And, in the Astor2 and Vanderbilt Loan Agreements, Plaintiff specifically acknowledged that it [redacted] like the materials Plaintiff allegedly received from the unspecified non-party individuals that allegedly misrepresented that the Lenders were associated with famous wealthy families. (*Id.*; SAC ¶¶ 52, 86, 100-102.) These contract provisions also preclude Plaintiff's claimed reliance. When a "contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993); *see also Harsco Corp.*, 91 F.3d at 343 (affirming court's dismissal of fraud claims were agreement containing non-reliance acknowledgement was "a detailed writing developed via negotiations among sophisticated business entities and their advisors.").

### *3. Plaintiff's Fraud Claims Are Poorly Disguised Contract Claims*

"[A] fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal citations omitted)); *Exch. Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 157 (S.D.N.Y. 2023) (J. Failla) (dismissing fraud allegation that the defendant promised to deliver shares without intending to keep that promise as "a quintessential example of a misrepresentation of an intent to perform under a contract . . . [for which the] only plausible claim lies in contract, not tort."); *W.B. David & Co. Inc. v. DWA Commc'ns, Inc.*, 02-cv-8479 (BSJ), 2004 WL 369147, at *3 (S.D.N.Y.

Feb. 26, 2004) (the law "does not recognize claims that are essentially contract claims masquerading as claims of fraud") (quotations omitted). Here, Plaintiff's fraud claims are premised on allegations that it delivered the Collateral Shares and other stock and cash collateral in reliance on alleged misrepresentations by the Individual Defendants—"made through" or "in concert with" the Lenders—that the Lenders would return the Collateral Shares upon Plaintiff's performance under the Loan Agreements. (*See* SAC, ¶ 35, 183-186, 197-205.) Plaintiff also accuses the Individual Defendants of misrepresenting "false Events of Default" under the Loan Agreements—also "through the Lenders." (*Id.*, ¶ 200.) None of these allegations is distinct from a contract claim.

Where fraud claims arise out of a contract, the plaintiff must "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). This rule applies even where, as here, the plaintiff does not assert a claim for breach of contract,[7] *Minnie–Rose LLC v. Yu*, 169 F. Supp. 3d 504, 20 (S.D.N.Y. 2016), and/or does not sue the parties to the contract at issue. *Exch. Listing, LLC*, 661 F. Supp. 3d at 156.

Plaintiff does not allege any of the circumstances allowing a fraud claim based on the Loan Agreements. Rather than identify any extraneous or collateral misrepresentation, Plaintiff's allegations are all predicated on the idea that the Lenders were somehow not legitimate and thus never intended to fulfill their contractual obligations to return the Collateral Shares upon

[7] Plaintiff has, however, asserted claims in the ongoing arbitration between Plaintiff and Lender UPC1 seeking the same relief with respect to that loan that it requests here. (SAC, ¶ 123.)

repayment under the Loan Agreements and not falsely claim Events of Default. (*See* SAC ¶¶ 182-186, 198-200.) These alleged misrepresentations are at the heart of a loan agreement, not "collateral or extraneous" to it. The Loan Agreements govern when the Collateral Shares will be returned, as well as the bases upon which the respective Lenders may assert Events of Default and sell or transfer the Collateral Shares. (*See* Singh Decl., Exs. 1, 2 (Astor2) at §§ VI(2)-(4); Ex. 3 (UPC1) at §§ 5.4, 9.1-9.6; Ex. 4 (Vanderbilt) at § 11.) Underscoring the extent to which its fraud claim duplicates breach of contract claims, Plaintiff repeatedly characterizes Lenders' alleged transfer of the Collateral Shares as "unlawful." (*See, e.g.*, SAC ¶¶ 39, 185, 202.) That characterization, however, could only be predicated on the assumption (albeit wholly unsupported) that the Lenders' alleged transfer or sale of the collateral violated the Loan Agreements.[8]

Not only do Plaintiff's allegations make clear that its claim sounds in breach of contract not fraud, but Plaintiff fails to even establish Lenders' breach under the Loan Agreements. Nothing in the SAC, and certainly no particularized allegation, establishes that Plaintiff was actually entitled to get its Collateral Shares back under the agreed upon contractual terms. To the contrary, Plaintiff's allegations establish that it breached the Loan Agreements, meaning the Lenders were entitled to retain the Collateral Shares, precluding Plaintiff's fraud claim. Plaintiff directly alleges that it purposely defaulted on its UPC1 and Vanderbilt Loan obligations (despite specifically alleging it had been making "regular and timely" payments under the UPC1 Loan, which it does not allege concerning Astor2 or Vanderbilt). (*See id.* ¶¶ 45, 80, 94, 116.) And, although Plaintiff vaguely alleges it "fully repaid" the Astor2 Loan "as of February 2023" and

[8] Moreover, any alleged misrepresentation concerning a return of the Collateral Shares cannot establish fraud in any event since Plaintiff's recovery of the Collateral Shares could only take place in the future upon its compliance with the Loan Agreements. Statements concerning future expectations, not present facts, cannot support a fraud claim. *Deutsche Bank Nat'l Trust Co. v. Sinclair*, 68 A.D.3d 914, 916 (2d Dep't 2009) ("[A] fraud claim must be based upon a misrepresentation of an existing fact rather than upon an expression of future expectations.").

made certain interest and fee payments, it does not aver that its payments were timely or that Plaintiff met any of the other obligations under the Astor2 Loan Agreements. (*See id.*, ¶ 80.[9]) There are numerous provisions of the Loan Agreements that would permit a Lender to retain the Collateral Shares upon a default by Plaintiff, and each of those Agreements makes clear that any uncured defaults, not just in the repayment of principal, may be remedied by the respective Lender by retaining the Collateral Shares. (*See, e.g.* Singh Decl., Exs. 1, 2 (Astor2) at § VI(4); Ex. 3 (UPC1) at §§ 6.2, 9.3; Ex. 4 (Vanderbilt) at §§ 7(i), 11(b).) Likewise, as noted above, the Astor2 Loan Agreement specifically dictates when Astor2 may send a margin call notice, and thus any challenge to those notices also sound in breach of contract. (*See supra*, pg. 11.) The issues raised by Plaintiff should be adjudicated against the Lenders based on the terms of the Loan Agreements, not in this action.

For all of the foregoing reasons, Plaintiff's fraud allegations are insufficient under applicable standards, and thus its secondary liability claims against the Servicer Defendants should be dismissed, with prejudice.

### B. Even if the SAC States Claims for Fraud against the Individual Defendants, Plaintiff's Allegations Against the Servicer Defendants Cannot Support Claims for Aiding and Abetting or Conspiracy to Commit Fraud

Even assuming Plaintiff has stated fraud claims, which it has not, Plaintiff has not met the pleading standard for either aiding and abetting fraud or conspiracy to commit fraud against the

---

9 In fact, Plaintiff's generalized contention that it paid off the Astor2 Loans, collectively, "as of February 2023" fails to establish it was not in breach of the Astor2 Loan Agreements since, at the very least, the first Astor2 Loan Agreement, executed in January 2020, [redacted]. (Singh Decl., Ex. 1 at § II(6)(a).) Such vague allegations, which fail to detail Plaintiff's timely compliance with each of the Loan Agreements' terms, cannot support a fraud claim under Rule 9(b).

Servicer Defendants.[10] Specifically, Plaintiff fails to allege that the Servicer Defendants: (1) knew of or agreed to participate in the Individual Defendants' fraud, or (2) provided substantial assistance to, or indeed participated at all in, the primary fraud alleged.

#### ***1. Plaintiff Fails to Allege that the Servicer Defendants Were Aware of or Agreed To the Alleged Fraud***

A valid aiding and abetting claim requires "actual knowledge" of the primary violation by the aider and abettor, *Kirschner*, 648 F. Supp. 2d at 533, and a conspiracy requires that a conspirator affirmatively enter into a "corrupt agreement." *Pope*, 2005 WL 613085 at *13. Here, Plaintiff fails to plead any such actual knowledge or entry into an agreement by the Servicer Defendants, requiring dismissal. Instead, Plaintiff merely proclaims that the Servicer Defendants "had actual knowledge of the Individual Defendants' fraud as alleged herein" (SAC, ¶ 209), and that "Defendants" "agreed and conspired to defraud Plaintiff" (*id*. ¶ 221). In addition to being insufficiently particular, these wholly conclusory allegations are contradicted by the remainder of Plaintiff's pleading.

Primarily, Plaintiff pleads that it was induced into the Loan Agreements based on alleged misrepresentations made before their execution, yet it also concedes that the Servicer Defendants were incorporated *after* Plaintiff executed the Loan Agreements with the Lenders. (*See id*. ¶¶ 51-52, 85-87, 100-102, 210.) Servicer Defendants thus could not have entered into any corrupt

[10] Moreover, to the extent Plaintiff's aiding and abetting claim is not dismissed, Plaintiff's civil conspiracy claim should be dismissed as duplicative of the aiding and abetting claim. *See, e.g.*, *In re Platinum-Beechwood Litig.*, 18-CV-10936 (JSR), 2020 WL 30335, at *5 (S.D.N.Y. Jan. 2, 2020) (dismissing conspiracy claim as duplicative of aiding and abetting claim).

agreement or provided any assistance, much less substantial assistance, in connection with the alleged inducement of Plaintiff into the Loan Agreements.[11] (*Id.* ¶ 210.)

Plaintiff similarly fails to allege or explain in any way how the Servicer Defendants had knowledge of or agreed to participate in any allegedly fraudulent conduct after the Loan Agreements were signed. As Plaintiff pleads, the Servicer Defendants were also each incorporated *after* nearly all of Lenders' alleged transfers of Collateral Shares occurred. Specifically, UPCH and Lviv, which each serviced the UPC1 loan, were created in March 2021 (*id.* ¶¶ 26-28), months after UPC1 allegedly transferred its Collateral Shares no later than January 21, 2021 (*id.*, ¶ 132). Likewise, CVM was created in November 2021 and serviced the Vanderbilt loan (*id.* ¶ 30), but Plaintiff contends that Vanderbilt transferred its Collateral Shares no later than August 4, 2021, months before CVM existed (*id.* ¶ 133). Again, neither UPCH, Lviv, nor CVM can plausibly be alleged to have actual knowledge of or agree to further a fraud committed at a time when they did not even exist.

Only SUC is alleged to have existed during the course of any alleged fraudulent conduct, but Plaintiff still does not adequately plead SUC's knowledge of the purported fraud or any agreement to engage in a conspiracy to defraud Plaintiff, nor does it allege any communications between Plaintiff and SUC. First, SUC was created in October 2020, and Plaintiff alleges that the Lender that SUC serviced, Astor2, first transferred Collateral Shares in May 2020, thus demonstrating SUC's lack of knowledge or agreement as to those transactions, as well as any premeditated plan by SUC to defraud Plaintiffs. (*Id.* ¶¶ 24, 40.) Second, although SUC existed at

---

[11] Specifically, Plaintiff pleads that: (1) SUC was established in October 2020, one month after Plaintiff executed the second Astor2 Stock Loan Agreement; (2) UPCH and Lviv were established in March 2021, five months after Plaintiff executed the UPC1 Agreement; and (3) CVM was established in November 2021, seven months after Plaintiff signed the CVCM Agreement. (SAC, ¶ 210.)

the time Astor2 allegedly transferred some (unspecified number) of the Collateral Shares securing those loans, the SAC is entirely devoid of any allegation that SUC agreed to a scheme involving those alleged transfers or had any knowledge, much less actual knowledge, of those transfers or that they were allegedly fraudulent.[12] Neither does Plaintiff allege SUC's agreement to conspire to transact in the Collateral Shares pledged in connection with the Astor2 Loan. *See Treppel*, 2005 WL 2086339, at *6 (dismissing civil conspiracy claim when plaintiff failed to show that defendant agreed to participate in a conspiracy or committed an overt act in furtherance of the conspiracy).

#### ***2. Plaintiff Does Not Allege that the Servicer Defendants Substantially Assisted in the Alleged Fraud or Even Participated at all in the Alleged Scheme***

"A defendant provides substantial assistance only if it affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Ryan v. Hunton & Williams*, 99-CV-5938 (JG), 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (internal quotations and citations omitted). The test for whether alleged assistance by a defendant is "substantial" is one of proximate cause. *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir 2018) (quotations and citations omitted). That is, the alleged injury must "be a direct or reasonably foreseeable result of the conduct." *Id.*

The SAC lacks specific allegations concerning what the Servicer Defendants allegedly did in furtherance of the alleged fraud. In fact, the Servicer Defendants are only alleged to have assisted the alleged fraud by opening and "beneficially holding" bank accounts in the names of the respective Servicer Defendants to receive payments from Plaintiff under the Loan Agreements,

---

12 Plaintiff also ignores that each of the Loan Agreements permits the respective Lenders to control and leverage the Collateral Shares during the term of the loans, as discussed in more detail above. (*Supra*, pg. 11.) Thus, even if the Servicer Defendants knew of those transactions, which is not alleged, such knowledge would not necessarily include actual knowledge of fraud.

despite that those accounts are allegedly owned and/or controlled by the Individual Defendants. (SAC, ¶¶ 211, 216.) Plaintiff fails, however, to tie the act of setting up bank accounts and accepting regular loan payments under the Loan Agreements to any of the alleged fraud, much less with particularity. As noted, none of the Servicer Defendants were even in existence at the time Plaintiff entered into the Loan Agreements, and only SUC existed at the time the Lender it serviced is alleged to have transferred or sold any Collateral Shares. (*Supra*, pgs. 18-20.) Moreover, even if this dispositive timing were ignored, there is no particularized allegation that the Servicer Defendants had anything to do with the Collateral Shares at all.

Plaintiff's conclusory statement that the "proximate result" of Servicer Defendants' conduct was the damages it suffered is insufficient to salvage its claim. (*See* SAC ¶ 217.) Beyond generally pleading that the Servicer Defendants set up accounts to receive loan payments from Plaintiff, Plaintiff does not specify when it was told to make payments into those accounts or by whom. Instead, Plaintiff broadly claims that all "Defendants through [each Lender] directed Plaintiff to send payments" to various accounts, including some—but not all—opened by the Servicer Defendants. (*See* SAC, ¶¶ 81, 95, 117, 148, 150.) Although Plaintiff alleges that it made certain principal and interest payments against the loans, it does not specify which party directed it to make payments, to which accounts its payments were made, or when they were made. (*See id*. ¶¶ 80, 94, 116.) Thus, by failing to specifically allege that Plaintiff paid any funds to the Servicer Defendants, while also alleging it made loan payments to one or more accounts unaffiliated with the Servicer Defendants (*id*. ¶ 81, 95, 117, 150), Plaintiff does not adequately allege any agreement, assistance or participation by the Servicer Defendants in any fraud.

Even after the Servicer Defendants opened the accounts at issue, and assuming (though not pleaded) that money was sent from Plaintiff to those accounts, Plaintiff fails to establish how that

conduct was illicit. The alleged misrepresentations made after execution of the Loan Agreements include that the Collateral Shares would be returned, that certain Events of Default had occurred under the Loan Agreements, and that additional shares were needed as a result in the decline in the Collateral Shares' value. (*See id*. ¶¶ 198, 200, 203). Each of these representations is claimed to be fraudulent because the Lenders had allegedly transferred or sold the Collateral Shares around the time they were pledged (*see id*. ¶¶ 202, 204), but Plaintiff suggests no connection between that conduct and the Servicer Defendants, much less with particularity. Plaintiff offers no theory as to how the Servicer Defendants' opening of accounts and/or their (presumed) receipt of funds from Plaintiff was even related to, much less was the proximate cause of, Lenders' alleged transfer of the Collateral Shares, which were held a non-party custodian broker, not the Servicer Defendants. (SAC ¶ 57, 93, 108.). Because Plaintiff does not plead how the Servicer Defendants were involved with Plaintiff or in any transaction of the Collateral Shares, Plaintiff thus fails to establish the Servicer Defendants' participation in or substantial assistance with any fraudulent scheme.[13]

Likewise, Plaintiff's further suggestion that the Servicer Defendants' mere existence assisted in the fraud by allegedly concealing the Individual Defendants' identities is also insufficient to support a secondary liability claim. Plaintiff provides no factual allegation, and certainly none with particularity, suggesting that any Servicer Defendant statement or conduct had any impact on Plaintiff's decision to make regular loan payments required in the Loan Agreements. In fact, Plaintiff alleges no communication between it and the Servicer Defendants at all. *See SPV Osus Ltd.,* 882 F3d at 346 (dismissing aiding and abetting claim that certain defendants gave "air of legitimacy" to alleged fraud where plaintiff failed to demonstrate its reliance on any of

[13] Also, as explained above, Plaintiff does not even allege full compliance with the Loan Agreements, thereby conceding that the Lenders may have had the right to retain the Collateral Shares, regardless of the Servicer Defendants conduct. (*Supra*, pgs. 8-11.)

defendants' statements or awareness of them). That Plaintiff made loan payments to bank accounts in the name of the Servicer Defendants, as would be the case with any loan servicer, does not rise to the level of "substantial assistance," an agreement, or an overt act in furtherance of alleged fraud. *Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 516 (S.D.N.Y. 2012) ("[T]he mere fact that participants in the [primary tort] used the defendant's regular business operation does not rise to the level of substantial assistance.") (citations omitted); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 416 (S.D.N.Y. 2021) (no substantial assistance where the only service defendant provided was to receive and transfer funds); *see also In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 545 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) (failure of clearing broker to disclose illicit acts of primary broker does not establish secondary liability without a separate duty to disclose).

## III. Plaintiff's Claim for Conspiracy to Commit Conversion (Claim 6) Is Also Subject to Dismissal as a Matter of Law

Plaintiff's conversion conspiracy claim also fails.[14] First, Plaintiff has not sufficiently alleged a primary conversion claim, precluding a related conspiracy claim. *See, e.g.*, *Ho Myung Moolsan Co., Ltd. v. Manitou Min. Water, Inc.*, 665 F. Supp. 2d 239, 257 (S.D.N.Y. 2009) ("Since the [pleading] does not state a claim for conversion, it is futile to the extent it attempts to state a claim for conspiracy to commit conversion."). Second, Plaintiff fails to adequately allege that the Servicer Defendants agreed to carry out a conspiracy to commit conversion.

---

[14] The elements of conspiracy to commit conversion are substantially the same as those for conspiracy to commit fraud. A conspiracy to commit conversion claim requires a plaintiff to allege the primary tort and four additional elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1267 (S.D.N.Y.1991) (*citing Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir.1986)).

**A. Plaintiff Fails to Plead a Valid Primary Conversion Claim**

Like its fraud claim, Plaintiff's primary conversion claim should be dismissed because it (1) is plainly a breach of contract claim under the Loan Agreements, and (2) fails to adequately allege the elements of a conversion claim. "A conversion claim may only succeed if the party alleges a wrong that is distinct from any contractual obligations." *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006); *see also Ho Myung Moolsan Co., Ltd*, 665 F. Supp. 2d at 257 (dismissing claims for conversion and civil conspiracy to commit conversion as duplicative of a breach of contract claim) (*citing D'Ambrosio v. Engel*, 292 A.D.2d 564, 565 (2d Dep't 2002) ("failure to return a deposit provided for under an agreement does not give rise to a distinct claim for conversion under New York law but rather constitutes a claim for breach of contract.")). Plaintiff fails to meet this requirement. If the Lenders had an obligation not to sell or transfer the Collateral Shares, or to release the Collateral Shares under the Loan Agreements (which Plaintiff does not plead but assumes), then the failure to do so would be a breach of contract. Plaintiff's conversion claim cannot stand.

Plaintiff also fails to plead the elements of conversion. To plead conversion, a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the [property], to the alteration of its condition or to the exclusion of the plaintiff's rights." *Moses v. Martin*, 360 F. Supp. 2d 533, 540 (S.D.N.Y. 2004) (citation and internal quotation marks omitted). Given that Plaintiff's conversion claim is "based on the same set of facts upon which plaintiff's fraud claim is grounded"—*i.e.*, that the Lenders transferred the Collateral Shares and did not return them to Plaintiff—Rule 9(b) applies. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 108 (S.D.N.Y. 2009); *see also Rombach v. Chang*, 355 F.3d 164, 170-72 (2d Cir. 2004) (Rule 9(b) applies to claims not styled as fraud but that rely upon "averments

of fraud"). Plaintiff's allegations fall short of providing the necessary particularized allegations to establish conversion, and its conversion claim should also be dismissed. *See Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (dismissing conversion claim sounding in fraud).

Plaintiff baldly alleges that the Lenders exercised unauthorized dominion and control over the Collateral Shares, including conclusory allegations that the Individual Defendants control the Lenders, but, those allegations alone are insufficient. As set forth in detail above, Plaintiff does not plead with particularity that it fulfilled all of its obligations under the Loan Agreements such that the Lenders' retention of the Collateral Shares was "unauthorized." (*See* SAC, ¶ 237; *supra*, pgs. 8-11.) The Loan Agreements plainly provide any uncured defaults may be remedied by the respective Lender by retaining the Collateral Shares. (*See, e.g.* Singh Decl., Exs. 1, 2 (Astor2) at § VI(4); Ex. 3 (UPC1) at §§ 6.2, 9.3; Ex. 4 (Vanderbilt) at §§ 7(i), 11(b).) Thus, where Plaintiff has not alleged its full compliance with its obligations in satisfaction of Rule 9(b), and indeed concedes to defaulting under the UPC1 and Vanderbilt Loans, it cannot plead a valid conversion claim. In turn, Plaintiff's conspiracy to commit conversion claim against the Servicer Defendants must also fail.

### B. Plaintiff Fails To Allege the Servicer Defendants' Participation in a Conspiracy to Convert

Apart from its failure to plead conversion, Plaintiff's conversion conspiracy claims against the Servicer Defendants also fail. The foundation of Plaintiff's conversion claim is the assertion that the Lenders improperly transferred the Collateral Shares and did not return them to Plaintiff. (SAC, ¶ 237.) Astor2 and UPC1 are alleged to have completely transferred or sold the Collateral Shares deposited with them between May 2020 and January 2021 (*id.*, ¶¶ 130, 131), and Vanderbilt is alleged to have transferred or sold substantially all of the Collateral Shares it held by August 2021 (id., ¶ 133). The Servicer Defendants could not have agreed to convert Plaintiff's collateral,

or intentionally participated in any such conversion, before they existed. (*Supra*, pgs. 18-20.) Even as to SUC, the only Servicer Defendant even in existence at the time the Lenders allegedly transacted in Collateral Shares, Plaintiff does not tie any SUC conduct to the Lenders' retention of the Collateral Shares.

Even if Plaintiff were not required to plead its claim with particularity, which it must, and assuming it actually alleged it had made some payment to SUC, which it does not, Plaintiff fails to establish how such payments represented an agreement to convert the Collateral Shares. Plaintiff pleads no contact with any Servicer Defendant. It does not allege any particular payments made into any Servicer Defendant account prior to the alleged conversion of the Collateral Shares. Nor does Plaintiff allege any dealings or direction by any Servicer Defendant, including SUC, concerning the Collateral Shares, which were deposited with a non-party custodian broker. (SAC ¶ 57, 93, 108.) The Servicer Defendants are alleged to have received Loan payments, but not to have held shares of stock. As a result, Plaintiff has not plausibly alleged any Servicer Defendant agreement to participate in conversion, and Plaintiff's conspiracy to commit conversion claim should be dismissed against the Servicer Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety, with prejudice, as against Defendants Sierra Universal Corp, UPC Holdings Ltd, Lviv Estate Holdings Ltd, and C Vanderbilt Management Ltd.

Dated: New York, New York
January 6, 2025

BRYAN CAVE LEIGHTON PAISNER LLP

By: */s/ Eric Rieder*
Eric Rieder
Chris LaRocco
Matias Gallego-Manzano
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000
eric.rieder@bclplaw.com
chris.larocco@bclplaw.com
matias.gallegomanzano@bclplaw.com

*Attorneys for Defendants Sierra Universal Corp, UPC Holdings Ltd, Lviv Estate Holdings Ltd, and C Vanderbilt Management Ltd*

**CERTIFICATE OF COMPLIANCE**

1. This memorandum of law complies with the type-volume limitation, as provided in Local Civil Rules of the United State District Courts for the Southern and Eastern Districts of New York, Rule 7.1(c), and Honorable Judge Katherine P. Failla's Individual Rules of Practice in Civil Cases, Rule 4(B), because, exclusive of the exempted portions, it contains 8,664 words.
2. As permitted by Local Civil Rule 7.1(c) and Hon. Judge Failla's Individual Rule 4(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: January 6, 2025

*/s/ Eric Rieder*
Eric Rieder

*Attorney for Defendants Sierra Universal Corp, UPC Holdings Ltd, Lviv Estate Holdings Ltd, and C Vanderbilt Management Ltd.*

**CERTIFICATE OF SERVICE**

I, Eric Rieder, hereby certify that on January 6, 2025, I caused a copy of the foregoing document to be served on counsel of record who are deemed to have consented to electronic service via ECF.

Dated: New York, New York
January 6, 2025

By: *_/s/ Eric Rieder_*
Eric Rieder